Kenneth E. Barker (WY Bar No. 6-3040)
BARKER LAW FIRM, LLC
10956 SD Highway 34
PO Box 100
Belle Fourche, SD 57717
Telephone: (605) 723-8000
kbarker@barkerlawfirm.com

Ian K. Sandefer (WY Bar No. 6-4334)
SANDEFER & WOOLSEY, TRIAL LAWYERS, LLC
143 N. Park Street
Casper, WY 82601
Telephone: (307) 232-1977
ian@swtriallawyers.com

Robert G. Pahlke (NSBA No. 13201)
THE ROBERT PAHLKE LAW GROUP
Admitted Pro Hac Vice
2425 Circle Drive, Suite 200
Scottsbluff, NE 69361
Telephone: (308) 633–4444
rgp@pahlkelawgroup.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| **WILLIAM JEROME RUTH,** individually, and as Wrongful Death Representative of the **ESTATE OF CYNTHIA SHOOK RUTH,**<br><br>Plaintiff,<br><br>v.<br><br>**BEARTOOTH ELECTRIC COOPERATIVE, INC.,** a Montana Corporation, and **ASPLUNDH TREE EXPERT, LLC,** a Pennsylvania Limited Liability Company,<br><br>Defendants. | **Case No. 22-CV-00230-KHR**<br><br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON "ACT OF GOD" AFFIRMATIVE DEFENSE AND PARTIAL SUMMARY JUDGMENT (LIABILITY)** |

 **COMES NOW** the Plaintiff, William Jerome "Jerry" Ruth, on behalf of the Estate of

Cynthia "Cindy" Shook Ruth, by and through his undersigned attorneys, and moves this Court for

an Order granting judgment as a matter of law on the so-called "Act of God" Affirmative Defense

and partial summary judgment concerning Defendant Beartooth Electric Cooperative, Inc.'s (hereinafter "Beartooth") liability.  In support of this request, Plaintiff provides the Court with the following brief:

I.    <u>**Introduction**</u>

There is no genuine issue of material fact concerning Beartooth's liability in this case and there is no fault to compare.  On November 16, 2021, a fire ignited when Beartooth's distribution line made contact with a cottonwood tree branch in very windy conditions in Clark, Park County, Wyoming.  The tree's branches and limbs were too close to Beartooth's line, which enabled conductor-branch contact and ignited a wildfire.  The wind pushed the flames down Line Creek toward Jerome "Jerry" and Cynthia Shook "Cindy" Ruth's home.  Cindy attempted to flee her home in her car as the fire headed in her direction.  On the road leading out of her property, she exited her vehicle and attempted to flee the approaching fire on foot.  She was overcome by flames and/or smoke inhalation.

Beartooth has admitted that the "subject tree," located directly adjacent to its power line, should have been trimmed approximately three (3) months before the fire, but was not.  Further, Beartooth has admitted that the subject tree making contact with its power line was the cause of the "Clark Fire."  Beartooth entered into a contractual relationship with Asplundh Tree Expert, LLC (hereinafter "Asplundh") to perform tree trimming services along its power line running through Clark, Wyoming.  Beartooth generally blames Asplundh for failing to properly trim the tree limbs of the cottonwood tree that were too close to the active distribution line and asserts that it relied upon Asplundh to do its job properly.  However, clearly established Wyoming law forecloses this defense.  Electricity providers have a nondelegable duty to safely maintain their modes of distributing power.  Because electricity is an ultrahazardous instrumentality under

Wyoming law, Beartooth cannot escape liability by hiring an independent contractor to perform its required vegetation management and then point the finger at the independent contractor when it negligently fails to perform the required maintenance at the expense of lives and property.

Further, Beartooth has alleged, as an Affirmative Defense, that the wind that contributed to the start and spread of the fire was an "Act of God," and, as such, it should be absolved of responsibility for Cindy's death. The Wyoming Supreme Court abolished the "Act of God" defense because it is superfluous in any Wyoming case sounding in negligence. Even if that were not the case, the doctrine would have no application here. Accordingly, the so-called "Act of God" defense should be stricken from this case as a matter of law.

## II.   **Material Facts for which No Genuine Issue Exists**

1.      Beartooth is a Montana electric cooperative, with its principal office in Red Lodge, Montana. It is authorized to do business in Park County, Wyoming and elsewhere. It provides electric services to its members. *See* ECF Doc. No. 1 (*Complaint and Jury Demand*) at ¶ 4 and ECF Doc. No. 7 (*Answer to Complaint by Defendant Beartooth Electric Cooperative, Inc.*) at ¶ 4.

