# EXHIBIT 1

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2                  FOR THE DISTRICT OF WYOMING

 3
    WILLIAM JEROME RUTH, individually,
 4  and as Wrongful Death Representative
    of the ESTATE OF CYNTHIA SHOOK RUTH,
 5
          Plaintiff,
 6
    V.
 7
    BEARTOOTH ELECTRIC COOPERATIVE, INC.,
 8  a Montana Corporation, and ASPLUNDH
    TREE EXPERT, LLC, a Limited Liability
 9  Company formed in Pennsylvania,

10        Defendants.

11

12
                  DEPOSITION OF ERIC ELTON
13                    May 16, 2023
                       8:30 a.m.
14

15
    PURSUANT TO THE UNITED STATES RULES OF FEDERAL
16  PROCEDURE, this Deposition was:

17  TAKEN BY:      Kenneth E. Barker, Esq.
                   Attorney for Plaintiff
18
    REPORTED BY:   Barbara Jean Morgenweck, RPR, CCR
19                 NCRA, RPR
                   New Mexico CCR #526
20

21

22

23

24

25
```

```
                                                        Page 2
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4
      Kenneth E. Barker
 5    BARKER LAW FIRM, LLC
      10956 SD Highway 34
 6    Belle Fourche, South Dakota 57717
      605-723-8000
 7    Kbarker@barkerlawfirm.com

 8    Robert Pahlke
      THE ROBERT PAHLKE LAW GROUP
 9    2425 Circle Drive, Suite 200
      Scottsbluff, NE 69361
10    308-633-4444
      Rgp@pahlkelawgroup.com
11
      Ian Keith Sandefer
12    SANDEFER & WOOLSEY, TRIAL LAWYERS, LLC
      143 North Park Street
13    Casper, WY 82601
      Phone: (307) 232-1977
14    Ian@swtriallawyers.com

15
      On behalf of Defendant Beartooth Electric
16    Cooperative, Inc.:

17
      Henry F. Bailey, Jr.
18    BAILEY STOCK HARMON COTTAM LOPEZ, LLP
      6234 Yellowstone Road
19    Cheyenne, Wyoming 82003
      Hank@performance-law.com
20    Andy@performance-law.com

