# EXHIBIT 2

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF WYOMING
 2

 3    WILLIAM JEROME RUTH, individually,
      and as Wrongful Death Representative
 4    of the ESTATE OF CYNTHIA SHOOK RUTH,

 5         Plaintiff,

 6    v.

 7    BEARTOOTH ELECTRIC COOPERATIVE, INC.,
      a Montana Corporation, and ASPLUNDH
 8    TREE EXPERT, LLC, a Limited Liability
      Company formed in Pennsylvania,
 9
           Defendants.
10

11

12              DEPOSITION OF KEVIN OWENS
                     March 15, 2023
13                    8:00 a.m.

14

15    PURSUANT TO THE UNITED STATES RULES OF FEDERAL
      PROCEDURE, this Deposition was:
16
      TAKEN BY:      Robert Pahlke, Esq.
17                   Attorney for Plaintiff

18    REPORTED BY:  Barbara Jean Morgenweck, RPR, CCR
                    NCRA, RPR
19                  New Mexico CCR #526

20

21

22

23

24

25
```

2

```
 1    APPEARANCES:

 2

 3    On behalf of the Plaintiff:

 4
      Kenneth E. Barker
 5    BARKER LAW FIRM, LLC
      10956 SD Highway 34
 6    Belle Fourche, South Dakota 57717
      605-723-8000
 7    Kbarker@barkerlawfirm.com

 8    Robert Pahlke
      THE ROBERT PAHLKE LAW GROUP
 9    2425 Circle Drive, Suite 200
      Scottsbluff, NE 69361
10    308-633-4444
      Rgp@pahlkelawgroup.com
11

12    On behalf of Defendant Beartooth Electric
      Cooperative, Inc.:
13

14    Henry F. Bailey, Jr.
      BAILEY STOCK HARMON COTTAM LOPEZ, LLP
15    6234 Yellowstone Road
      Cheyenne, Wyoming 82003
16    Hank@performance-law.com
      Andy@performance-law.com
17
      On behalf of Defendant Asplundh Tree Expert, LLC:
18

19    A. David Bona
      CARLSON CALLDINE  & PETERSON, LLP
20    One Post Street
      San Francisco, CA 82601
21    Dbona@ccplaw.com

