# EXHIBIT A

Page 1

```
 1
              IN THE UNITED STATES DISTRICT COURT
 2                FOR THE DISTRICT OF WYOMING

 3
     WILLIAM JEROME RUTH, individually,
 4   and as Wrongful Death Representative
     of the ESTATE OF CYNTHIA SHOOK RUTH,
 5
          Plaintiff,
 6
     V.
 7
     BEARTOOTH ELECTRIC COOPERATIVE, INC.,
 8   a Montana Corporation, and ASPLUNDH
     TREE EXPERT, LLC, a Limited Liability
 9   Company formed in Pennsylvania,

10        Defendants.

11

12
             DEPOSITION OF WILLIAM JEROME RUTH
13                   May 18, 2023
                     8:30 a.m.
14

15
     PURSUANT TO THE UNITED STATES RULES OF FEDERAL
16   PROCEDURE, this Deposition was:

17   TAKEN BY:      Henry F. Bailey, Jr., Esq.
                    Attorney for Defendant Beartooth
18                  Electric

19   REPORTED BY:  Barbara Jean Morgenweck, RPR, CCR
                    NCRA, RPR
20                  New Mexico CCR #526

21

22

23

24

25
```

```
                                                        Page 2
  1    APPEARANCES:

  2

  3    On behalf of the Plaintiff:

  4
       Kenneth E. Barker
  5    BARKER LAW FIRM, LLC
       10956 SD Highway 34
  6    Belle Fourche, South Dakota 57717
       605-723-8000
  7    Kbarker@barkerlawfirm.com

  8    Robert Pahlke
       THE ROBERT PAHLKE LAW GROUP
  9    2425 Circle Drive, Suite 200
       Scottsbluff, NE 69361
 10    308-633-4444
       Rgp@pahlkelawgroup.com
 11
       Ian Keith Sandefer
 12    SANDEFER & WOOLSEY, TRIAL LAWYERS, LLC
       143 North Park Street
 13    Casper, WY 82601
       Phone: (307) 232-1977
 14    Ian@swtriallawyers.com

 15
       On behalf of Defendant Beartooth Electric
 16    Cooperative, Inc.:

 17
       Henry F. Bailey, Jr.
 18    BAILEY STOCK HARMON COTTAM LOPEZ, LLP
       6234 Yellowstone Road
 19    Cheyenne, Wyoming 82003
       Hank@performance-law.com
 20    Andy@performance-law.com

 21    On behalf of Defendant Asplundh Tree Expert, LLC:

 22
       A. David Bona
 23    CARLSON CALLDINE & PETERSON, LLP
       One Post Street
 24    San Francisco, CA 82601
       Dbona@ccplaw.com
 25
```

1    Cheyenne, looked there, and went to Casper and

2    looked in there and then came to Cody and found

3    a place that we settled on in Clark.

4            MR. BAILEY:  Can't believe you passed up

5    Cheyenne for Clark.  That's just a joke.

6            THE WITNESS:  I understand.

7    Q.    So what year did you actually move to

8    Clark?  When did you start living there?

9    A.    In 2008.

10   Q.    Okay.  When were you married?  When were

11   you and Cindy married?

12   A.    In 1983, April 16th.

13   Q.    And is it all right with you if I refer

14   to her as Cindy?

15   A.    Yes.

16   Q.    Okay.  I want to visit with you today

17   about, you know, what's been referred to as the

18   "Clark fire."  That's the main purpose of my

19   questions today.

20           You were on the Clark Fire Department,

21   volunteer fire department, at the time of Clark

22   fire; is that correct?

23   A.    Yes.

24   Q.    How long have you been on the volunteer

25   fire department?

Page 12

1   you?

2    A.      So, roughly, around 10:30, I was

3   getting -- making ready for bed.  Cindy was

4   already in bed.  And I was -- our light switches

5   for the family room are on the west side of the

6   house, and we have a glass door that looks right

7   off the Line Creek and up into the mountains.

