Henry F. Bailey, Jr., #5-1681
Bailey | Stock | Harmon | Cottam | Lopez LLP
P. O. Box 1557
Cheyenne, WY 82003
(307) 638-7745
(307) 638-7749 (fax)
Hank@performance-law.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF WYOMING

| | |
|---|---|
| WILLIAM JEROME RUTH, Individually, and as Wrongful Death Representative to the ESTATE OF CYNTHIA SHOOK RUTH, | ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| BEARTOOTH ELECTRIC COOPERATIVE, INC., a Montana Corporation, and ASPLUNDH TREE EXPERT, LLC, a Pennsylvania Limited Liability Company, | ) ) ) ) |
| | ) |
| Defendants. | ) |

Civil Action No. 22-CV-230

---

### DEFENDANT BEARTOOTH ELECTRIC COOPERATIVE, INC.'s
### OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

---

Defendant Beartooth Electric Cooperative, Inc. ("Beartooth"), based on the attached portions of the depositions of Nate Hoffert, David Hoffert, Pam Nelson, William Jerome Ruth, John Goodfellow, Alan Carson, and Kevin Owens, and other materials referred to herein, as well as the legal authority contained herein, hereby opposes Plaintiff's Motion for Summary Judgment.

### INTRODUCTION

The unforeseeable events that led to Cindy Ruth's tragic death on November 16, 2021, present genuine issues of material fact that preclude summary judgment. This is established in the evidentiary materials submitted with this Opposition and is even reflected in the introductory comments in Plaintiff's own brief. For example, Plaintiff states, "Cindy attempted to flee her home in her car as the fire headed in her direction." Cindy Ruth did not "attempt" to flee her home.

She did *in fact* flee her home, but only after an unfortunate 39-minute delay in notifying her to evacuate.  As will be seen in more detail later in this Opposition, Cindy Ruth had no difficulty fleeing her home on the night of the fire.  Ironically, however, the home she fled was not significantly damaged in the Clark Fire.  Had she remained in her home, she would not have been killed.  (Nate Hoffert dep. Pg. 274, line 15, through Pg. 275, line 2; IRIS Photos 0107, 0108).  Additionally, implied within the statement, "On the road leading out of her property, she exited her vehicle and attempted to flee the approaching fire on foot," is the assumption that the fire was about to consume Cindy Ruth's Subaru vehicle.  Had she remained in her vehicle, she would not have been killed.  (Nate Hoffert dep. Pg. 261, lines 2-6, Pg. 275, lines 3-5.)  We know this, because when rescue personnel reached the Subaru sometime after midnight on November 16, 2021, the vehicle was "intact," with the Ruth dogs unharmed inside.  (Ruth dep. Pg. 49, lines 12-25, Pgs. 50-52; Nate Hoffert dep. Pg. 255, lines 5-7, 14-16; see also Park County Sheriff's Office Narrative.)  Additionally, when Cindy Ruth left her home late on the 15th or early on the 16th, had she taken the two-track road leading east from the Ruth home instead of west in the direction of the fire she likely would not have been killed.  (IRIS Photos 0088).  When she exited her vehicle, had she walked across the road to the north and away from the path of the oncoming fire, she likely would not have been killed.  (Nate Hoffert dep. Pg. 246, lines 13-25, pg. 247, lines 1-25, pg. 248, lines 1-3, pg. 251, lines 4-25, pg. 252, line 1; IRIS Photo 0001).  While Beartooth does not dispute that pursuant to its Right-of-Way Clearing Contract ("Contract") with Asplundh Tree Expert, LLC ("Asplundh") the "subject tree" should have been trimmed, and while it may be true the Clark Fire was sparked by contact between Beartooth's energized line and the subject tree, there is significant dispute and there are genuine issues of material fact about whether Beartooth breached any duty

in this case, and if Beartooth did breach a duty, whether that breach was the proximate or legal cause of Cindy Ruth's sad and untimely death. (Contract attached).