2.      Beartooth owns and maintains easements and rights-of-way for its electric power transmission and distribution lines located in northwestern Wyoming and elsewhere, including its powerlines in and near Clark, Park County, Wyoming. *See id.* at ¶ 8, respectively.

3.      Beartooth entered into a contractual agreement[1] with Asplundh to conduct vegetation management services on its power transmission and distribution lines in and near Clark, including Beartooth's power line at 197 Louis Lamour Lane, Clark. *See id.* at ¶ 9, respectively.

---

[1] The contract between Beartooth and Asplundh is dated May 26, 2021, but it was effective for the 2021calendar year.

4.      Per the agreement, Asplundh, as Contractor, was specifically required to trim the

tree according to the standards expressed in Exhibit "B" of the Contract:

> 12.  **Standard of Work**.  All work performed under this Contract
> shall be done in a good and workmanlike manner and shall conform
> to the RUS Standards, attached as Exhibit "B".

> Below is the standard depicted in Exhibit "B" to the Contract:



> Asplundh did not trim the subject tree according to the
> requirements of Exhibit "B."

*See id*. at ¶ 15, respectively.

5.      The subject tree should have been trimmed during Asplundh's work under the

contract and in accordance with the National Electric Safety Code (NESC) and the Rural Utility

Service Guidelines (RUS).  *See id*. at ¶ 13, respectively.

6.      Beartooth admits that, as the owner of the right-of-way and the powerline located at 197 Louis Lamour Lane,[2] it was required to adhere to the standards of the industry, Wyoming law, and the contract to ensure that the tree was properly trimmed.  *See id.* at ¶ 16, respectively.

7.      Beartooth generally admits that it had a nondelegable duty with respect to ensuring that the tree trimming work performed along its distribution and transmission lines was performed pursuant to applicable industry standards and the contract.  *See id.* at ¶ 17, respectively.

8.      Beartooth's line superintendent, Eric Elton, whose duties include vegetation management for Beartooth, provided sworn testimony at his deposition concerning the Clark Fire.  *See* **Exhibit 1** (Elton Depo.) at 4:19-24; 7:12-21; 8:1-3.

9.      Mr. Elton testified that he, as Beartooth's line superintendent, knew in November of 2021 that trees or tree branches contacting power lines can ignite fires.  *See id.* at 20:24-21:2.

10.     Mr. Elton testified that Beartooth's clearance standard for vegetation near its phase conductor lines was that the vegetation should be trimmed back fifteen (15) feet for transmission lines and ten (10) feet back from distribution lines.  *See id.* at 64:19-65:15.  Mr. Elton later changed his testimony to indicate that, per the contract, the measurement to the vegetation should be taken from the center pole, not from the phase conductor.[3]  *See id.* at 74:14-75:10; *see also id.* at 77:14-78:15.

11.     Mr. Elton testified that the clearance standards, as depicted in the schematic appended to the contract, reflected the Rural Utilities Service ("RUS") standard that applied to the phase conductor lines and vegetation here.  *See id.* at 71:17-72:9; 73:2-16.

---

[2] *See also* **Exhibit 1** (Elton Depo.) at 36:13-20, which identifies the line in issue as Beartooth's distribution line.

[3] This will prove to be a difference without a meaningful distinction because the subject tree's branches encroached into the prohibited space even when the shorter distance is applied.

12.     Mr. Elton testified to the purpose of the clearance standards:

>       Q. [. . .] My question was: The reason why there is clearance standards is to prevent danger?

>       A. Correct.

>       Q. To prevent a wildfire, as well as interruption of services?

>       A. Correct.

*See id.* at 199:3-9.

13.     Mr. Elton admitted that he was aware before the Clark Fire that contact between powerlines and trees can cause wildfires, which are dangerous, can be lethal, can destroy property, and can put people at risk.  *See id.* at 21:23-22:5.

14.     Beartooth hired Asplundh to do the trimming work in the Line Creek area in Clark County and Asplundh's employees were there working in approximately August of 2021.  *See id.* at 93:4-14; 97:2-5; 101:12-15; 106:9-16; 109:4-25.  Further, "Q.  Was there any question about the area that Asplundh was to trim in Line Creek?  /  A.  Absolutely not.  /  Q.  Where there was an electrical line overhead they were to trim?  /  A.  Correct."  *See id.* at 116:24-117:1.