21    On behalf of Defendant Asplundh Tree Expert, LLC:

22
      A. David Bona
23    CARLSON CALALDINE & PETERSON, LLP
      One Post Street
24    San Francisco, CA 82601
      Dbona@ccplaw.com
25
```

Page 4

1    ERIC ELTON,

2    Having first been duly sworn, testified as

3    follows:

4                          EXAMINATION

5    BY MR. BARKER:

6        Q.    Good morning, Mr. Elton.  How are you?

7        A.    Good.   Yourself?

8        Q.    Good.   You ready to go to work?

9        A.    I am.

10       Q.    Okay.   Good.   Please state your name for

11   the record.

12       A.    Eric Lance Elton.

13       Q.    Mr. Elton, where are you from?

14       A.    Red Lodge, Montana.

15       Q.    Is that where you live?

16       A.    Yes.

17       Q.    Is that where you work?

18       A.    Yes.

19       Q.    Who do you work for?

20       A.    Beartooth Electric Cooperative.

21       Q.    How long have you worked for Beartooth?

22       A.    Almost 29 years.

23       Q.    What is your current position?

24       A.    Line superintendent.

25       Q.    Twenty-nine years ago, beginning in what

Page 7

1    you've done a wonderful job -- is I have to ask

2    the question and there needs to be a brief pause

3    before you answer if that's okay.

4    A.    Okay.

5    Q.    The worst thing that can happen is if we

6    both talk over one another, okay?

7          And just one final comment is huh-huh's

8    and uh-huh's are hard for Barb to take down, so

9    if you can pronunciate and pronounce with your

10   response as best you can.

11   A.    Okay.

12   Q.    So as line superintendent since 2012,

13   can you describe for us your job

14   responsibilities, generally?

15   A.    Typically, I make sure that the

16   operation side is moving forward, the guys have

17   the work lined out ahead of them.  If there's

18   any problems, then I try to address them.  I

19   also help with some of the staking because we

20   are a small cooperative.  That's kind of the

21   main parts of it.

22   Q.    Staking, that is for new construction?

23   A.    Uh-huh.

24   Q.    That's a yes?

25   A.    Yes.

Page 8

1    Q.     Operations include vegetation

2    management?

3    A.     That's correct.

4    Q.     Do you have a written job description?

5    A.     I believe so.

6    Q.     What would that document be called?

7    A.     I haven't had a review for a little

8    while, so I can't think of what the title would

9    be, but it would probably be line superintendent

10   job description, I guess.

11   Q.     Okay.  Have you had a chance to look at

12   that the last few months?

13   A.     I have not.

14   Q.     If we looked at it if we had it here in

15   front of us, do you know how many pages it is?

16   A.     Probably three, maybe.

17   Q.     Is it, then, I assume arranged in

18   categories?

19   A.     I would believe so.

20   Q.     And do you know how many categories?

21   A.     No, I do not.

22   Q.     Would one of those categories be

23   vegetation management?

24   A.     Most likely not.

25   Q.     What does vegetation management fall

1   hierarchy?

2      A.      I am not.

3      Q.      What -- in the organization of Beartooth

4   Electric Cooperative how are your employees

5   taught about safety?

6      A.      We have a safety meeting almost every

7   month with MECA, which is a group of co-ops in

8   the State of Montana and Wyoming, and I believe

9   in Idaho, and they come in.  We have safety

10  topics that we go through and we spend about six

11  or seven hours, pretty much once a month, going

12  through the topics from first aid to CPR to

13  lockout/tagout, all the way to hurt man rescue

14  on the pole.

15     Q.      Are all employees required to attend

16  these safety meetings?

17     A.      That's correct.

18     Q.      Are you a presenter at these meetings?

19     A.      I am not.

20     Q.      Is vegetation management a topic of

21  these safety meetings?

22     A.      Tree trimming is because of the chain

23  saw safety, but not much more than that.

24     Q.      Were you aware as line superintendent in

25  November of 2021 that tree or tree branches

Page 21

1    contacting power lines could ignite a fire?

2      A.    Yes.

3      Q.    You've been with Beartooth since 1994.

4    Over that period of time I assume that you're

5    familiar with occasions when there has been

6    contact between a power line and a tree?

7      A.    That's correct.

8      Q.    That the result of that contact has been

9    a fire?

10     A.    That's correct.

11     Q.    That's something that occurs from time

12   to time in your operations?

13     A.    It does.

14     Q.    Something that you try to avoid.  It's a

15   risk that you wish to avoid, if you can, as a

16   company, and I'm referring to your company,

17   Mr. Elton, not you personally, but I assume you

18   hold the same principles?

19     A.    I do.

20     Q.    Because, again, it goes back to the

21   safety of the public, correct?

22     A.    That's correct.

23     Q.    And wildfires are dangerous?

24     A.    They are.

25     Q.    They can be lethal?

Page 22

1    A.    They can.

2    Q.    They can destroy property?

3    A.    They can.

4    Q.    They can put people at risk?

5    A.    They can.

6    Q.    Beartooth, over the years, even in the

7    last several years has experienced some pretty

8    big fires, wild fires; is that correct?

9    A.    I don't know if I can agree with that.

10   Q.    Fair.  Was there a fire up by Columbus,

11   Montana?

12   A.    Yes, there was.

13   Q.    Did that fire, was that ignited by a

14   tree?

15   A.    That was a secondary line through a

16   tree, yes.

17   Q.    A secondary line would also be known as

18   a distribution line?

19   A.    That's not correct.

20   Q.    What -- what's the difference?

21   A.    Secondary line is a voltage of less than

22   600 volts.

23   Q.    A tap line?

24   A.    No.  It would still be a service line or

25   a secondary line.

1    Q.    And Beartooth maintains a consistent

2    clearance distance for its lines; is that

3    correct?

4    A.    We do.

5    Q.    Does that clearance distance differ

6    between transmission and distribution lines?

7    A.    It does.

8    Q.    Does it differ between distribution and

9    tap lines?

10   A.    They are one in the same, but

11   distribution and secondary or service, yes, they

12   are different.

13   Q.    The line that is in question here that

14   we're going to be talking about at 197 Louis

15   L'Amour Lane at Clark, Wyoming, would that be

16   viewed by you as a service line, a tap line?

17   A.    That would be a distribution.