22

23

24

25
```

6

1    that you do in the utility industry.

2      Q.      What is your current position?

3      A.      I am general manager of Beartooth Electric

4    Co-op.

5      Q.      Any plans to change in the future?

6      A.      Yeah, am going to retire.   That is a big

7    change.

8      Q.      And when will that happen?

9      A.      July 1st.

10     Q.      As a professional engineer, I assume you're

11   familiar with Code of Ethics for Engineers?

12     A.      Uh-huh.   Yes, I am.

13     Q.      I don't like to nag you.   I'm going to let

14   Hank nag you.

15     A.      I will get the first one out of the way and

16   I will follow.

17     Q.      So as a professional engineer, you're -- I

18   am assuming you're familiar with the national Code

19   of Ethics for Engineers?

20     A.      Yes.

21     Q.      And I think you understand that engineers

22   are expected to exhibit the highest standards of

23   honesty and integrity?

24     A.      Yes.

25     Q.      Are you prepared to do that today?

51

1    broad jump from electricity to somebody not being

2    able to get out of a fire.  Those are two separate

3    instances in my mind.

4    BY MR. PAHLKE:

5      Q.    Let's talk about that more later, but right

6    now do you -- were you aware before November of 2021

7    that electricity could cause fires?

8      A.    Yes.

9      Q.    And were you aware that Montana and Wyoming

10   can have strong winds?

11     A.    Yes.

12     Q.    And were you aware that those fires combined

13   with wind can pose a risk of injury or death to the

14   public?

15     A.    That is a possibility, yes.

16     Q.    It is a risk, isn't it?

17     A.    Yes.

18     Q.    Is Beartooth's most important concern that

19   of safety?

20         MR. BAILEY:  Object.  Asked and answered.

21   Go ahead, answer again.

22         THE WITNESS:  Absolutely, both for its

23   employees and the public.

24   BY MR. PAHLKE:

25     Q.    It is important to be safe for both.

71

1   introduced him to me.

2         MR. BARKER:  His name is John Paulsen,

3   P-A-U-L-S-E-N.

4   BY MR. PAHLKE:

5    Q.    Do you know where he is located?

6    A.    Some place in Montana, maybe as far as

7   Woodinville.

8    Q.    When you signed the contract, are you saying

9   that on behalf of your members?

10   A.    Absolutely.

11   Q.    Are you expecting that Asplundh will trim

12   the trees so that the trees are going to avoid

13   contact with power lines that can cause fires?

14   A.    According to the standards that are provided

15   for in that contract, yes.

16   Q.    You expect them to follow that contract?

17   A.    Absolutely.  That is why it is a contract.

18   Q.    This case, you know that they didn't do that

19   at the Hutton property in 2021?

20   A.    That is correct.

21   Q.    They breached their contract to you.

22         MR. BONA:  Calls for speculation.

23         MR. BAILEY:  Calls for a legal conclusion,

24   but go ahead.

25         THE WITNESS:  I know that they were in error

72

1    not following that contract for the proper

2    clearances that are outlined in the contract.

3    BY MR. PAHLKE:

4      Q.    You know that they were negligent in not

5    following the contract.

6           MR. BONA:  Same objections.

7    BY MR. PAHLKE:

8      Q.    True?

9      A.    I know the tree was not trimmed to the

10   specifications in the contract.

11     Q.    It violated the specification of the

12   contract.

13     A.    Correct.

14     Q.    Were those specifications clear?

15     A.    I think they are.

16     Q.    Is there any doubt in your mind that those

17   specifications are clear?

18     A.    Not really.  Picture tells a thousand words.

19   A picture is about the simplest explanation and we

20   use that picture over and over and over again with

21   members in talking about the need to trim trees and

22   the whys and wherefores by it that we are actually

23   bound by codes to do that.

24     Q.    And the picture that speaks a thousand

25   words, which picture is that?

73

1    A.    That is the one within the contract that is
2  provided as part of the RUS guidelines.
3    Q.    And I am going to hand you what we have
4  marked as Exhibit 65.
5          (Exhibit 65 was marked for identification.)
6  BY MR. PAHLKE:
7    Q.    Is that the picture that speaks a thousand
8  words?
9    A.    Yes, it is.
10    Q.    Is that in every contract with every tree
11  trimmer including Asplundh that you have engaged in
12  in the last several years -- all the years you have
13  been at Beartooth Electric?
14    A.    As long as Beartooth has subscribed to the
15  RUS design and clearances for building and
16  maintaining power lines.
17    Q.    Those RUS standards.
18    A.    RUS standards.
19    Q.    Those standards are there for a reason.
20    A.    Yes, they are.
21    Q.    They are there for a safety reason.
22    A.    Safety and reliability.
23    Q.    Both -- both reasons?
24    A.    Yes, absolutely.
25    Q.    And that's something -- that picture is not

76

1   clearing guide"?

2              MR. BONA:  Not on the camera.

3              MR. BAILEY:  It's not on the camera.

4              MR. PAHLKE:  It is now.

5   BY MR. PAHLKE:

6     Q.     Would you circle the date that you