8          And as I walked toward the door to turn

9   the light switches off, I could see a glow and

10  flickering west of my location, up along Line

11  Creek, north of the creek.  And that caused me

12  to check my phone.  I get fire pages across my

13  phone.

14         My phone shuts down at 8:00.  It goes on

15  the silent mode.  And so the page didn't come

16  through.  It was registered to the phone, but it

17  didn't come through as an audible sound.

18   Q.     Okay.

19   A.     And so when I checked the phone, I saw

20  that there had been a page out for a fire on

21  Louis L'Amour.  And so I alerted Cindy there was

22  a fire up on Louis L'Amour and that I was going

23  to respond to it.

24   Q.     And you recall that you looked at your

25  phone at -- it was around 10:30 that evening?

Page 14

1    message and see who's responding and what they

2    indicated their response time would be to the

3    station or to the scene.

4      Q.    As you sit it here today, do you recall

5    the information that you received that night,

6    what you were told?

7      A.    What I recall is that there was a fire

8    and that -- nothing more.

9      Q.    Okay.  Do you recall anything about

10   where you were to go, the location or anything

11   like that?

12     A.    So to answer your question, I made ready

13   to leave, got dressed.  And I have a handheld

14   radio, a two-way radio, that I keep in a charger

15   at my house.  I turned it on and could hear a

16   little bit of the traffic, but I don't get

17   reception at the house generally.

18          So -- but I do get reception at the

19   mailboxes on 1AB at Crossfire Trail.  So once I

20   drove up to that location, I got information on

21   what to do at that point.  I inquired with Nate

22   Hoffert, what he wanted me to do, and he

23   instructed me to go to the station and bring a

24   truck with me.

25     Q.    Okay.  So you had a radio?

Page 15

1     A.     Handheld.

2     Q.     A handheld radio?

3     A.     Two-way.

4     Q.     You also had your cell phone with you?

5     A.     Yes.

6     Q.     Did you have anything else besides those

7  two means of communications?

8     A.     Not until I got to the station.

9     Q.     Okay.  When you spoke with Mr. Hoffert

10  at the mailboxes and he told you to go get a

11  truck, did he tell you which truck to get or did

12  you know which one you were supposed to get?

13     A.     I believe he instructed me specifically

14  what truck to bring up.

15     Q.     Okay.

16     A.     But -- and I believe it was truck 83,

17  but I'm not certain of that.

18     Q.     Okay.  What is truck 83, what kind of

19  truck is that?

20     A.     It's a modified pickup truck that has

21  equipment in the bed of it for like brush fires

22  and that sort.

23     Q.     What kind of -- what vehicle did you

24  drive to the mailboxes?

25     A.     83.  I believe it was 83.

1    A.    Or, well, wait a minute, 3500.

2    Q.    3500?  Okay.

3          When you got to the fire station, what

4    did you do?

5    A.    I parked my vehicle, went into the fire

6    station, which was open, and I put on my bunker

7    gear, and I got in the truck, started it up, and

8    drove it to the mailboxes --

9    Q.    Okay.

10    A.    -- at 1AB and Crossfire.

11    Q.    Okay.  Do you know about what time you

12    got to the fire station?

13    A.    No.

14    Q.    How far is the fire station from your

15    home?

16    A.    Eight miles.

17    Q.    Eight miles?

18    A.    Roughly.

19    Q.    Okay.  Okay.

20          Tell me what you observed as you were

21    driving from your home to the fire station in

22    terms of what you saw of the fire, if anything?

23    A.    Rephrase that.

24    Q.    Well, as you were driving from your home

25    to the fire station, did you observe any part of

Page 21

1   didn't seem any different than earlier in the

2   day.

3     Q.    Okay.  So you're at the mailboxes with

4   truck 83.  Are you by yourself?  I mean, did you

5   have that truck by yourself?