Plaintiff's "tree-conductor clearance" expert, John Goodfellow, described the unfortunate and unforeseeable events that led to the Clark Fire in this way:

"Windstorms are not unusual. But, you know what, tree-to-conductor contact is not unusual either. It's *bad luck,* frankly, that somehow the conductor became entangled or captured by the tree. If it was simply bouncing around, and the tree was swatting it, we'd see all of that incidental nipping of the terminal buds. We might see some spark generated, but very little, because this intermittent contact doesn't allow enough energy to flow to get things cooking, if you will, on the carbonization. This requires a persistent contact, which usually is because a branch breaks or a tree falls into the conductor and it lays there. That didn't happen in this case. The tree survived the wind event just fine. That's why this is – really, in my experience, this is an *unusual case*, and it's unfortunate." (Goodfellow dep. Pg 88, lines 5-21, emphasis added).

There is an additional and compelling reason why summary judgment is not appropriate in this case. Defendant Asplundh does not concede, nor do its retained experts, that the Clark Fire was caused by contact between Beartooth's powerline and the subject tree. Indeed, they vigorously dispute the cause. "During the almost three-year [sic] course of this investigation, experts for the plaintiff's [sic] failed to prove with any physical evidence that tree line contact occurred the evening of November 15, 2021, involving a single phase 7.2 kilovolt electrical service line owned by Beartooth Electric Cooperative in the vicinity of 197 Louis L 'Amour Lane, Clark Wyoming, and a cottonwood tree, causing the ignition of the Clark Wildfire." (Kirk Schmitt, Kirk Schmitt, IAAI-CFI, Golden Forensics Summary of Findings, Doc. 30-9, pg. 15). Asplundh and its experts point to the fact that the origin of the Clark Fire was 143 feet east of where the Beartooth

powerline contacted the subject tree, with no evidence of any fire between those two locations. (Craig Rice, P.E., Golden Forensics Technical Report, Document 30-7, pg. 16). And Plaintiff's principal "origin and cause" expert agrees. (Alan W. Carlson, INVF, Clark Fire Expert Report, Document 26-1, pg. 1). These uncontroverted facts and Asplundh's concomitant assertion that tree-conductor contact was not the cause of the Clark Fire creates a potentially irresolvable dilemma for the Court in dealing with Plaintiff's motion for summary judgment, and really raises a question as to the value or purpose of Plaintiff's motion at all. This is because, even if the Court grants summary judgment in favor of the Plaintiff, Asplundh's vigorous defense on the origin and cause of the Clark Fire necessitates a trial where all the evidence concerning this tragic event will need to be presented to the jury. Should the jury agree with Asplundh's position and find against the Plaintiff, the Court's earlier summary judgment would conflict with the jury's verdict, creating an inconsistent outcome that could not stand. In other words, Plaintiff's entire case is based on the assertion that tree-conductor contact was the initiating factor in the Clark Fire. If that assertion is rejected by the jury, as Asplundh contends it should be, neither of the Defendants should be responsible for the Clark Fire or Cindy Ruth's death. Given this conundrum, if the Court does not deny outright the Plaintiff's motion based on the arguments set forth hereafter, it should defer ruling on the motion until the jury has received all the evidence and decided the issues related to all parties and non-parties.

## UNDISPUTED FACTS

1. Beartooth is a small rural electric distribution cooperative headquartered in Red Lodge, Montana, servicing the electricity needs of rural consumer-members in Montana and Wyoming, including the unincorporated community of Clark, Wyoming, which is located about 35 miles south of Red Lodge.    At the time of the Clark Fire, Beartooth

had 17 employees, including linemen.  They have no employees stationed in Clark, Wyoming.

2.  On May 26, 2021, Beartooth contracted with Asplundh Tree Expert, LLC, ("Asplundh") for Asplundh to provide tree and brush trimming in Clark, Wyoming, specifically in the Line Creek area.  Pursuant to the Contract, Asplundh was to ensure at least a 20-foot vegetation-clear corridor, 10 feet on each side of the centerline of Beartooth's power pole.  Asplundh performed its trimming work in Clark, Wyoming, in August and September of 2021.  (Owens dep. Pg. 221, lines 1-7; Contract).