15.     Beartooth did not check any of Beartooth's trimming work on Line Creek during the applicable time period.  *See id.* at 305:6-9; 218:4-25.

16.     Plaintiff's counsel asked Mr. Elton whether he believed the subject tree should have been trimmed, to which he responded: "In my opinion, yes."  *See id.* at 169:1-4; 306:1-5.  Further,

>       Q.  And in your mind, when you went and looked at it [the subject tree], you thought that limb needed to be trimmed?

>       A.  I would have thought so, yes.

>       Q.  And is that because you know a fire happened?

>       A.  No.  Because I know that the power line was there and the tree was closer than it should have been, and we had them go

6

> up and trim that area.  My thought was that they should have
> trimmed that tree.

*See id*. at 314:19-315:4.

17.  Further, the morning following the Clark Fire, Mr. Elton called into his office the

Asplundh tree trimmers who worked in the Clark, Wyoming area in approximately August of

2021, Perry Toler and Charles "Chuck" Rowe, and expressed to them that they should have

trimmed the tree that caused the fire.  Specifically, Mr. Elton recounted the conversation, in

relevant part, as follows:

> Q.  In the meeting you had with Toler and Rowe in your
> office on the 16th of November, you were asked whether you told
> them to – that they should have trimmed or not trimmed.  You didn't
> express an opinion one way or another about whether they should
> trim?
>
> **A.  I believe they should have trimmed.**
>
> [. . .]
>
> **[Q.] Did you tell them at that time, at the moment in your
> office, they should have trimmed that tree?**
>
> **A.  I did not.  I told them they need to get legal counsel,
> talk to their manager.**
>
> **Q.  As a result of that, were you implying that they damn
> well should have trimmed that tree?**
>
> **A.  Yes.**

*See id*. at 309:14-310:6 (bold emphasis added).

18.  This conversation between Mr. Elton and Asplundh's employees was after Mr.

Elton went to scene after the fire and observed evidence of conductor-tree contact.  *See id*. at

128:18-129:9.

19.     On the morning of November 16, 2022, before calling in Asplundh's employees, Mr. Elton, who was an experienced lineman himself, personally observed a burned and blackened branch on the subject tree, as well as blackened marks on the conductor (i.e., the energized line) that appeared to be charcoal or soot.  *See id*. at 133:5-134:17; 140:6-11; 148:7-149:14; *see also id*. at 45:1-46:13.  Mr. Elton took photographs documenting what he observed.  *See id*.

20.     Mr. Elton admitted to knowing that Clark, Wyoming was historically a high-wind area and that Beartooth was required to factor this into its vegetation management program.  *See id*. at 171:10-173:4.

21.     Additionally, Beartooth designated its General Manager, Kevin Owens, to testify on its behalf as a 30(b)(6) witness and Mr. Owens understood his testimony would bind Beartooth with respect to the noticed topics.  *See* **Exhibit 2** (Owens Depo.) at 6:2-4; 169:9-14; 170:17-171:8; 172:1-7.

22.     Mr. Owens' conclusion, on behalf of Beartooth and based upon the Beartooth's investigation, was that the Clark Fire originated because of conductor-branch contact in the subject tree.  *See id*. at 222:12-223:8; 224:7-15.

23.     Mr. Owens further testified that had Asplundh trimmed the cottonwood tree to the specifications in the contract, "[i]t would not have contacted [the power line]."  *See id*. at 232:6-20.

24.     Mr. Owens testified as follows:

> Q. When you signed the contract, are you saying that on behalf of your members?
>
> A. Absolutely.
>
> Q. Are you expecting that Asplundh will trim the trees so that the trees are going to avoid contact with power lines that can cause fires?

A. According to the standards that are provided for in that contract, yes.

Q. You expect them to follow that contract?

A. Absolutely. That is why it is a contract.

Q. This case, you know that they didn't do that at the Hutton property in 2021?

A. That is correct.

Q. They breached their contract to you.

MR. BONA: Calls for speculation.

MR. BAILEY: Calls for a legal conclusion, but go ahead.

THE WITNESS: I know that they were in error not following that contract for the proper clearances that are outlined in the contract.