18   Q.    So it is a distribution line of how many

19   KVs?

20   A.    7.2.

21   Q.    That is a line you're familiar with?

22   A.    It is.

23   Q.    Is it a line that Beartooth installed or

24   built, constructed?

25   A.    Yes.

Page 45

1    Q.    Are you familiar with the cottonwood at

2    197 Louis L'Amour Lane?

3    A.    I am.

4    Q.    It is a cottonwood that you inspected on

5    November 16th of 2021?

6    A.    That is correct.

7    Q.    Is that the first time that you saw that

8    tree?

9    A.    I have been by that tree previous years,

10   just through work, and that tree has been

11   trimmed at some point.  I have not trimmed that

12   tree personally, but I do know the tree.

13   Q.    Are you suggesting -- strike that.  Let

14   me start here:  Are you familiar with the burned

15   branches on that tree?

16   A.    I am.

17   Q.    You took photographs of it, I presume?

18   A.    I did.

19   Q.    It was something that was of interest

20   that drew your attention in your inspection on

21   November 16th?

22   A.    It is.

23   Q.    And you took those photographs for the

24   purpose of documenting what you saw?

25   A.    I did.

Page 46

1    Q.    Because you had the -- at least some

2    idea that there may have been conductor-tree

3    contact the evening before on the 15th of

4    November?

5    A.    I did.

6    Q.    And that that tree-conductor contact may

7    have ignited what is now known as the Clark

8    fire?

9    A.    That's correct.

10    Q.    And your purpose of documenting what you

11    saw through the photographs was to pass that

12    information on to your supervisor, Kevin Owens?

13    A.    That's correct.

14    Q.    And you saw -- or excuse me -- you

15    provided those photographs that day on

16    November 16th?

17    A.    I took the photographs with the manager

18    on site.

19    Q.    So he was there and saw what you saw?

20    A.    That's correct.

21    Q.    That was the second time that you came

22    back that day?

23    A.    That's correct.

24    Q.    We're going to get into more detail

25    about that, but was there anybody else with you

Page 64

1    you said was how many volts?

2      A.    7.2.

3      Q.    7.2.  And how was that line constructed?

4      A.    That was a -- I believe it was an A-9

5    framing, so it meant it had a cross arm with a

6    phase conductor on the east side of the pole and

7    a neutral conductor on the west side.

8      Q.    And does a neutral carry current?

9      A.    Neutral will carry current.

10     Q.    Does it regularly carry current?

11     A.    It can.

12     Q.    Was it on the night of November 15,

13   2021?

14     A.    The phase wire carries voltage.  The

15   phase wire had voltage the night of 2021.  The

16   neutral -- the ground wire probably had some

17   current return on it the night of 2021.

18     Q.    Thank you.

19            I want to go back and make sure I have

20   an understanding of the clearance standards for

21   vegetation on the Beartooth system.

22            Fifteen feet is what you testified to as

23   to transmission lines?

24     A.    That's correct.

25     Q.    It is 15 feet from the conductor to the

Page 65

1    vegetation?

2       A.     That's correct.  The phase conductor.

3       Q.     The phase conductor.  And for

4    distribution it is 10 feet?

5       A.     That is correct.

6       Q.     And it's 10 feet from the outside

7    conductor to the vegetation?

8       A.     From the phase conductor, yes.

9       Q.     Are those standards reflected in

10   Exhibit 3, Exhibit B, the contract?

11      A.     That's correct.

12      Q.     Is it your testimony that Exhibit B is

13   consistent with the standard that you just told

14   me?

15      A.     Yes.

16      Q.     I would like you then to page back into

17   the contract on Page 3.  That would be Page 3 of

18   the document.  It is Bates stamped 46.

19             MR. BONA:  Are we on Exhibit 3?

20             MR. BARKER:  We are.

21             MR. BONA:  Thank you.

22   BY MR. BARKER:

23      Q.     Do you see Item D, healthy trees?

24      A.     Yes.

25      Q.     Would the cottonwood that you observed

1   back on your testimony up to this point in time,

2   you've answered my questions.  There's not

3   anything that you would want to change right

4   now; is that correct?

5     A.     No.

6     Q.     You have answered the questions to the

7   best of your ability?

8     A.     I have.

9     Q.     And you've been truthful?

10    A.     Yes.

11    Q.     And you've been honest?

12    A.     Yes.

13    Q.     And you've been complete, to the best of

14  your ability?

15    A.     Yes.

16    Q.     We were talking about clearance distance

17  when we went to break, and just to try to tie

18  this up, I'd like you to refer to Exhibit 3,

19  Exhibit B.  Exhibit B is a diagram that

20  apparently is fairly common -- commonly used in

21  your industry; is that correct?

22    A.     It is.

23    Q.     It's a document that's -- is at least

24  purported to reflect what is called RUS

25  standards, correct?

Page 72

1    A.    Uh-huh.

2    Q.    Yes?

3    A.    Yes.

4    Q.    RUS is Rural Utilities Service?

5    A.    Yes.

6    Q.    And Rural Utilities Service is a federal

7    agency or at least federally regulated; is that

8    true?

9    A.    Yes.

10   Q.    In your career with Beartooth since

11   1994, you've been familiar with what RUS is,

12   generally?

13   A.    Yes.

14   Q.    As you have risen through the ranks and

15   ascended to your position of line

16   superintendent, I imagine that you've probably

17   become more familiar as you have progressed up

18   the ladder?

19   A.    Yes.

20   Q.    To the point now you're generally very

21   familiar with what RUS standards are?

22   A.    Yes.

23   Q.    And RUS standards is something, as an

24   operations person, that you deal with probably

25   every day in your work?

Page 73

1    A.    Weekly.

2    Q.    At least weekly.  On Exhibit B there is

3    a -- distances that seem to be diagrammed

4    between vegetation and a power line?

5    A.    Yes.

6    Q.    And if you start at the top of the

7    exhibit and work our way down, the first

8    distance that is defined -- or it seems to be,

9    but that is why I am asking you the question, is

10   that is 30 feet; is that correct?

11   A.    It is, but this is a three-phase line.

12   The line in question is a single-phase line.

13   Q.    So Exhibit B wouldn't apply to the Line

14   Creek area?

15   A.    It would, but this exact example is a

16   three-phase line.

17   Q.    When you say "three-phase," what does