7   understand Exhibit 65 became effective.  Now at the

8   top of this exhibit which you attach to every

9   contract, true?

10    A.     That is correct.

11    Q.     For tree trimming.

12    A.     Yes.

13    Q.     Would you circle the 30-foot.  What does the

14  30-foot represent?

15    A.     Tree line to tree line.

16    Q.     What does that mean?

17    A.     The corridor that the power line runs

18  through has to be 30 feet, at least 30 feet wide.

19    Q.     Does that mean 15 feet on each side of the

20  pole?

21    A.     That would be a fair conclusion.

22    Q.     Is it your conclusion?

23    A.     The way that I am looking at the diagram,

24  yes.

25    Q.     Then below that next pole there are some

77

1   letters or some numbers, and it says, as I read it,

2   ten-foot minimum.

3      A.     That is correct.

4      Q.     Do you know what that means?

5      A.     From the center line of the pole to the

6   nearest tree limb would be ten feet minimum.

7      Q.     So that's an absolute minimum.

8      A.     As depicted here on the picture, yes.

9      Q.     That you have been using this exhibit for

10  years.

11     A.     Yes.

12     Q.     And this is what you're telling the tree

13  trimming companies they have to do to stay within

14  the standards, true?

15     A.     That is correct.

16     Q.     They have to give a 30-foot corridor where

17  the power line is going to go through, true?

18     A.     That is correct.

19     Q.     There has to be at least a minimum of ten

20  feet per side of space before you have any

21  possibility of interference with a tree?

22            MR. BONA:  Misstates the document.  Go

23  ahead.

24            THE WITNESS:  As I read it from the center

25  line of the pole.

78

1    BY MR. PAHLKE:

2       Q.    From the center line of the pole, there has

3    to be ten feet of space free of any tree.

4       A.    Minimum.

5       Q.    Minimum.  And it could be more.  It could be

6    up to 30 feet, 15 feet on a side.

7            MR. BONA:  Calls for speculation.

8    Incomplete hypothetical.

9    BY MR. PAHLKE:

10      Q.    True?

11      A.    I believe so, yes.

12      Q.    You're the guy that has been signing this

13   contract since when at Beartooth?

14      A.    That's right.

15      Q.    How long?

16      A.    Five-and-a-half years since August of 2017.

17      Q.    Has Asplundh ever come to you and said, Sir,

18   I don't know what this contract means?

19      A.    No.

20      Q.    Have they ever said, I don't know what a

21   30-foot core door means?

22      A.    No.

23      Q.    Has Asplundh ever come to you and said, I

24   don't understand what 10 feet from the center of the

25   pole to the nearest tree branch means?

97

1   or out straight horizontally.  I have no knowledge

2   of the direction that limb was growing.

3   BY MR. PAHLKE:

4     Q.     But we know that it was clearly invading the

5   space that was supposed to be free of?

6           MR. BONA:  Calls for speculation.

7           THE WITNESS:  That's correct.

8   BY MR. PAHLKE:

9     Q.     So who was the foreman that Eric was talking

10  to?

11    A.     I would just be guessing at that name.  Eric

12  can answer that question for you.

13    Q.     Do you know the name of the trimmer?

14    A.     No.

15    Q.     But what Eric shared with you is the tree

16  trimmer said to his foreman, that's the tree I

17  talked to you about a few times?

18    A.     That is correct.

19    Q.     And he was saying, that tree needs to be

20  trimmed, to the foreman?

21    A.     I don't know what he said specifically to

22  the foreman.

23    Q.     But we do know that he was calling to the

24  foreman's attention that that tree needed to be

25  trimmed?

169

1    Q.    And now is the other and different version

2    that we sent that was shown on January 20, to the

3    people at the community event center?

4    A.    They should be the same.  The person that

5    did the actual PowerPoint for me is the one that is

6    sending them.

7    Q.    Who did the PowerPoint?

8    A.    Kaaren Robbins.

9    Q.    I am going to jump ahead.  I just want to

10   talk to you about the 30(b)(6) notice we had

11   provided.  It is my understanding you are one of the

12   guys designated to speak on behalf of the company;

13   is that correct?  Am I correct?

14   A.    That is correct.

15   Q.    And are you going to be speak on all topics

16   or have you guys divided it up?

17          MR. BAILEY:  There has been no division.  I

18   provided this to Mr. Owens and Mr. Elton and was

19   advised those are the two people that can respond so

20   I think you're going to have to go

21   question-by-question.

22          MR. PAHLKE:  To shorten this up, if I have

23   already covered some things that I would cover more

24   in depth here, can we agree that he is speaking on

25   behalf of Beartooth?

170

1          MR. BAILEY:  Absolutely.

2          MR. PAHLKE:  That is agreeable to you too,

3    sir?

4          THE WITNESS:  Yes.

5    BY MR. PAHLKE:

6      Q.    You have been provided -- look at Exhibit 53

7    or if you prefer, I can give you a clean copy and

8    you don't have to wrestle with that big notebook?

9          MR. BAILEY:  He has got it, Bob.  He is

10   looking at it.