6     A.    Yes.

7     Q.    Okay.  Who did you meet at the

8   mailboxes, if anyone?

9     A.    No one that I recognized.

10    Q.    Okay.  Were you given an assignment when

11  you reached the mailbox in truck 83?

12    A.    Yes.

13    Q.    What was that?

14    A.    To assist in communications with the

15  field units and dispatch.

16    Q.    Okay.  And describe what that means.

17    A.    I was going to be the relay person

18  taking messages from trucks and crew that were

19  already involved in fighting the fire, and

20  relaying whatever information they had to radio

21  dispatch in Cody because their -- we had limited

22  coverage in that area, radio coverage.

23    Q.    Okay.  Why was there limited radio

24  coverage in that area?  Is that typical or was

25  that unusual for that night?

Page 22

```
 1    A.    Typical.
 2    Q.    Okay.  I understand that there was a
 3  repeater somewhere in the area that was blown
 4  down or damaged in some way that night and would
 5  have been effective communications.
 6          Are you aware of that?
 7    A.    I heard about that later.
 8    Q.    Okay.  Do you have any idea whether that
 9  affected the ability to communicate that night?
10    A.    I was told that it did.
11    Q.    Okay.  Did you notice anything unusual
12  about your ability to communicate that night
13  with the agencies that you were communicating
14  with?
15    A.    Did I notice anything in particular?
16    Q.    Yeah.  Anything out of the ordinary with
17  your ability to communicate with people?
18    A.    No, not with the frequency of it.
19          MR. SANDEFER:  I just want to put an
20  objection to as to time, anytime during the
21  night.
22  BY MR. BAILEY:
23    Q.    Let's confine it to when you were first
24  at the mailboxes and received your assignment.
25          Early on in the evening, you didn't
```

Page 31

1    A.    I did it on my own.

2    Q.    Okay.  Where did you go after you left

3    Teri's house?

4    A.    Went back to the mailboxes.

5    Q.    Okay.  Continued the coordination of

6    communications?

7    A.    Radio traffic.

8    Q.    Okay.  When you went back to the

9    mailboxes after you left Teri Cothern's house,

10   were there other people from the Clark Fire

11   Department there with you that you recall?

12   A.    At some point I had a conversation with

13   Nate Hoffert.

14   Q.    Tell me about that.

15   A.    Nate was in another fire truck and he

16   had another fireman with him.  I don't know who

17   that was.  But we had a open-window

18   conversation, truck to truck.  At some point

19   between the time that I left Teri's house and

20   when I met up with Nate, the rear window of my

21   truck was blown out, the back window that faces

22   the bed of the truck.

23   Q.    Do you know why that happened?

24   A.    Not exactly.  I assumed that a rock hit

25   it, an airborne rock.

Page 44

1    A.    No.

2    Q.    Okay.  So there's a call that she placed

3    to you, and then according to your record, you

4    placed a call to her at 11:54.

5          You're not sure if that's the precise

6    time, but you do recall making a phone call to

7    her on your cell phone that evening?

8    A.    Yes.

9    Q.    When was that call made in relationship

10   to the conversation you had with Nate Hoffert at

11   the mailboxes?

12   A.    Before.

13   Q.    Okay.  And what did -- tell me about

14   that conversation.

15   A.    It was very short and to the point.  I

16   told her that I -- and I -- excuse my language

17   at this point -- I told her to get the fuck out.

18   Q.    Okay.

19   A.    And I don't use that word ever.  And,

20   you know, I wanted to drive a point home to her

21   that she needed to leave immediately.

22   Q.    Okay.  Was there some hesitation on her

23   part to leaving?