3.  On the evening of November 15, 2021, Clark experienced an extreme weather event that included hurricane force wind gusts of at least 85 miles per hour.  Fire Chief Nate Hoffert estimated, "gusts over 100 miles an hour and probably sustained *over* 70, trying to blow your vehicle off the road…." (Nate Hoffert dep. Pg. 23, emphasis added).  The wind was severe enough that it moved a 20-foot horse trailer loaded with three horses. "Yes, it's crazy.  It's a stock trailer, 20-foot stock trailer.  And I had three horses in there….  [A] gust came and pushed that horse trailer, slid it over towards the tanker…. So it blew the trailer."  (Pam Nelson dep. Pg. 146, lines 23-25, pg. 147, 1-11). According to Jerry Ruth, "At some point between the time that I left Teri's house and when I met up with Nate, the rear window of my truck was blown out, the back window that faces the bed of the truck."  (Ruth dep. Pgs. 31, lines 18-22).  A large archway constructed of "telephone poles or something similar" at the Herschberger residence was blown over and blocked the road and had to be dragged away by a fire engine using a log chain. (Nate Hoffert dep. Pg. 270, lines 24-25, pg. 271, lines 1-16).  Former Clark Volunteer Fire Department ("CVFD") chief, Dave Hoffert, described the horrendous

5

wind conditions that night in this way, "The winds were excess of 80 miles-an-hour. I don't try to go beyond – if it gets to 80 miles-an-hour, you can't stand up. You're leaning into it, crawling on the ground or hiding behind something. It was above 80. When I went out of the house, I had to protect myself and work to get to the car, and be careful to get to the door, and it is just something you learn when you deal with it, and it was excessive. We had reports over a hundred routinely. I can't tell you what it really was, but it was definitely [in] excess of 80 miles-an-hour." (Dave Hoffert dep. Pg. 13, lines 16-25, pg. 14, lines 1-3). Plaintiff's principal origin and cause expert, Alan W. Carlson, testified, "[T]he strength of the wind would have been one of the major factors that I – having looked at the wind records for several years back, there was never – *I never saw an event that was as strong as that night*." (Carlson dep. (rough) Pg. 139, lines 18-21).

4. At some point on November 15, 2021, it appears a Beartooth powerline was blown by the extreme wind into the limb of a cottonwood tree on the Hutton property.

5. The Clark Fire was first reported to the Clark Volunteer Fire Department at approximately 22:26 (10:26 p.m.). The Clark Volunteer Fire Department personnel, including Plaintiff, responded, arriving at the scene at approximately 10:47 p.m. (Nate Hoffert dep. Pg. 24, lines 13-20).

6. The extreme wind, including hurricane force wind gusts, moved the Clark Fire generally in a West to East direction. The specific origin area ("SOA") for the Clark Fire was 143 feet east of where the Beartooth powerline apparently contacted the subject tree. (Plaintiff's expert, Alan W. Carlson, INVF, Clark Fire Expert Report, Document 26-1, pg. 1).

7.  Residents in harms' way evacuated their residences either of their own volition or at
    the direction/assistance of first responders, which eventually included units from Cody
    and Powell, Wyoming, and Belfry, Montana. (Nate Hoffert dep. Pg. 26, lines 1-12, pg.
    71, lines 7-25, pg. 72, lines 1-9).

8.  Communications between emergency responders were hampered by the wind blowing
    down the radio tower, "the one we call the County Clark Repeater," needed to facilitate
    radio communications with Cody Dispatch. (Nate Hoffert dep. Pg. 27, lines 5-25, pg.
    28, lines 1-7).  Loss of radio communications also interfered with evacuation efforts.
    "Our communications were poor because we had lost our tower…so we were a little
    bit running blind until we could bump into deputies face to face and come up with a
    plan." (Nate Hoffert dep. Pg. 68, lines 7-25, pg. 69, lines 1-6).

9.  Approximately 25 to 30 minutes after initial arrival at the scene, because of an
    "unexpected" wind shift, "a surprise," Chief Hoffert concluded "the fire was
    completely out of our control.  Until that point, I had a plan of attack to drive it out of
    fuel….  *At that point* (approximately 11:15 p.m.)*, it became just evacuations*." (Nate
    Hoffert dep. Pg. 65, lines 1-25, pg. 66, lines 1-7, emphasis added).  And yet no one
    from the Clark Volunteer Fire Department notified Cindy Ruth to evacuate her
    residence until at least 11:54 p.m. when Plaintiff called his wife and said, "Get the f__k
    out," with no instructions as to where to go.  (Ruth dep. Pg. 44, lines 2-17, pg. 45, lines
    7-12).  Plaintiff's call took place approximately 39 minutes after the fire was out of
    control and only after Chief Hoffert told Plaintiff to tell Cindy Ruth to "get out now."
    (Nate Hoffert dep. Pg. 234, line25, pg. 235, lines 1-25, pg. 236, 1-8, pg. 246, lines 13-
    20; Dave Hoffert dep. Pg. 50, lines 2-18).