BY MR. PAHLKE:

Q. You know that they were negligent in not following the contract.

MR. BONA: Same objections.

BY MR. PAHLKE:

Q. True?

A. I know the tree was not trimmed to the specifications in the contract.

Q. It violated the specification of the contract.

A. Correct.

Q. Were those specifications clear?

A. I think they are.

Q. Is there any doubt in your mind that those specifications

are clear?

A. Not really. Picture tells a thousand words. A picture is about the simplest explanation and we use that picture over and over and over again with members in talking about the need to trim trees and the whys and wherefores by it that we are actually bound by codes to do that.

Q. And the picture that speaks a thousand words, which picture is that?

A. That is the one within the contract that is provided as part of the RUS guidelines.

*See id.* at 71:8-73:2. *See also id.* at 97:4-7 ("Q. But we know that it was clearly invading the space that was supposed to be free of? / MR. BONA: Calls for speculation. / THE WITNESS: That's correct."); 212:2-18 ("[A.] The work should have been done correctly and was not done." [...] "Q. You confirmed that on the basis of personal observation? / A. Yes.").

25.    Mr. Owens agreed that "if the tree trimming company had done its job properly, it could have cut the limb back...." *See id.* at 235:25-236:10.

26.    Mr. Owens testified that the "absolute minimum" of the nearest tree limb to the center line of the pole per the contract was ten (10) feet. *See id.* at 76:25-77:15; 78:2-4.

27.    Mr. Owens testified that the charred area of the broken branch was within five-and-a-half feet of the conductor when measured by Beartooth's retained engineer. *See id.* at 264:14-25.

28.    Mr. Elton did not inspect or audit Asplundh's trimming work on Line Creek. *See id.* at 213:9-18.

29.    Beartooth knew electricity could cause fires. Beartooth knew that Montana and Wyoming can have strong winds. Beartooth knew that fires caused by electricity, combined with the wind, posed a risk of injury or death to the public. *See id.* at 51:5-17.

30.     Mr. Owens testified that he and Beartooth were not critical of Cindy, Jerry, or the Clark Fire Department's actions on the night of the fire.  *See id.* at 235:10-24; *see also id.* at 247:16-22 ("[D]o you in any way criticize or blame Cindy Ruth for her death?  /  A.  No, not at all.  /  Q. Do you in any way blame the Clark Fire Department?  /  A.  No.  I am not passing judgment on any of those people.")

31.     Finally, Beartooth designated Jeff Berino as its fire origin and cause investigator expert to testify at trial over this matter.  *See* ECF Doc. No. 28.[4]  Mr. Berino's conclusions are below:

## CONCLUSIONS

The results of the investigation conducted by AEI indicate the following:

1. The wildfire originated approximately 136 feet east of the subject tree. This area is for all intents and purposes identical to the SOA identified by Mr. Alan Carlson in his report dated August 15, 2023.

2. No visible damage to the conductors, poles, or crossarms were observed on any of the BEC equipment in the GOA.

3. The fuel first ignited was the organic material from a branch on the west side of the subject tree.

4. The cause of the fire was a portion or portions of the subject tree contacting an energized conductor during a high wind event. This contact resulted in airborne embers or firebrands[14] traveling approximately 136 feet to the east and contacting a receptive bed of ground fuels.

[14] **Embers and Firebrands.** Embers and firebrands can be lofted by the convective column and fall out or be blown by wind into unburned fuel great distances… *(Section 25.5.1 NFPA 921, 2021 Edition).*

5. No other competent ignition sources were observed in the GOA.

6. The required clearance from the conductor to the branch(s) on the subject tree was not maintained by the Asplundh Tree Experts who were working in the Line Creek drainage area approximately 6 weeks prior to the fire.

7. This fire would not have occurred if the proper mitigation and limbing of tree branches adjacent to the east conductor was completed per the contract between BEC and Asplundh.

8. The cause of this fire is accidental in nature.

*See id.* at Pages 31 and 32.

---

[4] Mr. Berino's "Statement of Opinion" as to the origin and cause of the Clark Fire begins at Page 19 of ECF Doc. No. 28.

As a result of the failure to trim the subject cottonwood tree, as required by the RUS standards and outlined in the contract, a wildfire spread though the Clark, Wyoming area, as the photograph below depicts:



*See* **Exhibit 3** (Nelson Depo.) at 56:17-65:8.