18   that mean?

19   A.    It means there is three opposing phases

20   on top the arm, and then the neutral is framed

21   down.

22   Q.    Okay.  And so those of us who are lay

23   people when it comes to electricity, can you

24   tell us in layperson's language what three

25   phases means?

Page 74

1          Does that mean that there are three
2    conductors?
3    A.      There would be four conductors.
4    Q.      Okay.  And meaning two conductors on
5    either side of the arm?
6    A.      One conductor on either side of three
7    phase, and then one in the middle and then the
8    neutral is framed down.
9    Q.      When you say "framed down," what does
10   that mean?
11   A.      It is below.  That is what this diagram
12   shows.
13   Q.      Show me where that should --
14   A.      The neutral would be about where the ten
15   is.  And I did misspeak.  It is 10 feet from the
16   pole, and I think I said 10-foot from the
17   conductor.
18   Q.      Let me just ask you a question of
19   whether you had anything that you needed to
20   change in your testimony and you testified no?
21   A.      And I am looking at the diagram right
22   now, and I think I told you it was 10 feet from
23   the conductor.
24   Q.      You did.
25   A.      I did.

Page 75

1    Q.    It is in the record under oath.  Now

2    you're saying that is changed?

3          MR. BAILEY:  Yeah, he says he made a

4    mistake.

5          THE WITNESS:  I believe I misspoke when

6    I said 10 feet from the conductor.

7    BY MR. BARKER:

8    Q.    Did that change as a result of what?

9    A.    It changed when I was sitting here when

10   you were having me look at the diagram.

11   Q.    Okay.  So if we were looking at the line

12   that we're talking about -- so if we're looking

13   at the Hutton property and looking at the line

14   and the tree, the cottonwood that we have been

15   talking about, is on the other side of this pole

16   in Exhibit B, so it would be looking basically

17   north to south, right?

18   A.    Yes.

19   Q.    If you can just put that in your mind's

20   eye.

21   A.    Yes.

22   Q.    So on the west side of the structure,

23   there's how many conductors?

24   A.    One.

25   Q.    Is that conductor, what -- would it

Page 76

1    carry electricity?

2      A.    Is a neutral or ground conductor.

3      Q.    Does it carry electricity?

4      A.    It carries return current.

5      Q.    If this is the question:  How much

6    return current?

7      A.    We don't know.  You won't know what the

8    return current is.

9      Q.    Then on the other side of the conductor,

10   that would be on the east side -- excuse me --

11   on the east side of the cross arm, there's

12   another conductor; is that correct?

13     A.    That's correct.

14     Q.    And what is that conductor called?

15     A.    That is a phase conductor.

16     Q.    And what's the definition of a phase

17   conductor?

18     A.    Phase conductor carries voltage.

19     Q.    And in this case the 7.2?

20     A.    7.2 KW or KV -- I'm sorry.

21     Q.    KV.  Kilovolts?

22     A.    Yes, that's, correct.

23     Q.    So if we go to, then -- bear with me

24   here.  Before we leave this exhibit, then down

25   below the conductor -- excuse me.  Down below

Page 77

1    the cross arms in this diagram there's -- it

2    says:  10 feet.

3           Do you see that?

4    A.    I do.

5    Q.    Ten feet, and then what is the rest of

6    it?

7    A.    I believe it is 10-foot minimum, and I

8    can't tell you with this copy what the 10-foot

9    dash -- I can't tell you what is next to that.

10   Q.    From your prior experience and

11   familiarity with this exhibit, would you say

12   that is 10-foot minimum?

13   A.    Yes.

14   Q.    Okay.  And it is your testimony now that

15   that is 10 feet from the center of the pole to

16   the vegetation?

17   A.    That's correct.

18   Q.    The center of the -- strike that.

19          What is the length -- or the width of

20   the cross arm?

21   A.    The cross arm as an 8-foot arm.

22   Q.    Is that standard?

23   A.    That is for single phase.

24   Q.    And so then what's the clearance

25   distance then?  Can you do the math for me?

Page 78

1    A.    Minimum is 6 feet.

2    Q.    When you say minimum, what does that

3    mean?

4    A.    We would like to see it no less than

5    6 feet to the conductor.

6    Q.    Should it be 7 feet?

7    A.    Anything more than six would be -- meet

8    the requirement.

9    Q.    So whatever the clearance standard is,

10   it has to be -- the intent is, at least, as I

11   understand it, is that Beartooth wants this to

12   be a safe line that is free from vegetation

13   contact until the next trim cycle comes up,

14   correct?

15   A.    We do.

16   Q.    The next trim cycle would be, according

17   to your testimony, in five years.

18   A.    That's what we hope for, yes.

19   Q.    So if it was trimmed in 2021, your hope

20   in 2021 was that this clearance distance would

21   last until 2026?

22   A.    That is correct.  We trimmed Wyoming in

23   2018, which would have put up us back to this

24   year as being the end of -- or the start of a

25   new cycle.

Page 93

1    Q.    And so you didn't know the extent of the

2    work that Asplundh was going to have to do on

3    Line Creek?

4    A.    I knew Line Creek wouldn't take a whole

5    lot of work because there is not a whole lot of

6    trees up Line Creek.  It is not a big area.  It

7    is not a lot of vegetation up Line Creek.  When

8    I sent them over there I gave them a map of Line

9    Creek.  They know Line Creek, and I said, Start

10   at the bottom, work your way to the top.

11   Q.    Meaning, starting at the east and go to

12   the west?

13   A.    Yes.  Complete all of the tree trimming

14   in Line Creek.

15   Q.    And so did you go over there with

16   somebody from Asplundh?

17   A.    I did not.

18   Q.    Did Asplundh, to your knowledge, send

19   out somebody to do a pre-contract or pre-trim

20   inspection?

21   A.    I believe Perry did.

22   Q.    Why do you believe that?

23   A.    I have asked Perry to treat -- to

24   permission everything in front of the crew so

25   that the crews aren't taking time to permission,

Page 97

1    A.       When they were up there trimming.

2    Q.       When were they up there trimming?

3    A.       I believe it would have been -- it was

4    in August, I believe, possibly the beginning of

5    August.

6    Q.       Are you relying on memory or a written

7    record?

8    A.       I am trying to rely on memory and that's

9    why I don't have the exact date.

10   Q.       Do you keep any log or memos in your