11         MR. PAHLKE:  Okay.  Ken, I have a copy for

12   you.

13   BY MR. PAHLKE:

14     Q.    Mr. Owens, have you had the opportunity to

15   look through Exhibit 53 before today?

16     A.    Yes.

17     Q.    So let's just talk about it.  Exhibit 53 is

18   the 30(b)(6) deposition notice?

19     A.    Yes.

20     Q.    You have been selected as a company

21   spokesman on some of these topics or perhaps parts

22   of all or all?

23     A.    That is correct.

24     Q.    Who selected you?

25     A.    Who selected me?

171

1    Q.     Yes.

2    A.     I did.  Comes with the job.

3    Q.     How did you decide to select yourself?

4    A.     It is my job.

5    Q.     Do you understand that your testimony binds

6    the defendants on the topics that are listed on the

7    30(b)(6) notice Exhibit 53?

8    A.     Correct.

9    Q.     And before we started talking about

10   Exhibit 53, we had a brief conversation and to save

11   time, I think we have all agreed that if I talk to

12   you -- if I have already talked to you about one of

13   these topics, we can agree that that is on behalf of

14   the Beartooth Electric Cooperative?

15   A.     Correct.

16   Q.     So we don't have to plow things twice, fair

17   enough, and agreed to by all?

18   A.     Yes.

19          MR. BAILEY:  Yes.

20   BY MR. PAHLKE:

21   Q.     Let's just talk.  You said, maybe answer to

22   my question before I got to it, you were selected

23   because having the position you have with the

24   Beartooth, this sort of thing comes with the job?

25   A.     That's correct.

172

1    Q.     You do understand your testimony binds the

2    Beartooth on the topics that we're going to address

3    and have addressed?

4    A.     That's correct.

5    Q.     Do you agree to testify on all of the

6    topics?  I think we have 13.

7    A.     I believe so, yes.

8    Q.     What have you done to prepare for this

9    deposition?

10   A.     Just briefed myself on the interrogatories

11   and the responses that we provided on these notices.

12   Q.     About how much time did you spend preparing

13   for this deposition?

14   A.     Probably 3 or 4 hours yesterday.

15   Q.     Who has information besides you on these

16   topics?

17   A.     Eric Elton and myself collaborated on all of

18   these.

19   Q.     You talked to Eric?

20   A.     He did a lot of the data gathering that was

21   in his possession.

22   Q.     And what have you learned from Eric?

23   A.     What did I learn from Eric?

24   Q.     As it relates to these questions.

25   A.     There weren't any surprises.  It was stuff

212

 1           MR. BONA:  Argumentative.

 2           THE WITNESS:  The work should have been done

 3    correctly and was not done.

 4      Q.    And just because we had an objection, things

 5    get a little confused at the end of the day.  What

 6    should have been done is the tree should have been

 7    trimmed back at the Hutton property where the fire

 8    started?

 9           MR. BONA:  Calls for speculation, lacks

10    foundation.

11           THE WITNESS:  I believe it should have been,

12    yes.

13    BY MR. PAHLKE:

14      Q.    It was not?

15      A.    That is correct.

16      Q.    You confirmed that on the basis of personal

17    observation?

18      A.    Yes.

19           MR. BONA:  Same objections.

20    BY MR. PAHLKE:

21      Q.    So Eric goes and he inspects to make sure

22    the Asplundh does what its supposed to do?

23      A.    Yes.

24      Q.    He reported back to you that Asplundh hadn't

25    done what he was supposed to do at the Hutton camp

213

1  property?

2  A.   Yes.   That was probably a joint -- one of

3  those joint trips out there in the field to the

4  site.

5  Q.   Was that something he reported to you?

6  A.   Yes.

7  Q.   Did he report that to you before the fire?

8  A.   No.

9  Q.   So he had not inspected that area or didn't

10  report to you about that area not being trimmed back

11  like it was supposed to before the fire?

12  A.   That's correct.

13  Q.   Are there any audits of these areas to make

14  sure they're being properly done, properly trimmed?

15  A.   Other than what I just previously described

16  to you as far as him driving through the areas and

17  circuits when he is there in the area following-up

18  work they have done on a circuit.

19  Q.   And is that also what you might call a

20  patrol the power line?

21  A.   Well, it's -- no, it is a different function

22  than patrolling.  Patrolling is looking for the

23  cause of an outage, what might be a problem for the

24  future per se or the cause of an outage.  Like I

25  say, inspecting work is a totally different function

218

1    property where the fire started?

2      A.    No, I don't.

3      Q.    In terms of the help you have been trying to

4    get in terms of management, you have taken it upon

5    yourself in part to have this program 20 percent a

6    year for every five years, and you have companies

7    like Asplundh and Davey coming in and trimming?

8      A.    I know that to be the correct way to operate

9    a vegetation management program.

10     Q.    And who -- you shared already that the guy

11   that is going to testify later today?

12     A.    Eric.

13     Q.    And he does inspections to see that the

14   Asplundhs are doing their job?