24   A.    No.

25   Q.    Okay.

Page 45

```
 1    A.    Not that I picked up on.

 2    Q.    Okay.  And you hadn't had any other

 3  conversation with her before that?

 4    A.    No.

 5    Q.    Okay.  Other than the one at home?

 6    A.    Correct.

 7    Q.    Okay.  Did you give her any instructions

 8  about where to go when she left the home?

 9    A.    No.

10    Q.    To come to the staging area or anything

11  like that, just get out?

12    A.    Just get out.

13    Q.    Okay.  When you had that conversation

14  with her, where was the fire as far as you can

15  recall?

16    A.    It was on Hoot Owl Trail.

17    Q.    Okay.  And Hoot Owl Trail moving east?

18    A.    Yes.

19    Q.    Along Line Creek?

20    A.    Yes.

21    Q.    Okay.  Then if we -- if we look back --

22  stay on page 78, Mr. Ruth.  We have a number

23  of -- there are a number of calls that you

24  placed to Cindy beginning at 11:54.

25          MR. BAILEY:  If you go down two more
```

Page 47

```
 1    A.    Yes.

 2    Q.    Okay.  All right.

 3          MR. SANDEFER:  If we're at a breaking

 4    point, we've been going about an hour, I might

 5    take a little break.

 6          MR. BAILEY:  Absolutely.  Absolutely.

 7    Yeah.

 8          (A recess was taken from 9:34 a.m. until

 9    9:49 a.m.)

10          (Exhibit 112 was marked for

11    identification.)

12    BY MR. BAILEY:

13    Q.    Mr. Ruth, I'm handing you what's been

14    marked Exhibit 112.  And I gave you a copy.  And

15    this is not a document that you had anything to

16    do with preparing, I realize that.

17          This is the Park County Sheriff's Office

18    narrative of the Clark fire.  And I just want to

19    clarify a couple of things.

20          MR. BAILEY:  If you'll turn to the

21    second page of that document, Mr. Ruth, and we

22    go down to the line that begins:  "On Tuesday

23    November 16, 2021, at approximately

24    0-1600 hours, he received a voicemail."

25          First of all, let me ask you this:  Do
```

1    mailboxes, where he said he was going to go get

2    Cindy?

3       A.    Yes.

4       Q.    Okay.  Any idea how long after?

5       A.    Can I make some clarifications here?

6       Q.    Yes.  Well --

7             MR. SANDEFER:  If you need to say

8    something to answer his question in context, go

9    ahead, is my thought.

10            MR. BAILEY:  Okay.  Go ahead.

11            THE WITNESS:  So restate your question,

12   please.

13   BY MR. BAILEY:

14      Q.    This time that you go to your -- with

15   this fire department employee, you go to your

16   wife's vehicle, you find your wife's vehicle.

17      A.    So let's back up just a second.

18      Q.    Sure.

19      A.    I made two trips down there.

20      Q.    Okay.

21      A.    Okay?  And this is where I want to

22   clarify some things.

23      Q.    Okay.

24      A.    Okay?  I made two trips.  One initially

25   to -- right after I saw Nate Hoffert drive down

Page 51

1    Crossfire Trail, he did not go to where our

2    driveway was.

3          At that time, I went and made contact

4    with another fireman that I did not know, he was

5    from another fire department.  And I said to

6    him, I said, I need to get down to get my wife

7    out.  And he agreed to go with me.

8          He drove his truck, I was a passenger.

9    We went to Louis L'Amour Lane, which is on the

10   north side of Line Creek, meaning we had to

11   cross over the bridge on Line Creek, and we

12   turned and went east down the driveway to where

13   we found my wife's car parked, stopped in the

14   middle of the driveway.

15     Q.    Okay.

16     A.    Can I continue?

17     Q.    You can, absolutely, go ahead.

18     A.    Okay.  The car was occupied by three

19   dogs.  The rear hatch of the Subaru was open.

20   There was a pillow that was on fire inside of

21   the hatch.  My wife was not around.  But I

22   tossed pillow aside, and we took the dogs.  The

23   firemen and I both took all three dogs out of

24   the car, we placed them in the fire truck.