10. Plaintiff describes the night as "very chaotic.  We had at least three fire companies up there and very poor communication between the personnel that were actually out trying to work the fire…. [I]t appeared to me that there was people standing around that could have been doing things.  There was a lack of direction because there was too many misconnections between people that were in charge." (Ruth dep. Pg. 149, lines 4-13).

11. Sometime after Plaintiff called his wife, Nate Hoffert advised Plaintiff he was going to get Cindy out.  However, he did not do that.  He drove in a different direction, which caused Plaintiff to enlist the aid of another fireman to help evacuate Cindy.  (Ruth dep. Pg. 33, lines 8-9, Pg. 50, line 25, Pg. 51, lines 1-14, pg. 149, lines 19-25, pg. 150, lines 1-25).

12. Once Plaintiff located a fireman to assist him, Plaintiff and the fireman went to the area of Plaintiff's residence. "He drove his truck, I was a passenger.  We went to Louis L'Amour Lane, which is on the north side of Line Creek, meaning we had to cross over the bridge on Line Creek, and we turned and went east down the driveway to where we found my wife's car parked, stopped in the middle of the driveway." (Ruth dep. Pg. 51, lines 8-14).  They found Cindy Ruth's vehicle "roughly half a mile" west of the Ruth residence.  (Ruth dep. Pg. 53, line 15, IRIS 00001 photo of Ruth vehicle the day after the accident, showing proximity to Ruth residence).  "The car was occupied by three dogs.  The rear hatch of the Subaru was open.  There was a pillow on fire inside of the hatch.  My wife was not around.  But I tossed the pillow aside, and we took the dogs." (Ruth dep. Pg. 49, lines 12-25, Pgs. 50-52).

13. Plaintiff and the fireman then walked toward the Ruth residence and found the house "on fire on the northwest corner.…  I grabbed the bucket and threw water on it.…  And

8

put it out." (Ruth dep. Pg. 53, line 23-24, Pg. 54, lines 4-9). Fire Chief Nate Hoffert

has testified that the Ruth residence was intact when he arrived there early on the 16th.

While there, he was notified that Cindy Ruth's body had been found. (Nate Hoffert

dep. Pg. 261, lines 2-10; IRIS Photos 0107, 0108).

14. Cindy Ruth was the only individual injured or killed during the Clark Fire. (Nate

Hoffert dep. Pg. 274, lines 3-14).

15. There was a two-track road available for Cindy Ruth to use to evacuate the area after

she left her house. Nate Hoffert testified, "I don't understand, you know, why that

wasn't an option to her." (Nate Hoffert dep. Pg. 247, lines 13-25, pg. 248, lines 1-3;

IRIS Photos 0088) It was the same road Chief Hoffert had used to reach the Ruth

residence during the fire. (Nate Hoffert dep. Pg. 246, lines 13-25, pg. 247, 1-2).

16. Also, when Cindy Ruth exited her vehicle, she walked south in the direction of the

oncoming fire instead of north, uphill and away from the fire.

> Q. Without getting bogged down on the exact distance, it's clear when she
>
> exited the vehicle, at some point, she headed in the direction of the fire, isn't
>
> that true?
>
> A.     Correct. Or I guess I believe the fire was probably west of her, and
>
> she was headed south in front of the fire, but not directly toward the fire. I don't
>
> think the fire was there yet.
>
> Q.     Clearly headed in the direction of Line Creek [along which the fire
>
> was moving]?
>
> A.     Yes.

Q.      And if we look on the left-hand side, the upland side of the terrain, it does not – to me, it does not look like that upland side of the terrain past the edge of the road has suffered any significant fire damage.  When you were out there the next day looking at things, was there any significant fire damage on that side of the road?

A.      Not that I recall for the most part.  It may have hopped in a couple spots, but I don't even recall that for sure.  It seems like it was – the road stopped it.  (Nate Hoffert dep. Pg. 251, lines 4-25;  IRIS Photos 0001).

17. After the fire, it was learned that a mature cottonwood tree on the Hutton property had not been trimmed by Asplundh during their August/September, 2021, tree trimming activities along Line Creek and that a limb or limbs of that tree, the "subject tree," encroached upon the 20-foot clearance corridor specified in the Asplundh Contract.