Beartooth admits that Cindy died as a result of injuries she suffered from the Clark Fire. *See* ECF Doc. No. 7 at ¶ 12.

## III.   <u>Law and Argument</u>

    a.   *<u>Summary Judgment Standard</u>*

This Court recently outlined the applicable law on summary judgment in *Jones v. Mountainside Apartments, L.P.*, 2022 U.S. Dist. LEXIS 109031, *3-5 (D. Wyo. May 23, 2022), a case in which the Court addressed a nondelegable duty issue, which is worth reciting in full herein:

        Summary judgment is proper if "there is no genuine dispute as to
        any material fact and the movant is entitled to judgment as a matter

of law." Fed. R. Civ. P. 56(a). A fact is material if it would affect the outcome of the case. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden to either affirmatively disprove an essential element of the non-movant's case or to demonstrate the non-movant lacks evidence to support the claim at trial, "since a complete failure of proof concerning an essential element" renders all other facts immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To meet this initial burden, the movant must inform the court "of the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323 (quoting Fed. R. Civ. P. 56(c)(1)). If the movant bears this initial burden, the non-movant "must respond with specific facts showing the existence of a genuine factual issue to be tried." *Coleman v. Darden*, 595 F.2d 533, 536 (10th Cir. 1979).

When reviewing a motion for summary judgment, the court's role is not to weigh the evidence, but rather to assess the threshold consideration of whether a genuine issue of material fact exists. *Liberty Lobby*, 477 U.S. at 249-50. All reasonable inferences must be resolved in the light most favorable to the non-moving party. *Id.* at 255. This inquiry is also guided by applicable evidentiary standards. *Id.*

In addition, partial summary judgment is proper under the federal rules. *See* Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought.")

"A federal Court sitting in diversity must ascertain and apply state law to reach the result the Wyoming Supreme Court would reach if faced with the same question." *Cooperman v. David*, 214 F.3d 1162, 1164 (10th Cir. 2000).

b. *Relevant Wyoming Law*

i. Negligence

In Wyoming, "[s]ummary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact." *Cook v. Shoshone First Bank*, 2006 WY 13, ¶ 12, 126 P.3d 886, 889 (Wyo. 2006) (citing *Jones v. Schabron*, 2005 WY 65 ¶¶ 9-11, 113 P.3d 34, 37 (Wyo. 2005). *See also Bogdanski v. Budzik*, 2018 WY 7, 408 P.3d 1156, 1161 (Wyo. 2018) (citing *Johnson v. Dale C.*, 2015 WY 42, 345 P.3d 883, 886-87 (Wyo. 2015)).

Wyoming's negligence law is well-defined and oft-cited as follows:

> The elements of negligence in Wyoming are: (1) a duty, (2) a violation thereof, (3) which violated in the proximate cause of, (4) injury to the plaintiff."

*See Daily v. Bone*, 906 P.2d 1039, 1043 (Wyo. 1995). The existence of a duty is a question of law. *See Shafer v. TNT Well Serv.*, 2012 WY 126, ¶ 24, 285 P.3d 958, 965 (Wyo. 2012). As the Wyoming Supreme Court recently explained in *Cornella v. City of Lander*, 2022 WY 9, ¶ 26, 502 P.3d 381, 387 (Wyo. 2022):

A duty arises when,

> 'upon the facts in evidence, such a relation exists between the parties that the community will impose a legal obligation upon one for the benefit of the other—or, more simply, whether the interest of the plaintiff which has suffered invasion was entitled to legal protection at the hands of the defendant.'

*Id*. (quoting *Warwick Accessible Space, Inc*., 2019 WY 89, ¶ 13, 448 P.3d 206, 211 (Wyo. 2019)).

"A legal duty may arise from a contract, a statute or the common law." *Id.*

Ordinary care is defined in Wyoming as "the degree of care which should reasonably be expected of the ordinary careful person under the same or similar circumstances."  *See Halvorson v. Sweetwater County Sch. Dist. No. 1*, 2015 WY 18, ¶ 9, 342 P.3d 395, 398 (Wyo. 2015).  "In addition, Wyoming has recognized a higher standard of care for businesses involving ultrahazardous instrumentalities.  Exercising reasonable care under 'all the circumstances' is still the standard, but greater care is required because the nature of the business is ultrahazardous."  *Ruhs v. Pacific Power & Light*, 671 F.2d 1268, 1271 (10th Cir. 1982).