11   position as line superintendent of what your

12   tree trimmers' activities are from day to day?

13   A.       Their time cards or their time sheets

14   are fairly vague.  It is an area.  It's not down

15   to a location.  Typically, it's trimmed Line

16   Creek or trimmed Wyoming.  It's not exact

17   address.

18   Q.       I am familiar what you're referring to,

19   but that -- what you're referring to is a time

20   card that is produced by Asplundh, correct?

21   A.       That's correct.

22   Q.       I am asking you if you keep a record?

23   A.       I do not.

24   Q.       Do you keep a log?  Do you keep any kind

25   of record of what your daily activities are as

Page 101

1    page, Page 14 of Exhibit 54, and again Bates

2    1508.  It says at the bottom of the page under

3    the line 4, if you see that, it says:  Wyoming,

4    correct?

5    A.    Yes.

6    Q.    Describe for us what this document is?

7    A.    This is the time sheets that they submit

8    to our accounts payable department.

9    Q.    Is this a form that Asplundh provides or

10   Beartooth?

11   A.    Asplundh.

12   Q.    So we can see that the three crew

13   members, at least in August of 2021, were Kelly

14   McCain, Charles Rowe, and Perry Toler, correct?

15   A.    Correct.

16   Q.    Kelly McCain was the trainee; is that

17   right?

18   A.    Like I mentioned earlier, I am not

19   exactly sure.  I don't believe she is a trainee.

20   I believe she is a trimmer, but -- and I could

21   be wrong on that.

22   Q.    Well, again, there is reference in this

23   Document 54.

24   A.    Reason I say that, it even says under

25   the comments, Kelly should be paid foreman's

1    us.  They have worked on Line Creek more than

2    one day, I guess is what I am saying.  And on

3    this day they told us 8/26 they did trim on Line

4    Creek, but that is not the only day that they

5    trimmed Line Creek.

6        Q.    Well, I'm -- okay.  So I am trying to --

7    let's just take this step by step, okay?

8        A.    Okay.

9        Q.    So Asplundh crew goes in on Line Creek

10    sometime in 2021, correct?

11       A.    Uh-huh.

12       Q.    Yes?

13       A.    Yes.

14       Q.    Most likely that was the month of August

15    of 2021, true?

16       A.    I believe so.

17       Q.    To the best of your knowledge, it wasn't

18    prior to August?

19       A.    I can't answer that because I don't

20    remember.  Perry would have permissioned ahead

21    of the crew, and I do in remember that Chuck and

22    Perry spent several days up there.  Christy, I

23    don't remember if she was there for the whole

24    duration or not.

25            MR. BAILEY:  Kelly.

Page 109

1    Q.    So we're left to that.  Does that -- is

2    that the map though?

3    A.    This is.

4    Q.    And is it your testimony that this map

5    shows every service location of all of Line

6    Creek?

7    A.    It does.

8    Q.    Can you show us where the Hutton

9    property is?

10    A.    Yes.

11    Q.    Can you take this highlighter and refer

12    us to the page where the Hutton property is

13    located?

14    A.    It's Page 4 of 4.

15    Q.    Okay.  Could you just highlight that for

16    us.  The Hutton property?

17    A.    The Hutton property itself?

18    Q.    Yes.

19    A.    I think it's actually going to be right

20    on this line.

21    Q.    Would you take this pen and diagram for

22    us -- or just write Hutton.

23          And the Hutton property is 197 Louis

24    L'Amour Lane?

25    A.    Yes.

Page 116

1    Q.    Do you know if it did in July of 2021?

2    A.    I can't answer that.

3    Q.    Did you have discussions with members of

4    the crew that Mr. Toler or Mr. Rowe or

5    Ms. McCain in that time period about -- about

6    what the map depicted?

7    A.    I believe so.  For Kaaren to set up the

8    logins, we would have had discussions on how to

9    get into the mapping and what to do to get to

10   the mapping to see it.

11   Q.    Logically, they wouldn't need updates of

12   the map unless -- and login information unless

13   they were accessing it, correct?

14   A.    That's correct.  When I sent them to

15   Line Creek, Line Creek is a -- were the only

16   lines there.  I asked them to trim all of Line

17   Creek.

18   Q.    And who did you give that direction to,

19   specifically?

20   A.    I can't tell you if it was Perry or

21   Chuck because I talked to Perry quite a bit

22   because Perry would permission it in front of

23   Chuck.

24   Q.    Was there any question about the area

25   that Asplundh was to trim in Line Creek?

Page 117

1    A.    Absolutely not.

2    Q.    Where there was an electrical line

3  overhead they were to trim?

4    A.    Correct.

5    Q.    That is the generally the direction that

6  you gave them?

7    A.    That is correct.

8    Q.    Go forth and trim?

9    A.    I said trim Line Creek.  That is the

10  only place we haven't been.  And they knew where

11  Line Creek was.  There was no question.  They

12  were at Hutton's property, there was no question

13  of that, when they called to -- I know I had a

14  conversation about the locked gate.

15    Q.    Do you know when that conversation --

16    A.    I do not.

17    Q.    Do you -- are you able to estimate that

18  that conversation took place sometime in the

19  timeframe indicated by Exhibit 54, that would be

20  the latter part of August of 2021?

21    A.    I cannot recall but I can remember

22  having a conversation with Perry about it.

23    Q.    Did you direct Perry to talk to Pam

24  Nelson, the caretaker of the Hutton property?

25    A.    I did not.  I gave him -- I believe we

Page 128

1    A.    That's correct.

2    Q.    Or at least the version that existed at

3    that time?

4    A.    That's correct.

5    Q.    And you brought up, and you were able to

6    zero in on it, the Hutton property?

7    A.    That's correct.

8    Q.    And specifically 197 Louis L'Amour Lane?

9    A.    That's correct.

10   Q.    It's the green dot that is marked on

11   Exhibit 89 that you drew a line to overhead tap

12   to Hutton property?

13         MR. BAILEY:  Go ahead.

14         THE WITNESS:  To the best of my

15   abilities with the map that I have in front of

16   me, that is correct.

17   BY MR. BARKER:

18   Q.    Understand.  And you're telling them,

19   based upon the fact that you have been out there

20   that day, correct?

21   A.    That's correct.

22   Q.    At least twice?

23   A.    That's correct.

24   Q.    That what you saw was evidence of

25   conductor-tree contact?

Page 129

1    A.    That is correct.