15     A.    Correct.

16     Q.    Are there any other assessments, surveys, or

17   patrols to look to see:  Is there a hazard between

18   power lines and trees or to confirm that the tree

19   trimmers are doing their job?

20     A.    It would come directly back from the line

21   crews to the journeymen in their work out in the

22   field.

23     Q.    The bidding, is that submitted -- are the

24   bids submitted to the lowest bidder or how do you

25   assign them the contract work that you have?

222

1   days?

2       A.      I presume it was many, much more than three

3   days, yes.

4       Q.      Any other knowledge you have or oral written

5   communications about the activities of your company

6   or Asplundh concerning the Line Creek area and

7   specifically what we are calling the subject tree

8   which is the one where the fire started?

9       A.      I don't believe we have had anymore contact

10  with Asplundh, other than meeting on site and doing

11  existing work.

12      Q.      Topic 6, evidence associated with origin and

13  cause of the Clark fire.  You shared some

14  information.  Do you have any other information to

15  share that you haven't already shared?

16      A.      Regarding the origin?

17      Q.      Yes.

18      A.      No.  Just that I have got a different

19  perspective as going through the process in the

20  investigation process.

21      Q.      Have you shared that with us?

22      A.      No, I haven't.

23      Q.      Do you want to share it with us?

24      A.      I believe that it is reasonable to suspect

25  that that contacting of that limb with that

223

1   conductor was the origin of the fire.

2       Q.      Why do you believe that?

3       A.      It is just understanding a lot of the

4   investigation and watching people, listening to them

5   out in the field and taking a look at the line, the

6   marks on the line and understanding a little bit

7   more about the fire investigation process.  I think

8   that is a reasonable conclusion.

9       Q.      Who did you talk to that helped you get to

10  that conclusion by name?

11      A.      They weren't helping me get to a conclusion.

12  I was making my own conclusions just based on

13  reading Eric's report.  I just read the IRIS report

14  and other things like that.  I think that is -- I

15  think it is a person in my position, how in the hell

16  it happened?  I don't know, but I think it happened.

17          It is a real stretch for me, as I said, from

18  day one.  I couldn't get it through my head how

19  sparks could travel from what I believe was a

20  smouldering line contact with a tree that could

21  generate enough energy, enough sparks to travel

22  150 feet through this spiderweb of limbs.

23          I just couldn't get there, but I have

24  nothing else.  I had nothing.  I just reported that

25  somebody felt it was an ash can.  That is all I did

224

1   there.  I didn't know if it was valid or not.  It

2   was just a point of reference that I probably beat

3   you down a hell of a lot more if I didn't bring

4   something like that forward and somebody calling up

5   saying, hey, that is where that fire started, but I

6   think it is a reasonable conclusion.

7       Q.     That the fire started at the tree?

8       A.     Yes.

9       Q.     On the Hutton property where the camp was

10  located?

11      A.     I think that is a reasonable conclusion at

12  this point.

13      Q.     That is your conclusion on behalf of the

14  Beartooth?

15      A.     Yes.

16      Q.     Any other evidence concerning origin and

17  cause of the fire that has been called by me the

18  Clark fire?  It has been called other things:  That

19  tree that was involved in Mrs. Ruth's death, the

20  Hutton campfire which isn't the right name but the

21  owner's name?

22      A.     I just think it is just one of those things

23  that you constantly wrestle with.  I have never

24  dealt with anything this tragic in my 46 years in

25  the business.  I hate to see it; I hate to be part

232

1    BY MR. PAHLKE:

2        Q.     But the pole didn't break off?

3        A.     No, but --

4        Q.     So let's assume --

5        A.     -- I am not going to speculate.

6        Q.     We have already established through you that

7    the limb was the source of the fire?

8        A.     I think that is a reasonable conclusion.

9        Q.     Had the limb -- that limb been removed and

10   others around it if they needed to be removed, that

11   area would not have been a source of the fire; do

12   you agree?

13           MR. BONA:   Calls for speculation, incomplete

14   hypothetical.

15           MR. BAILEY:   Same objection, go ahead.

16           THE WITNESS:   I -- just on the facts that we

17   know right now.

18   BY MR. PAHLKE:

19       Q.     Yes?

20       A.     It would not have contacted.

21       Q.     And I have never been in the position of

22   Cindy Ruth.   I have never been in winds that you

23   describe as high as 140 miles-an-hour, maybe more,

24   maybe it is less than that.   Maybe it is a hundred

25   miles-an-hour, in blow sand with a fire that is

235

1    terrible, terrible tragedy, that it is hard to place

2    blame on anyone under the condition of such extreme

3    wind and fire, event like that.  They just felt it