25          At that point we went down the driveway.

Page 53

```
 1    A.    And there was a bit of fire on the north
 2  side of the driveway as well.  So with the dog
 3  secured in his truck, we went on foot to the
 4  house.
 5    Q.    Okay.  Did you walk all the way to the
 6  house?
 7    A.    Yes.
 8    Q.    Okay.  Did you go in the house?
 9    A.    Yes.
10    Q.    Okay.  Again, you're searching for your
11  wife?
12    A.    Yes.
13    Q.    Okay.  How -- any idea how long it took
14  for you to walk from the car to your house?
15    A.    I'm going to say it's roughly half a
16  mile.
17    Q.    Okay.
18    A.    So not very long.
19    Q.    Okay.  And then when you got to the
20  house, what did you do?
21    A.    Well, the house was on fire.
22    Q.    Where was the house on fire?
23    A.    The house was on fire on the northwest
24  corner.
25    Q.    By the garage?
```

Page 54

```
 1    A.    No, this would have been by the -- what
 2  we commonly call the front door.
 3    Q.    Oh, okay, okay.  What did you do?
 4    A.    I grabbed the bucket and threw water on
 5  it.  There was -- we have a hot tub, and I
 6  flipped the cover over and grabbed the bucket
 7  with water and threw water on it --
 8    Q.    Okay.
 9    A.    -- and put it out.
10    Q.    Okay.  Then what did you do?
11    A.    Entered the house and the house was full
12  of smoke.  We did not locate my wife there.
13  He -- I believe the other fireman checked my
14  shop, which was still a wreck, but on fire at
15  that point.  And we reconnected and walked back
16  to the car and to his truck, and he said, we
17  need to get out of here.
18    Q.    Okay.  So you drove back the way you
19  came in?
20    A.    Yes.
21    Q.    Okay.  And the reason you went with the
22  fireman is after Nate Hoffert told you he was
23  going to get Cindy, he didn't go in the
24  direction to get Cindy?
25    A.    Correct.
```

Page 59

```
 1   the first one did you go down there again?
 2    A.    Minutes.
 3    Q.    Okay.
 4    A.    So -- so during the time that -- and I
 5   can't give you a pinpoint.
 6    Q.    Okay.  That's fair enough.
 7    A.    I called a neighbor, Charley Jones, and
 8   he responded up to the mailboxes.  And Charley
 9   lives just down the road a couple of miles, and
10   he took charge of the dogs and took them to his
11   house.
12    Q.    Okay.
13    A.    And once I got the dog settled --
14   because Charley was already waiting up there
15   when I showed up with the dogs.
16    Q.    Waiting where?
17    A.    At the mailboxes for me.
18    Q.    Okay.
19    A.    And he took the dogs with him, and then
20   I made contact with the second crew of firemen.
21   And there was three of them; there was a female
22   and two males.
23    Q.    Okay.
24    A.    And we went back down there in a fire
25   truck, a pickup truck.
```

Page 60

1    Q.    Okay.

2    A.    And the car was still there.

3    Q.    Okay.

4    A.    At this time, it started to burn.

5    Q.    The car had started to burn?

6    A.    Yes.

7    Q.    Okay.

8    A.    The right rear tail light was on fire.

9    Q.    Okay.

10    A.    And I said something to them to the

11    effect, should we try to get this car out of

12    here?  And they said, no, leave it.

13    Q.    Okay.

14    A.    And so we did a sweep.

15    Q.    Where did -- so that you're in the fire

16    truck --

17    A.    Yes.

18    Q.    -- with these three.  Do you know the

19    names of any of these three individuals?

20    A.    No.

21    Q.    Okay.

22    A.    They were not people I'm used to working

23    with.

24    Q.    Okay.  You're at the car, it's on fire,

25    you ask them if you should get it out, they say

Page 61

1    leave it.