## ISSUES

Whether genuine issues of material fact exist to preclude summary judgment in Plaintiff's favor.  More specifically, (1) whether Beartooth breached its duty to safely operate and maintain its power lines, and (2) whether the alleged breach of duty was the proximate cause of Cindy Ruth's death.

## STANDARD OF REVIEW

Plaintiff correctly states the applicable law governing summary judgment.  "When reviewing a motion for summary judgment, the court's role is not to weigh the evidence, but rather to assess the threshold consideration of whether a genuine issue of material fact exists…. All reasonable inferences must be resolved in the light most favorable to the non-moving party." *Jones v. Mountainside Apartments, L.P. 2022* U.S. Dist. LEXIS 109031, *4-5 (Dist. Wyo. May 23,

2022).  "Summary judgments are not favored in negligence actions and are subject to exacting

scrutiny."  *Erpelding v. Lisek*, 2003 WY 80, ¶ 10, 71 P.3d 754, 757 (Wyo. 2003).  And the federal

court sitting in diversity jurisdiction must apply the substantive law of the state.  *Cooperman v.*

*David*, 214 F.3d 1162, 1164 (10th Cir. 2000).

## ARGUMENT

Plaintiff correctly outlines the elements of a negligence claim under Wyoming law – duty,

breach of duty, proximate cause, and damage/injury.  Negligence is the failure to use ordinary care

under the circumstances. *W.C.P.J.I.* 3.02; *Erdelyi v. Lott*, 2014 WY 48, 326 P.3d 165 (Wyo. 2014).

A claim based on negligence requires proof of all four elements of the cause of action.

*Danculovich v. Brown*, 593 P.2d 187, 195 (Wyo. 1979).  "The fact that damages or injury occurred

is not, in itself, sufficient to show that any party was at fault."  *W.C.P.J.I.* 2.08; *Vasquez v. Wal-*

*Mart*, 913 P.2d 441 (Wyo. 1996).

## DUTY

Defendant does not dispute it had the duty to safely operate and maintain its electric

distribution system.  Indeed, that is why in May of 2021, Beartooth hired the tree trimming experts

at Asplundh Tree Expert, LLC, for its vegetation management work in Clark, Wyoming.

Importantly, there is no specific and uniform industry standard for right-of-way clearance

pertaining to electric distribution cooperatives.   The National Electric Safety Code ("NESC"),

which governs the safety aspects of Beartooth's business, provides in Section 21, subsection 218,

under "Vegetation Management":

"Vegetation Management should be performed around supply and communication lines as
experience has shown to be necessary.  Vegetation that may damage ungrounded supply
conductors should be pruned and removed. NOTE 1: Factors to be considered in determining the
extent of vegetation management required include, but are not limited to:  line voltage class,
species' growth rates and failure characteristics, right-of-way limitations, the vegetation's location
in relation to conductors, the potential combined movement of vegetation and conductors during

*routine winds,* and sagging of conductors due to elevated temperatures or icing.  NOTE 2:  It is not practical to prevent all tree-conductor contacts on overhead lines."  (*NESC* 2017, emphasis added).

## BREACH OF DUTY

Whether or not a duty has been breached is a question of fact for the jury.  *Johnson v. Reiger*, 93 P.3d 992, 999 (Wyo.2004); *Jones v. Chevron U.S.A.*, 718 P.2d 890, 897 (Wyo.1986). This is true even when facts bearing on negligence are undisputed if reasonable minds could reach different conclusions and inferences from the facts.  *Bettencourt v. Pride Well Serv.*, 735 P.2d 722, 726 (Wyo.1987); *Foote v. Simek*, 139 P.3d 455, 461-62 (Wyo. 2006).