> ii.   Nondelegable Duty

Wyoming law is clearly established that, "[w]here an ultrahazardous instrumentality such as electricity is involved, the duty to the electric company to maintain safe premises is nondelegable."  *See Ruhs*, 671 F.2d at 1272.

Black's Law defines "non-delegable duty" as follows:

> 1. General: An obligation that cannot be outsourced to a third party according to the terms of the contract. In the event that it is delegated, the second party reserves the right to reject the performance of the obligation.

> 2. Contracts: The fulfillment of an obligation which is solely the responsibility of the obligatory, and which does restrict delegation of the contract to a third party. For example, The safety of the employees is the responsibility of the employer even though a third party was hired to monitor compliance with safety standards.

*See Non-Delegable Duty, Definition & Meaning*, Black's Law Dictionary (June 14, 2022), https://thelawdictionary.org/non-delegable-duty/ (last visited October 21, 2023).

A company with a nondelegable duty is directly liable for the negligent acts of its selected independent contractor, regardless of whether the delegating company itself exercised due care.  *See, e.g., Ring v. Lexington Apts. & Motor Inns-Oklahoma*, 3 Fed. Appx. 847, 850 (10th Cir. 2001) ("In other words, he cannot contract out his ultimate legal responsibility for the proper performance

of that duty by an independent contractor.") (citing *Copeland v. Lodge Enters., Inc.*, 4 P.3d 697, 700 (Okla. 2000)). *See also Deaf Smith Cty. Grain Processors, Inc. v. Springer Elec. Coop., Inc.*, 1998 U.S. Dist. LEXIS 24359, *3 (D.N.M 1998) ("[When there is a nondelegable duty,]...if reasonable precautions are not taken and a third party suffers harm as a result, the employer of the independent contractor will not be able to avoid liability by relying on the fact that the work was done by the contractor rather than the employer.").

   iii. <u>"Act of God"</u>

  The Wyoming Supreme Court has abolished the defense of an "Act of God" in negligence cases. *See Cox v. Vernieuw*, 604 P.2d 1353, 1354 (1980). Specifically, the *Cox* Court held as follows:

> [W]e shall hold that a physical defect ["of the driver of a motor vehicle"; i.e., a heart blockage causing oxygen deprivation and, ultimately, the loss of consciousness] is not within the definition of an Act of God, and **we shall expand the issue to encompass a rule that the defense of an Act of God should not be considered in any case in which recovery is sought upon a theory of negligence. In such a case the defense of an Act of God is superfluous**.

*See id*. (bold emphasis added). In other words, "an act of God is no more than another way of saying that the defendants were not negligent" and, thus, "better jurisprudence would foreclose the application of the theory in a negligence case." *See id*. at 1358.

  Ten years before *Cox*, the Wyoming Supreme Court, in *Sky Aviation Corp. v. Colt*, 475 P.2d 301, 304 (Wyo. 1970), provided a legal definition of, and limitation on, the Act of God defense in all cases in which it is alleged. Specifically, the Court held as follows:

> As a legal term act of God has been defined as any accident, any accident, due directly and exclusively to natural causes, without human intervention, which by no means of foresight, pains or care, reasonably to have been expected, could have been prevented. 1 C.J.S. Act of God, p. 1423.

The term is also used to designate the cause of an injury to person or property where such injury is due directly and exclusively to natural causes without human intervention and which could not have been prevented by the exercise of reasonable care and foresight. 65 C.J.S. Negligence § 21, p. 652.

In order for the rule to apply, the act of God must be the sole cause of the injury. There can be no combination of an act of God and the fault of man as the presence of one excludes the other. If defendant's negligence directly contributed to the injury so that it is reasonably certain that the force of nature alone would not have sufficed to produce the injury, defendant is liable. The ordinary force of nature such as winds which are usual at the time and place are conditions which reasonably could have been anticipated and will not relieve from liability the person guilty of the original negligent act.

   c. *Argument*

      i. <u>Defendant Beartooth had a Nondelegable Duty and is Liable for all Damages Negligently Caused by the Clark Fire, even if it was Asplundh's Negligence that Caused the Fire and Injuries</u>

There is no legitimate dispute that Beartooth had a duty to maintain safe power lines, which was for the benefit of protecting the lives and property of Wyoming residents. Cindy was one of the people that Beartooth had a duty to protect.