2    Q.    As a result of what you and Mr. Owens --

3    because Mr. Owens was with you, right?

4    A.    The second time, yes.

5    Q.    Yes.  As a result of what you and

6    Mr. Owens saw, there was a discussion or at

7    least some type of processing in your mind that

8    you needed to call these two gentlemen?

9    A.    Yes.

10   Q.    Did Mr. Owens know you were going to be

11   calling them?

12   A.    I believe so.

13   Q.    Did you have a discussion with him about

14   that?

15         MR. BAILEY:  With Mr. Owens?

16         MR. BARKER:  With Mr. Owens.

17         THE WITNESS:  I can't say exactly.  I

18   would say we spent all afternoon together down

19   there and we had a lot of conversations and I am

20   going to say yes, I told him I would be calling

21   the tree trimmers in.

22   BY MR. BARKER:

23   Q.    Apparently, not a man to waste time, you

24   did it that day?

25   A.    I did.

Page 133

1    morning after.  But I'm pretty sure it was the

2    next morning.  We were back over there, me and

3    him, and taking more pictures and looking at

4    more of it.

5       Q.    Now, I'm getting a little bit ahead of

6    myself.  So I want to backtrack just a little

7    bit to make sure by that time you had observed

8    that -- the tree, the cottonwood, true?

9       A.    Yes.

10      Q.    And you had taken pictures of it?

11      A.    Yes.

12      Q.    And you'd taken pictures of the

13   conductor?

14      A.    I did, from the ground.

15      Q.    To the best you could?

16      A.    Yep.

17      Q.    But what you observed in the tree was at

18   least what appeared to you to be burn marks?

19      A.    That is correct.

20      Q.    And a branch that appeared to be broken?

21      A.    There was a branch that was blackened.

22      Q.    And a conductor that appeared to have

23   marks on it as well?

24      A.    Yes.

25      Q.    Marks that would indicate to you, as an

Page 134

1   experienced lineman, that there was contact

2   between a branch and the conductor?

3      A.    Yes.

4      Q.    The markings on the conductor were

5   distinctive something that you wouldn't expect

6   on a conductor, just an average conductor?

7      A.    Yes.

8      Q.    Distinctive in what way?

9      A.    Blackened.

10      Q.    Blackened in the way that it appeared to

11   somebody observing, that it was charcoal or soot

12   or something like that?

13      A.    Yes.

14      Q.    You made these observations in the

15   morning of November 16th, correct?  First?  The

16   first time?

17      A.    That is correct.

18      Q.    We have -- I think if it is easiest for

19   you, certainly is for me, if we just go through

20   it chronologically for that day and then pick up

21   where you have the afternoon meeting.

22          Is that all right?

23      A.    That is fine with me.

24      Q.    I am going by Exhibit 25.

25          And 25 is a memo that you wrote; is that

Page 140

1    Q.    You haven't measured it to date?

2    A.    No, it was.  I just don't know what the

3    measurements are.

4    Q.    But you didn't do it?

5    A.    No, I did not.

6    Q.    When you said that you saw arc marks,

7    describe for us, if you were describing this to

8    a jury, how you would define it or describe it?

9    A.    Tree branch that was missing or had

10   smouldered back to a stub and a black soot mark

11   on the power line.

12   Q.    And Mr. Owens was there while you made

13   these observations?

14   A.    He was.

15   Q.    You told him exactly what you were

16   seeing?

17   A.    I did, and Kevin really struggled that

18   there was absolutely no way that could have

19   happened because, same thing in his mind, how

20   would it have done -- the winds must have been

21   beyond horrific to do that, and I can't say what

22   he was thinking, but in my mind it's -- we

23   needed to start there.

24          And for several days he was convinced

25   that it definitely couldn't have been, because

Page 148

1    Q.    Based upon what your personal

2    observation was and your memory and the

3    photographs, are you able to give us a close

4    approximation?

5    A.    I can give you a 10-foot area.

6    Q.    That's okay.  That is good enough.

7          So you're looking at Exhibit -- excuse

8    me, Photograph 17 of Exhibit 90?  And you're

9    drawing a circle?

10   A.    Yes.

11   Q.    Or an oval?  Okay.  Would you initial

12   that too?  Okay.

13         And within this area, what would you

14   be -- what would we be seeing if we were there

15   that day, that time looking at the conductor,

16   knowing it is against the blue sky and the

17   photograph is limited?

18         What would we be seeing?

19   A.    Four- or 5-inch carbon black spot.

20   Q.    Now, the line where you drew the oblong

21   circle is that line the neutral line or is it

22   the --

23   A.    It is phase conductor.

24   Q.    The phase conductor.  Meaning the one

25   that carried the electricity?

Page 149

1    A.      That is correct.

2    Q.      That was the phase that was closest to

3    the tree?

4    A.      That is correct.

5    Q.      Does it make any difference if the tree

6    was on the other side of the power line and it

7    contacted the neutral conductor, what would

8    happen?

9    A.      Nothing.

10   Q.      So the phase conductor is the one that

11   if there is going to be contact would generate

12   what you're seeing, a blackened branch and a

13   blackened conductor?

14   A.      That's correct.

15   Q.      So you also took photographs of where

16   the fire appeared to have started; is that

17   correct?

18   A.      That's correct.

19   Q.      That is also within these photographs,

20   at least 29?

21   A.      Yes.

22   Q.      Would you be able to identify the one

23   you think describes or depicts most accurately

24   what you saw in that area?

25   A.      Well, the problem I had is I am not a

Page 169

1    Q.     That was because you believed that that

2    tree should have been trimmed under the terms of

3    the contract?

4    A.     In my opinion, yes.

5    Q.     And also it's your opinion that that

6    tree-conductor contact is what ignited the Clark

7    fire?

8           MR. BONA:  Calls for speculation.  Calls

9    for expert opinion, incomplete hypothetical.

10          THE WITNESS:  My opinion is that the

11   tree was 4 to 5 feet away, and the wind was

12   blowing 140 miles an hour, and it pushed the

13   conductor over to the tree.

14   BY MR. BARKER:

15   Q.     What evidence do you rely upon to say

16   that the wind was blowing at 140 miles an hour?

17   A.     Nate Hoffert, who I know fairly well