4    was a terrible, terrible tragedy to Larry and the

5    community.

6        Q.    To Larry?

7        A.    Suffering the loss of Cindy.

8        Q.    You mean Jerry?

9        A.    Jerry, yes.  I am sorry.

10       Q.    Are you blaming -- I need to know, are you

11   blaming Cindy?

12       A.    No, I am not speculating on any of that.  It

13   is just, as I relayed originally, it is a terrible

14   event that a lot of things happened in a very short

15   amount of time.

16       Q.    Are you critical of Cindy?

17       A.    No.

18       Q.    Are you critical of Jerry?

19       A.    No.

20       Q.    Are you critical of the fire department?

21       A.    No, I have nothing to be critical of them

22   of.  It was a terrible event.  It was a tragic

23   event.  You wouldn't want to see anybody go through

24   or that community go through.

25       Q.    You do agree that if a tree trimming company

236

1    had done its job properly, it could have cut that

2    limb back?

3           MR. BONA:  Asked, answered, calls for

4    speculation, incomplete hypothetical, calls for

5    expert opinion.

6           MR. BAILEY:  Right.  Could I get that

7    question read back?

8           (The last question was read by the court

9    reporter.)

10          THE WITNESS:  Yes, I believe that.

11   BY MR. PAHLKE:

12    Q.    The next topic I have for you is, I believe,

13   No. 7, scope of the contract you have had with

14   Asplundh?

15    A.    Yes.

16    Q.    Is there any additional information that you

17   haven't given us concerning the contract and the

18   performance of the contract you want to call to our

19   attention?

20    A.    No.

21    Q.    Other than Exhibit 65, the large poster, are

22   there any quality control standards, safety

23   standards, safety rules, safety practices that apply

24   to either, first of all, to bear...

25          MR. BAILEY:  Beartooth.

247

1    A.    Not very many.

2    Q.    But you don't know?

3    A.    No, I don't.

4    Q.    But you know it does happen a few to a

5    number of times per year?

6    A.    We have got a couple areas of our system

7    that experience high winds.

8    Q.    This is one of them?

9    A.    Yes.

10   Q.    It has done so for years?

11   A.    I would say more pronounced in recent years

12   than in the past.  There is an element of climate

13   change that has taken place in that valley and the

14   Beartooths.

15   Q.    So No. 2, I asked you this before.  I think

16   you already answered it, but do you in any way

17   criticize or blame Cindy Ruth for her death?

18   A.    No, not at all.

19   Q.    Do you in any way blame the Clark Fire

20   Department?

21   A.    No.  I am not passing judgment on any of

22   those people.

23   Q.    Do you -- in this it says, if the Clark fire

24   was caused by a tree coming into contact with your

25   line and if a pre tree was not properly trimmed by

264

1    protection system.

2        A.     That was part of the wrestling in my head.

3        Q.     Did Mr. Black have a struggle with that same
4    idea, to your knowledge?

5        A.     No, he didn't share anything that was going
6    on in his head.

7        Q.     Mr. Black doesn't -- his report states that
8    he does not agree that the tree to power line
9    contact caused the fire, doesn't it?

10       A.     I think he does on that preliminary one,
11   yeah.

12       Q.     Is there another report?

13       A.     No, I have never seen another report.

14       Q.     I think you said that he -- the five and a
15   half -- it was 5-and-a-half feet distance from the
16   power line to the contact on the tree?

17       A.     Yes.

18       Q.     Do you mean the little nub that was depicted
19   in the photographs?

20       A.     Yes, the charred area.

21       Q.     Did you measure that yourself?

22       A.     No.  He did.  Eric did in a bucket.

23       Q.     He said it is five-and-a-half feet from the
24   conductor to the area of broken tree?

25       A.     That's right.  He was up in the bucket with

305

1    actually applied for service to get electricity

2    there, and on their membership application, I

3    believe that was 2004.

4        Q.    And do you know -- well, has that line

5    been -- had any maintenance done to it?

6        A.    Eric would know the answer to that question.

7        Q.    Okay.

8        A.    Right away.

9        Q.    And do you do -- well, does the RUS require

10   pole integrity inspection, pole inspections?

11       A.    I don't believe so.  There are practices in

12   place.  Every ten years, you're supposed to inspect

13   your system, or ten percent of your system every

14   year, something along that line.  We have those

15   requirements in Wyoming specifically.

16       Q.    Does Beartooth follow those requirements?

17       A.    They have since I have been there.

18       Q.    Do you know when the last time the poles in

19   Line Creek line would have been inspected?

20       A.    2019 or January 7, 2020.

21       Q.    Who did that work -- who did the inspection?

22       A.    Our linemen.

23       Q.    Did they also visually inspect the lines?

24       A.    I don't know if that was part of it or not.

25   It was a GIS location.  It was pictures of the tree,