2              Where do you go from there?

3    A.        So we park the truck.

4    Q.        Okay.

5    A.        At the car.

6    Q.        Okay.

7    A.        And we get out on foot.  And we're doing

8    sweep.  Now, we're spread out across my driveway

9    on both sides.

10   Q.        Okay.

11   A.        And we're walking down toward the house.

12   Q.        Okay.

13   A.        And this time we did a more thorough

14   search.  I went into the house again.  The house

15   was still full of smoke.  Our cats were still in

16   the house.  I don't remember seeing my horse.

17   Q.        Okay.

18   A.        We checked all the buildings.  The -- at

19   that time, the shop was on fire.  The greenhouse

20   was on fire.  I grabbed a bucket of water again

21   and tried to put the greenhouse out and was not

22   successful.  We circled around, got together.  I

23   said, let me take my truck out of here.  And I

24   did.  And they -- the other firemen got in the

25   four-wheeler, my side-by-side, and they drove

Page 62

1    that out.

2       Q.    Okay.

3       A.    I got the truck stuck trying to go

4    around the -- my wife's car.

5       Q.    Did you go on the north side of the

6    road?

7       A.    South side.

8       Q.    South side?  The Line Creek side?

9       A.    Yes.

10      Q.    Okay.

11      A.    And so we left the truck there.  It was

12   in the burn.  It was in the black, and I felt

13   that it was safe there.  And I got it back in

14   the pickup truck, and the other firemen drove

15   the four-wheeler up to the mailboxes as we

16   followed them up in the truck.

17      Q.    Okay.  But your truck got stuck on the

18   south side of the road?

19      A.    Yeah, I left it there.

20      Q.    So the fire had already gone through

21   that area?

22      A.    Yeah, that's what means "in the black."

23      Q.    Okay.  Okay.

24            When you were at -- when you were at the

25   car the first time --

Page 64

```
 1    Q.    Okay.

 2    A.    And he would not let me go back down.

 3    Q.    Okay.  Mr. Ruth, are you at the mailbox

 4  when he says --

 5    A.    Yes.

 6    Q.    -- they may have, excuse me, they may

 7  have located Cindy?

 8    A.    Yes.

 9    Q.    And that was the sheriff's deputy?

10    A.    Yes.

11    Q.    Okay.  At some point did somebody bring

12  you Cindy's cell phone to identify?

13    A.    Yes.

14    Q.    Where were you when that happened?

15    A.    I was sitting in Katrina Heyworth's (ph)

16  departmental vehicle at the mailboxes.

17    Q.    Okay.  Okay.  Do you have any idea of

18  the timeframe from the time you were told by the

19  sheriff's deputy they may have found Cindy's

20  body to the time that they brought the cell

21  phone to you?  Are we talking half an hour or a

22  few minutes longer?  Do you have any idea of how

23  long that span was?

24    A.    Well, first of all, they didn't tell me

25  they found her body.
```

Page 65

1    Q.    Okay.  They just said they had located

2    her?

3    A.    May have located her.

4    Q.    May have located her.  Okay.

5          From the time they told you that to the

6    time they brought you the cell phone, what?

7    A.    Minutes.

8    Q.    Minutes, okay.

9    A.    Twenty minutes maybe.  I don't know.

10   Q.    Okay.  Who brought the cell phone?

11   A.    A sheriff's deputy.

12   Q.    Okay.  And it was Cindy's phone?

13   A.    Yes.

14   Q.    Okay.  Tell me about that conversation.

15         MR. BAILEY:  Do you need to take a

16   minute, Mr. Ruth?

17         THE WITNESS:  They came to the driver's

18   door.  I was sitting -- sitting in the driver's

19   seat, and he said that -- something to the

20   effect that, I need to know whether you can

21   identify this phone.  And he had it in a plastic

22   zip bag that I could see through.  And I told

23   him it was Cindy's phone.