Plaintiff relies on *Ruhs v. Pacific Power & Light,* 671 F.2d 1268 (10th Cir. 1982) for the assertion that "Wyoming law is clearly established that, '[w]here an ultrahazardous instrumentality such as electricity is involved, the duty of the electric company to maintain safe premises is nondelegable.' " *Ruhs* at 1272.  But Wyoming law is not clearly established on that point.  Neither Plaintiff's brief nor the *Ruhs* decision itself cites any Wyoming Supreme Court precedent establishing or adopting the "nondelegable" standard espoused by Plaintiff.  The Court's holding does not directly address that issue.  Instead, the Court simply ruled that summary judgment for Pacific was inappropriate and that further proceedings were needed, "consistent with this opinion." *Ruhs* at 1274.  The *Ruhs* Court ruled that "on remand, the record should be clarified to show whether the NESC is statutorily mandated in this case," and if not, "whether the common law standard of reasonable care was followed." *Ruhs* at 1273.  The Court, citing Wyoming case law, concluded that "[a]n independent contractor's employee who goes on the owner's premises is an invitee to whom the owner may be liable for injury caused by an unsafe condition on the premises" and that genuine issues of material fact existed as to whether Pacific employees "were negligent

because they 'willingly' permitted Ruhs to work around energized lines," and whether Pacific breached a duty imposed on it by Section 210 of the NESC. *Ruhs* at 1273-1274.

Although a tree trimmer injured while working in close proximity to energized power lines is not analogous to the facts of this case, the Court's ruling is still instructive. Even though the Court ruled that Pacific owed a general duty of care to Mr. Ruhs, and perhaps a specific duty of care under the NESC, the Court found there was still a material question of fact as to whether the duty was breached. And that same analysis and conclusion should be applied to Plaintiff's claims in this case.

In another non-analogous case cited by Plaintiff, *Deaf Smith Cty. Grain Processors, Inc. v. Springer Elec. Coop., Inc.*, 1998 U.S. Dist. LEXIS 24359 (D.N.M. 1998), a power line built by an independent contractor broke and started a range fire that consumed 7,000 acres of pasturage. The court reasoned, "a person who employs an independent contractor to perform inherently dangerous work or to install an inherently dangerous facility has a nondelegable duty to ensure that reasonable precautions are taken to prevent harm to third parties." *Deaf Smith* at *3 citing *Saiz v. Belen School Dist.*, 1992-NMSC 018, 113 N.M. 387, 827 P.2d 102 (1992). "[I]f reasonable precautions are not taken and a third party suffers harm as a result, the employer of the independent contractor will not be able to avoid liability by relying on the fact that the work was done by the contractor rather than the employer." *Id.*

Unlike the construction of a power line, as in *Deaf Smith*, or working around an energized power line, as in *Ruhs*, and being directly exposed to high voltage electricity, there is nothing inherently dangerous or ultrahazardous about tree trimming itself. And Plaintiff cites no case precedent for that proposition.

For the reasons stated, the Court should decline Plaintiff's invitation to find Beartooth breached its duty to the Plaintiff and should instead let the trier of fact decide. *Ruhs* at 1274.

## PROXIMATE CAUSE

Whether Beartooth was negligent for not trimming the subject tree, or rather because its contractor, Asplundh, did not trim the tree, and whether that negligence caused *the Clark Fire* are entirely different questions from whether Beartooth's alleged negligence proximately or legally caused *Cindy Ruth's death*.

> "In order for proximate cause to exist, "the accident or injury must be the natural and probable consequence of the act of negligence." *Foote v. Simek*, 2006 WY 96, ¶ 22, 139 P.3d 455, 463 (Wyo.2006). In fact, "[t]he ultimate test of proximate cause is foreseeability of injury. In order to qualify as a legal cause, the conduct must be a substantial factor in bringing about the plaintiff's injuries." *Foote*, ¶ 22, 139 P.3d at 464. In our consideration of cases involving proximate cause, we have discussed not only what constitutes proximate cause, but also what does not:
>
> In *Lemos v. Madden*, 28 Wyo. 1, 200 P. 791, 793 (1921), this court first defined proximate cause as "[t]hat which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred." This same definition has been relied upon in recent years. *Robertson v. TWP, Inc.*, 656 P.2d 547 (Wyo.1983); *Kopriva v. Union Pacific R. Co.*, 592 P.2d 711 (Wyo.1979). In *Lemos v. Madden*, supra, 200 P. at 794, the court also rejected a "but for" rule of causation, stating: " * * * But if the original wrong furnished only the condition or occasion, then it is the remote and not the proximate cause, notwithstanding the fact that there would have been no loss or injury but for such condition or occasion. * * * "
> An intervening cause is one that comes into being after a defendant's negligent act has occurred, and if it is not a foreseeable event it will insulate the defendant from liability. It is reasonably foreseeable if it is a probable consequence of the defendant's wrongful act or is a normal response to the stimulus of the situation created thereby. *Killian v. Caza Drilling, Inc.*, 2006 WY 42, ¶ 20, 131 P.3d 975, 985 (Wyo.2006).
>
> *Lucero v. Holbrook*, 2012 WY 152, ¶ 17, 288 P.3d 1228, 1234-35 (Wyo. 2012) (quoting *Collings v. Lords*, 2009 WY 135, ¶ 6, 218 P.3d 654, 656-57 (Wyo. 2009)) (emphasis in original).