Beartooth, nevertheless, alleges that it relied on Asplundh to properly perform the tree trimming work that they contracted be performed on Line Creek, including at 197 Louis Lamour Lane, Clark. *See* ECF Doc. No. 1 at ¶¶ 4, 9 and ECF Doc. No. 7 at ¶ 4, 9. However, as an electric company and the distributor of an ultrahazardous instrumentality, Beartooth possessed a nondelegable duty to ensure that its vegetation management and tree trimming work was performed in accord with industry standards. *See Ruhs*, 671 F.2d at 1272. A nondelegable duty is, by definition, a duty that cannot be contracted away. *See, e.g., Ring*, 3 Fed. Appx. at 850; *see*

17

*also Deaf Smith Cty. Grain Processors, Inc.*, 1998 U.S. Dist. LEXIS 24359, \*3.  As a result, Beartooth is liable for both its own failings and all of its chosen contractor's failings.[5]

Beartooth knew that the failure to properly trim vegetation far enough back from its distribution lines ran the risk of starting a wildfire and endangered the lives and property of residents living in the vicinity of the distribution lines.  *See* **Exhibit 1** at 21:23-22:5; 199:3-9.  *See also* **Exhibit 2** at 51:5-17.  Nevertheless, Beartooth did nothing to verify that Asplundh properly performed under the terms of the contract.  *See* **Exhibit 1** at 305:6-9; 218:4-25.  *See also* **Exhibit 2** at 213:9-18.  Wyoming law is clear, "greater care is required because the nature of the business is ultrahazardous."  *See Ruhs*, 671 F.2d at 1271.

Beartooth—through its managing agent, its designated representative, and its retained expert—is very clear: Asplundh violated applicable industry standards, as reflected in the contract, when its employees failed to trim the subject tree's branches and limbs that were too close to Beartooth's distribution line located on Line Creek in Clark, Wyoming.  Further, Beartooth has unequivocally stated that the fire would not have occurred had Asplundh properly performed its job pursuant to the contract.  In other words, simply following industry standards would have prevented the fire from occurring, according to Beartooth itself.

In fact, Beartooth was so certain about, and critical of, Asplundh's nonfeasance that its line superintendent, Mr. Elton, called Asplundh's trimmers into his office and "told them they need to get legal counsel, talk to their manager," by which he was "implying that they damn well should have trimmed that tree."  *See* **Exhibit 1** at 309:14-310:6.  It is beyond legitimate dispute that Beartooth believed Asplundh failed to use reasonable care under all the circumstances—at a

---

[5] Beartooth certainly has remedies against Asplundh in contract and, likely, equity; however, that does not change Beartooth's responsibility and liability to Wyoming citizens when its chosen contractor fails in the performance of its contracted duties.

minimum—when it instructed Asplundh's employees to contact their manager and legal counsel because of their failure to properly perform the trimming work.  It is also beyond legitimate dispute that the risk of failing to properly perform this work—i.e., clear vegetation away from the distribution line—was that a fire could occur.  That is the foreseeable consequence.  It is not contested that the Clark Fire caused Cindy's death.  *See* ECF Doc. No. 7 at ¶ 12.

Furthermore, Beartooth, through its designee Mr. Owens, selected to provide binding testimony on behalf of the company, admitted that Cindy, Jerry, and the Clark Fire Department are not to blame for Cindy's untimely death.  *See* **Exhibit 2** at 235:10-24; *see also id.* at 247:16-22.  There is no fault to compare with respect to the negligence creating liability in this case.  Beartooth is liable for all of Asplundh's negligence under Wyoming law, leaving no one else for Beartooth to point the finger at or put on the verdict form regarding its fault and liability.

Despite summary judgment being subject to more exacting scrutiny in a negligence action, here, judgment as a matter of law with respect to liability should be granted against Beartooth because the record fails to establish the existence of a genuine issue of material fact concerning this issue.  Said another way, in light of the pleadings, Beartooth's admissions, the undisputed facts in the record, and the applicable law, no reasonable jury could find anything other than that Beartooth is liable for the failure to trim the subject tree at 197 Louis Lamour Lane, Clark.  The RUS standard applicable required it.  The contract detailing Beartooth's expectations and standards required it.  Ordinary care certainly required it, especially in light of the fact that greater care is required because of the known risks and ultrahazardous nature of electricity.  *See Ruhs*, 671 F.2d at 1271.