18   just from working through Beartooth, he stopped

19   us over at the entrance to Line Creek later that

20   day when I was with Mr. Owens, and Nate had

21   commented on that.  His father, Dave, later told

22   me that they had -- he has never seen anything

23   like it.  It blew down grain bins three miles

24   from there.  It blew the repeater off of the

25   butte that night, and so there was no two-way

Page 171

1    don't have any -- I don't have Weather

2    Underground.  I don't know what it is.  I do

3    know another home was blown in that night or it

4    was a total loss.  The wind had imploded it, not

5    too far from where we were in Montana, as Line

6    Creek is actually very close to the state line.

7    Just across the state line there was a home that

8    was demolished, so I do know that it was fairly

9    horrific.

10   Q.    The front range of the Beartooth through

11   Cody to Clark to Belfry, that general area is

12   known as a high wind area, correct?

13   A.    I would say so.

14   Q.    Because it's known as that, that is

15   something that you knew as superintendent of

16   operations for Beartooth, correct?

17   A.    I don't know about Cody, but I can speak

18   for the Clark area as a high wind area.

19   Q.    Has a history of high winds?

20   A.    I would say so.

21   Q.    And that -- because you know that

22   history, that is part of the local factors that

23   you need to take into consideration for purposes

24   of your vegetation management, correct?

25   A.    I don't know how anybody plans for a

Page 172

1    wind event that is that great.  I don't know how

2    to answer that.

3      Q.    When the wind blows, depending on its

4    intensity, the wind will blow trees, right?

5    They will move.

6      A.    Uh-huh.

7      Q.    True?

8      A.    That's correct.

9      Q.    If it blows with enough intensity, it

10   will move conductors, true?

11     A.    That is correct.

12     Q.    And that's something that as line

13   superintendent you know?

14     A.    I do know that, yes.

15     Q.    So something that we observe as -- in

16   terms of the conductor and a branch relationship

17   on a day that is calm may be different on a day

18   when the wind blows?

19     A.    That is correct.

20     Q.    You're familiar with RUS standards for

21   line clearance?

22     A.    I am.

23     Q.    We talked about that earlier, correct?

24     A.    We did.

25     Q.    And under the RUS standards, it is

Page 173

1  required that your vegetation management policy

2  is take into consideration local conditions,

3  true?

4     A.    Yes.

5     Q.    Local conditions, meaning not only

6  weather conditions, but also the growing pattern

7  of the vegetation?

8           MR. BONA:  Calls for speculation.

9  BY MR. BARKER:

10    Q.    Correct?

11    A.    That's correct.

12    Q.    And, for example, you pointed out in

13 your earlier testimony that there's some areas

14 of the Beartooth system that -- where the

15 vegetation of the trees grow faster than other

16 areas, true?

17    A.    That's correct.

18    Q.    In this particular case, the cottonwood

19 at 197 Louis L'Amour Lane, cottonwoods like

20 water, correct?

21    A.    Yes.

22    Q.    They will -- their growing pattern

23 depends upon the availabilities of moisture,

24 true?

25    A.    Correct.

Page 199

1   soon as possible to take care of it.

2       Q.    My question was a little bit different

3   than that.  My question was:  The reason why

4   there is clearance standards is to prevent

5   danger?

6       A.    Correct.

7       Q.    To prevent a wildfire, as well as

8   interruption of services?

9       A.    Correct.

10      Q.    We talked a little bit with Mr. Owens

11  about the meters that are set at the houses --

12  at the homes -- the -- what should I call them?

13  The residences?  They are customers, consumers?

14      A.    Consumers.

15      Q.    Okay.  Your consumers.  He referred to

16  something like a smart meter?

17      A.    They can be called a smart meter.

18      Q.    Okay.  Is that what they are in Clark?

19      A.    Yes, depending on what your definition

20  of a smart meter is.  I would call them a smart

21  meter.  They're a two-way communication, so yes.

22  There is different kind of smart meters.  There

23  is RF; they use a radiofrequency.  We do not do

24  that.  We are a power line carrier, which is the

25  big difference.

Page 218

1    Q.     The contract provides for that or allows
2    for it, correct?
3    A.     It does.
4    Q.     You check the accuracy of their
5    trimming.
6           Is that something that you do?
7    A.     I am one of them, yeah.  There is
8    several of us can do it, but like I said
9    earlier, we don't -- we don't check every tree
10   that they trim.  We put them on a feeder, an
11   area or a line, and we let them trim it, and if
12   there is any questions or problems then we try
13   to help them address it, if it is a landowner or
14   something.
15          We don't inspect every tree that they
16   do.  We do spot inspections to check areas.  We
17   took -- we took the idea that Line Creek was
18   trimmed correctly at that point, and I did not
19   make a drive over there to inspect every tree
20   that they had trimmed.
21   Q.     Did you send an employee to do spot
22   inspections?
23   A.     No.  Well, we do spot inspections.  Line
24   Creek was not one of them we inspected with the
25   tree trimmers or after the tree trimmers.

Page 235

1    the contract that Asplundh had executed with

2    Beartooth, correct?

3      A.    I do.

4      Q.    And you knew on that day that you had

5    had a meeting with Mr. Rowe and Mr. Toler in

6    your office, correct?

7      A.    Yes.

8      Q.    That they had told you that they had

9    looked at the tree -- or at least Mr. Toler did,

10   and questioned why they hadn't trimmed it, and

11   expressed that opinion in that meeting, correct?

12     A.    Yes.

13     Q.    None of those things you told Mr. Ruth

14   on January 17th at 2022, correct?

15     A.    That's correct.

16     Q.    You also were aware on that day that the

17   branch stub had charcoal on it, burn marks.  The

18   conductor above it had burn marks and that a

19   branch had been located with a burned end.

20          You knew all that, right?

21     A.    That's correct.

22     Q.    Did you tell Mr. Ruth or those others

23   present about any of that?

24     A.    There was a -- there was some kind of a

25   PowerPoint or a -- some presentation that Kevin

Page 247

1    Q.     When you're speaking of the grain bins

2    being blown in, where was that?

3    A.     Just east of Clark, right by the fish