24   Q.    Okay.

25   A.    And it was burned.  And it was scorched,

```
 1   and so I could -- then I could tell it was her

 2   phone.

 3    Q.    Did he tell you at that time that they

 4   had found her body?

 5    A.    Yes.

 6    Q.    Okay.  Did he ask you -- was there any

 7   point in time where they asked you to identify

 8   the body?

 9    A.    No.

10    Q.    Okay.

11    A.    They wouldn't let me go back down there.

12    Q.    Okay.  Is it -- so is it accurate to say

13   that you did not see Cindy's body where it was

14   located when she died?

15    A.    No.

16    Q.    That's correct?

17    A.    Yes.

18    Q.    Okay.  Okay.  Where -- where does -- you

19   describe your driveway as -- is that Louis

20   L'Amour Lane?

21    A.    Yeah, I think it is.

22    Q.    Okay.  Is your -- is yours the last

23   house on Louis L'Amour Lane?

24    A.    It is.

25    Q.    Okay.  Where does Louis L'Amour Lane
```

Page 155

1          Do you recall those lines of

2   questioning?

3    A.    Yeah.

4    Q.    Some of this work you're doing, you're

5   on your own, right?

6    A.    Yes.

7    Q.    Is that to keep the costs down?

8    A.    Yes.

9    Q.    So would that be -- the true cost of

10   hiring somebody to come in and do it would be

11   much more than doing it yourself, right?

12   A.    Oh, much more, yes.

13   Q.    There was a question about whether you

14   were permitted to walk down and see Cindy in the

15   field.

16          Do you recall that question?

17   A.    Yes.

18   Q.    You weren't permitted to do that, right?

19   A.    No.

20   Q.    Can you tell for us where it was and

21   when you first saw Cindy?

22   A.    I was at a neighbor's house, Charley and

23   Kim's house, and the coroner came by to speak to

24   me before he went into town after collecting her

25   body.

Page 156

1           And I went out to see her body, and she

2      was in a body bag in the back of the hearse.

3      The -- I got her anniversary ring and -- from

4      the coroner, and I could see the form of her

5      body was all contorted.  The coroner and the --

6      and his assistant, I know they were concerned

7      that I would open the bag, but I couldn't -- I

8      couldn't bear to see her that way.  I couldn't

9      believe she was gone.

10          I still can't sometimes.  She was so

11     alive.  I just couldn't believe this whole thing

12     was happening.  It was such a fucking nightmare.

13     And I had to call the kids and tell them there

14     mom was gone.  Oh, God.  It -- we had so much to

15     do, and it was just stolen from us.  We had

16     talked about dying together, but we were going

17     to live to 120, and that date, that age kept

18     getting pushed further and further out.

19          Oh, God.  It was just -- you know, I

20     have a memorial next to the driveway where she

21     died.  My daughter found the soles of her shoes

22     there after the coroner removed her body, and it

23     was very upsetting, but it kind of gave us an

24     idea about where she was when the life was

25     sucked out of her.  And it's kind of a peaceful

Page 160

```
 1

 2

 3                         CERTIFICATE

 4
          I, Barbara Morgenweck, Registered
 5   Professional Reporter, and Certified Court
     Reporter, do hereby certify that prior to the
 6   commencement of the examination the Deponent was
     duly sworn by me to testify to the truth, the
 7   whole truth and nothing but the truth.
          I DO FURTHER CERTIFY that the foregoing is
 8   a verbatim transcript of the testimony as taken
     stenographically by me at the time, place and on
 9   the date hereinbefore set forth, to the best of
     my ability.
10        I DO FURTHER CERTIFY that I am neither a
     relative nor employee nor attorney nor counsel
11   of any of the parties to this action, and that I
     am neither a relative nor employee of such
12   attorney or counsel, and that I am not
     financially interested in the action.
13

14

15

16   _____

17   Barbara Morgenweck
     COURT REPORTER
18   Registered Professional Reporter
     Certified Court Reporter NM # 526
19   Notary Public

20

21

22

23

24

25
```