*Amos v. Lincoln County School District No. 2*, 359 P.3d 954, 961-963 (Wyo. 2015).

"(T)he test to be applied in determining whether the negligence of an electric power

company can be regarded as the proximate cause of an injury is whether, under all the circumstances, the injury might have been reasonably foreseen by a person of ordinary intelligence and prudence.  See Annotation 69 *A.L.R.2d* 9, 19, § 4."  *Ruhs* at 1271.

"As with the question of breach of duty, the question of proximate cause is one 'reserved for the trier of fact's determination unless the evidence is such that reasonable minds could not disagree.' *Glenn v. Union Pacific R.R. Co.*, 176 P.3d 640, 644 (Wyo. 2008)."  *Amos* at 963.

Given the undisputed facts summarized herein, was the "natural and probable consequence" of not trimming the subject tree a wildfire that would take the life of Cindy Ruth? Was it *reasonably foreseeable* that Cindy Ruth would die because Asplundh failed to trim the subject tree?  Or did Asplundh's failure to trim the tree simply "furnish" the "condition or occasion" for the Clark Fire? Were the following events after the "negligent act," foreseeable?

1.  Hurricane force winds ("I never saw an event that was as strong as that night," (Carlson dep.)) that caused the Beartooth energized line and the subject tree to become "entangled or [for the line to be] captured by the tree" as John Goodfellow testified.

2.  The loss of the Clark Repeater, which hampered communications during the Clark Fire emergency response.

3.  At least a 39-minute delay in notifying Cindy Ruth to evacuate her residence, with no guidance as to how or where to evacuate.

4.  The Ruth home was not destroyed or significantly damaged in the Clark Fire.  Had Cindy Ruth remained in her home she would not have been killed.

5.  When Jerry Ruth arrived at Cindy Ruth's vehicle in the early morning of November 16, 2021, the vehicle was still intact and the family dogs safe inside.  If Cindy Ruth had remained in her vehicle, she would be alive today.

6. Had Cindy Ruth taken the road that leads east of her home when she evacuated, she would likely be alive today.

7. When Cindy Ruth evacuated her vehicle, had she gone north away from the path of the fire instead of south directly toward the path of the fire, she would likely be alive today.

8. Was Asplundh's breach of the right-of-way clearing contract an intervening cause? If it's true, as Plaintiff alleges, that Beartooth breached its alleged non-delegable duty by not trimming the subject tree, thus creating the potentially unsafe condition, *that* breach occurred sometime prior to Asplundh being hired to trim Line Creek. Thus, Asplundh's subsequent failure to fulfill the contract could be considered an intervening cause insulating Beartooth from liability.

Finally, Plaintiff contends the Clark Fire Department and Cindy Ruth have no fault to compare against Beartooth's alleged fault. This is based on Kevin Owens' unwillingness to "blame" Cindy Ruth or the CVFD for Ms. Ruth's death. Plaintiff argues, "There is no fault to compare" in this case, because Mr. Owens, Beartooth's general manager, "admitted that Cindy, Jerry, and the Clark Fire Department are not to blame for Cindy's untimely death." For this conclusion, Plaintiff relies on Mr. Owens' deposition testimony.

Q. Do you in any way criticize or blame Cindy Ruth for her death?

A. No, not at all.

***

Q. Do you in any way blame the Clark Fire Department?

A. No. *I am not passing judgment* on any of those people. (Owens dep. Pg. 247, emphasis added).

Plaintiff's counsel has taken Mr. Owens' testimony out of context, manipulating and transforming his personal reluctance to cast blame into a formal company declaration that would preclude any comparison of party and non-party responsibility for Cindy Ruth's death under Wyoming's comparative fault statute.  W.S. 1-1-109.