Accordingly, the Court should enter partial summary judgment on the issue of liability.

   ii.  <u>Beartooth's "Act of God" Affirmative Defense is Unavailable under Wyoming Law</u>

Next, Plaintiff will turn to Beartooth's assertion that the strong wind the night of the fire should foreclose any recovery as part of this wrongful death action.  Beartooth alleged as an Affirmative Defense, at the outset of this case, that the fire caused by its conductor contacting the power line was an Act of God and, thus, they cannot be held accountable for the harm caused.  *See* ECF Doc. No. 7 at Page 7 of 9, ¶ 1.  Its reliance on this defense is misplaced.

The Wyoming Supreme Court specifically foreclosed this defense in actions sounding in negligence.  *See Cox*, 604 P.2d at 1354, 1358.  As detailed above, Plaintiff's case against Beartooth is based primarily on the negligent actions and inactions of Beartooth, Asplundh, or some combination thereof.

To the extent that Beartooth attempts to argue that the Act of God defense has some application to this matter outside of the negligence realm, it would be mistaken.  "There can be no combination of an act of god and the fault of man as the presence of one excludes the other."  *See Sky Aviation Corporation*, 475 P.2d at 304.  Further, the incident must be "due directly and exclusively to natural causes without human intervention and which could not have been prevented."  *See id*.  Here, Beartooth knew of the risks associated with the vegetation not being trimmed according to industry standards and the contractual specifications.  Beartooth has admitted that its independent contractor failed to properly trim the subject tree next to its distribution line.  Finally, Beartooth admitted that, had the tree been properly trimmed, there would have been no fire.  If only the contract and industry standards were followed, a tragedy could have been averted.  This is far from the requirement that the accident be attributable *exclusively* to natural causes "by which no means of foresight, pains or care, reasonably to have been expected,

could have been prevented." *See id*. The Clark Fire was the fault of man according to Beartooth's own admissions.

Accordingly, the Beartooth's Act of God affirmative defense should be dismissed as a matter of law.

## II.    <u>Conclusion And Remedy</u>

For the reasons stated herein, Plaintiff respectfully requests that the Court GRANT Plaintiff's motion for summary judgment regarding Beartooth's so-called "Act of God" Affirmative Defense and partial summary judgment concerning Beartooth's liability.   No reasonable jury could find anything other than Beartooth is liable for causing Cindy Ruth's death based on the pleadings, its admissions, and properly applying the controlling law.

**DATED** and SIGNED this <u>25th</u> day of October, 2023.

**SANDEFER   &   WOOLSEY,   TRIAL LAWYERS, LLC**

**/s/ Ian Sandefer**

_____

Ian Sandefer
Attorney for Jerry Ruth
143 N. Park Street
Casper, WY 82601
(307) 232-1977
ian@swtriallawyers.com

**BARKER LAW FIRM, LLC**
Kenneth E. Barker
Attorney for Jerry Ruth
10956 SD Highway 34
PO Box 100
Belle Fourche, SD 57717-0100
kbarker@barkerlawfirm.com
Tel: (605) 723-8000
Fax: (605) 723-8010

**ROBERT PAHLKE LAW GROUP**
Robert G. Pahlke

Attorney for Jerry Ruth
2425 Circle Drive, Suite 200
Scottsbluff, NE 69361-1224
(308) 633-4444
rgp@pahlkelawgroup.com


## CERTIFICATE OF SERVICE

This is to certify that on the 25th day of October, 2023, the undersigned served the within and foregoing *Plaintiff's Brief in Support of Motion for Summary Judgment on "Act of God" Affirmative Defense and Partial Summary Judgment (Liability)* upon counsel by electronic service via CM/ECF to:

Henry F. Bailey, Jr.
Andrew D. Bailey
Bailey Stock Harmon Cottam Lopez
6234 Yellowstone Road
PO Box 1557
Cheyenne, WY 82003
Email: hank@performance-law.com
Email: andy@performance-law.com

Scott E. Ortiz
Williams Porter Day & Neville PC
PO Box 10700
Casper, WY 82601
Email: sortiz@wpdn.net

A. David Bona
Carlson, Calldine & Peterson, LLP
One Post Street, Suite 500
San Francisco, CA 94104
Email: dbona@ccplaw.com

/s/ Ian K. Sandefer

_____

Ian K. Sandefer