4    hatchery, close to the repeater.

5    Q.     Where -- and the house that was blown

6    in, where was that?

7    A.     It was north of the state line just a

8    few miles.  So not real far from Line Creek.

9    Q.     Belfry?

10   A.     Not to Belfry.  Just across the state

11   line, just a little ways as the crow flies

12   from...

13   Q.     If you're experienced with the wind up

14   there, as you have been, you know that the wind

15   speed can vary from drainage to drainage

16   substantially, correct?

17   A.     Yes.

18   Q.     What may be a wind speed over the hill

19   may not be the wind speed where you're standing

20   at the moment correct?

21   A.     That could be.

22   Q.     The house that blew in, was it a

23   stick-built house?

24   A.     It was a house that we actually had

25   moved through our territory above somebody that

Page 305

1    A.    Less than that.

2    Q.    Or less than, yeah.

3    A.    That is what we like to see, for sure.

4    Q.    Like to see, but it says minimum?

5    A.    That is what we ask them to do.

6    Q.    But Beartooth, at least in 2021, didn't

7    do anything to check to see if that's what was

8    done, correct?

9    A.    Not at the Hutton property.

10   Q.    With respect to the Hutton property, you

11   said that there is a number of trees that needed

12   to be trimmed on the entire Hutton property,

13   correct?

14   A.    That is correct.

15   Q.    A fairly -- I think you said, a fairly

16   large number of trees?

17   A.    Just beyond the Hutton property, yes,

18   there is a grove of aspens, yes.

19   Q.    Including on the Hutton property, the

20   camp property, correct?

21   A.    There is only just a couple trees on the

22   camp property that would ever be impacting the

23   power line, yes.

24   Q.    Including the subject tree?

25   A.    That is correct.

Page 306

1    Q.    And the subject tree should have been

2    trimmed?

3          MR. BONA:  Calls for speculation.

4    Misstates prior testimony.

5          THE WITNESS:  I would say yes.

6    BY MR. BARKER:

7    Q.    You mentioned something with respect to

8    the 50 to 60 trees about flat tops.

9          What is a flat top?

10   A.    Sometimes the tree trimmer, if they --

11   they will trim the tree, will cut the tree in

12   half.

13   Q.    The main --

14   A.    Yeah.  And we call them a flat top.

15   They do that.  It's just one of the ways you can

16   trim.

17   Q.    You mentioned that you now meet with

18   your crews, your trimming crews, at the

19   beginning of their --

20   A.    I went out with them yesterday.

21   Q.    And you do -- your meeting with them is

22   different than what you did prior to 2021?

23   A.    It is, because now I will hand them the

24   contract, and it talks exactly about the stump

25   height and the clearances that we expect.  There

Page 309

1    A.      White.

2    Q.      The pickups, are they white as well?

3    A.      They are.

4    Q.      And do your crews wear shirts that have

5    Beartooth insignia on them?

6    A.      Yes.

7    Q.      Is that a company policy?

8    A.      We try to have all the shirts that the

9    guys wear with our logo and our name on them,

10   yes.

11   Q.      And so a consumer would be able to

12   readily identify a Beartooth employee?

13   A.      I would say so, yes.

14   Q.      In the meeting that you had with Toler

15   and Rowe in your office on the 16th of November,

16   you were asked whether you told them to -- that

17   they should have trimmed or not trimmed.  You

18   didn't express an opinion one way or another

19   about whether they should trim?

20   A.      I believe they should have.

21   Q.      I think counsel was asking some

22   questions, and I got confused.

23           Did you tell them at that time, at that

24   moment in your office, they should have trimmed

25   that tree?

Page 310

1    A.    I did not.  I told them they need to get

2    legal counsel, talk to their manager.

3    Q.    As a result of that, were you implying

4    that they damn well should have trimmed that

5    tree?

6    A.    Yes.

7    Q.    Kevin Owens drives a private pickup

8    sometimes?

9    A.    Probably very seldom.

10   Q.    On the 16th of November did he drive his

11   personal pickup?

12   A.    No, we took mine.

13   Q.    Okay.  And yours, again, is?

14   A.    Company truck.

15   Q.    White?

16   A.    White.

17   Q.    Does Kevin Owens drive a black pickup?

18   A.    He does not.

19   Q.    We're trying to identify the black

20   pickup that was on site?

21   A.    We have no idea.

22   Q.    You haven't figured it out either?

23   A.    No.

24   Q.    When you figure it out, will you let us

25   know -- let your counsel know?

Page 314

1   2021 the summer of 2021?

2   A.    I do not believe I do.

3   Q.    That is all the questions I have.  Hang

4   on just a second.

5                      EXAMINATION

6   BY MR. BONA:

7   Q.    Do you remember what time on the 16th

8   you first went to the Hutton property?

9   A.    I went early morning because when my

10  journeymen called and said that he heard from

11  one of the firemen that there was a fatality, I

12  left right then.

13  Q.    So it was before you talked to Chuck and

14  Perry?

15  A.    Yes.

16  Q.    But you hadn't measured the limb to see

17  how close it was?

18  A.    No.

19  Q.    And in your mind, when you went and

20  looked at it, you thought that limb needed to be

21  trimmed?

22  A.    I would have thought so, yes.

23  Q.    And is that because you know a fire

24  happened?

25  A.    No.  Because I know that the power line

Page 315

1    was there and the tree was closer than it should

2    have been, and we had them go up and trim that

3    area.  My thought was they should have trimmed

4    that tree.

5      Q.    Do you know how close the tree -- did

6    you then at that time know how close the tree

7    was?

8      A.    No.

9      Q.    No more questions.

10          MR. BAILEY:  We will read and sign.

11          MR. SANDEFER:  I just said he should be

12   able to finish his answer.  He started

13   answering.

14          MR. PAHLKE:  What he said was it should

15   have been trimmed.

16          THE WITNESS:  That is what I said.

17          MR. BAILEY:  That is what I thought he

18   said.

19          We will read and sign.

20          MR. BARKER:  Today we marked Exhibits 85

21   through 90 sub A, and we have agreed that

22   Barbara, our court reporter, is going to be

23   taking these exhibits and handling them the same

24   way she did the exhibits in the first round.

25          MS. COATES:  No.  Okay, so we did not