Mr. Owens' personal views and reluctance to cast blame are further revealed in the following exchanges:

Q. Are you critical of anyone else in terms of what they did or didn't do in connection with this case, in connection with this fire and Cindy Ruth's death?

A. The only thing that has been relayed to me and it has only been on a couple different occasions is that people had made mention that this was just a terrible, terrible tragedy, that it is hard to place blame on anyone under the condition of such extreme wind and fire, event like that. They just felt it was a terrible, terrible tragedy to [Jerry] and the community.

***

Q. Are you blaming -- I need to know, are you blaming Cindy?

A. No, *I am not speculating on any of that.* It is just, as I relayed originally, it is a terrible event that a lot of things happened in a very short amount of time.

Q. Are you critical of Cindy?

A. No.

Q. Are you critical of Jerry?

A. No.

Q. Are you critical of the fire department?

A. No, I have nothing to be critical of them. It was a terrible event. It was a tragic

17

event. You wouldn't want to see anybody go through or that community go through.  (Owens dep. Pgs. 234-235).

Mr. Owens' reluctance to "pass judgment" and his refusal to "speculate" or criticize were perfectly reasonable, even laudable, especially given the complicated, complex, and tragic nature of the Clark Fire, which it took Plaintiff's principal "origin and cause" expert (Alan Carlson) 93 pages and hundreds of pages of documents to analyze and explain.  It is the jury's task to "pass judgment" and determine "fault" for the death of Cindy Ruth, not Kevin Owens'.

Given all of the events and circumstances surrounding the Clark Fire and Cindy Ruth's death, reasonable minds could certainly differ as to whether Ms. Ruth's death was a reasonably foreseeable consequence of the contact or entanglement that may have occurred between Beartooth's power line and the subject tree on November 15, 2021.  Proximate cause in this case is clearly a question of fact that should be left to the jury.

## ACT OF GOD

Defendant's first affirmative defense states, "Ms. Ruth's tragic death was caused by extreme forces of nature and circumstances *sometimes referred to* as an "Act of God," over which Defendant had no control, specifically weather conditions, including hurricane force winds in excess of 140 mph, that caused the spread of the Clark Fire."  Thus, Beartooth is not asserting that Cindy Ruth's death was caused by an act of God, rather that it was caused by forces of nature, i.e. hurricane force winds, and not by any act of man.  Given how the winds that night have been described by Nate Hoffert, Pam Nelson, Dave Hoffert, and even Plaintiff's own expert, Alan Carlson, it is certainly possible a jury could conclude forces of nature and not anyone's negligence were the cause of Cindy Ruth's tragic and untimely death.  Indeed, sometimes injury and death occur when no one is at fault.  *W.C.P.J.I.* 2.08.

**CONCLUSION**

For all the reasons set forth herein, Plaintiff's motion for summary judgment should be denied.

Dated this 8th day of November, 2022.

**BAILEY STOCK HARMON COTTAM LOPEZ LLP**

*/s/ Henry F. Bailey Jr.*
Henry F. Bailey Jr.
6234 Yellowstone Road
Cheyenne, WY 82003
307-638-7745
*Attorney for Defendant*
*Beartooth Electric Cooperative, Inc.*

**CERTIFICATE OF SERVICE**

This is to certify that a true and correct copy of the foregoing **Opposition** was served via the court's CM/ECF system on the 8th day of November, 2023, to the following:

Kenneth E. Barker
10956 SD Highway 34
P. O. Box 100
Belle Fourche, SD 57717-0100
kbarker@barkerlawfirm.com

Ian K. Sandefer
143 N. Park Street
Casper, WY 82601
ian@swtriallawyers.com

Robert G. Pahlke
The Robert Pahlke Law Group
2425 Circle Drive, Suite 200
Scottsbluff, NE 69361
rgp@pahlkelawgroup.com

David Bona
Colin Munro
Michael Sepuya
CARLSON, CALLADINE & PETERSON,
LLP
One Post Street, Suite 500
San Francisco, CA 94101
dbona@ccplaw.com
cmunro@ccplaw.com
msepuya@ccplaw.com

Scott E. Ortiz
WILLIAMS PORTER DAY NEVILLE,
P.C.
P.O. Box 10700
Casper, WY 82602
sortiz@wpdn.net

                                        */s/ Henry F. Bailey Jr.*
                                        Henry F. Bailey Jr.