# DEPOSITION OF NATE HOFFERT

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF WYOMING
2

3   WILLIAM JEROME RUTH, individually,
    and as Wrongful Death Representative
4   of the ESTATE OF CYNTHIA SHOOK RUTH,

5        Plaintiff,

6   V.

7   BEARTOOTH ELECTRIC COOPERATIVE, INC.,
    a Montana Corporation, and ASPLUNDH
8   TREE EXPERT, LLC, a Limited Liability
    Company formed in Pennsylvania,
9
         Defendants.
10

11

12             DEPOSITION OF NATE HOFFERT
                    March 14, 2023
13                    8:00 a.m.

14

15  PURSUANT TO THE UNITED STATES RULES OF FEDERAL
    PROCEDURE, this Deposition was:
16
    TAKEN BY:     Kenneth E. Barker, Esq.
17                Attorney for Plaintiff

18  REPORTED BY: Barbara Jean Morgenweck, RPR, CCR
                 NCRA, RPR
19               New Mexico CCR #526

20

21

22

23

24

25

23

1  the windiest nights we have ever had in Clark. I
2  don't know how that -- if that holds true. Wind is
3  different when you're huddled in your house than
4  when you're out in a fire.
5     So -- but it seemed very strong. I would
6  have said, in my experience, there were gusts over
7  100 miles an hour and probably sustained over 70,
8  trying to blow your vehicle off the road, hard to
9  open a vehicle door to get in or out. We had a lot
10 of wind issues that night on the fire as far as just
11 being able to respond, damage to vehicles, that sort
12 of thing from the wind. So.
13    Q. Where is your home located from the fire
14 department?
15    A. Approximately 3 miles to the east of where
16 the fire hall is.
17    Q. Okay. And before you got the dispatch page
18 at 10:26, had you noticed anything about the wind?
19    A. Just it was -- it was really strong. You
20 can hear it. You can hardly sleep through it kind
21 of thing. You know that there's going to be damage
22 of some kind in the morning. Those sort of things.
23    And on response to the hall, it was trying
24 to blow my personal vehicle off the road trying to
25 get to the fire hall, so very difficult to drive in.

24

1     Q. Were you in bed at the time that you got the
2  dispatch?
3     A. I was.
4     Q. Okay. So you awoke from a sleep and
5  responded in the time, where it says "officer
6  responding," is that responding to the dispatch call
7  or is that arrival at the hall?
8     A. That's me calling, responding to dispatch,
9  so around from time of page to calling and
10 responding to the scene or the fire hall, that's
11 when they have me -- dispatch has me recorded as
12 responding to the incident.
13    Q. So if dispatch is at 10:26 and you responded
14 at 10:30, that was the four minutes from the
15 dispatch until --
16    A. Right.
17    Q. -- you responded?
18    And then you arrived at 10:47, which is
19 27 minutes later. Does that sound right?
20    A. 17 minutes later.
21    Q. Or, excuse me, 17 minutes later, I'm sorry.
22    A. It would have been arrival on scene.
23    Q. And at the time that you got there, you had,
24 I assume, other volunteer firemen arriving?
25    A. Yeah, just the -- correct. Two other

25

1  responders and my engine, we were the first three on
2  the scene.
3     Q. Okay. And the crew members that responded
4  are in the second page of Exhibit 6 on page 2 where
5  it says "Responding Personnel"?
6     A. Yes.
7     Q. And "initial response." And these are your
8  crew, the volunteer firemen that responded
9  initially; is that accurate?
10    A. Correct. The -- I had to mark it down two
11 separate things there, so if there's an "X" next to
12 their name, they responded to the initial page and
13 were there on the 16th, or the next day. Those with
14 just the 16 next to their name were -- came in on
15 the 16th and worked the remainder of the fire and
16 mop up. So if there's an "X" next to their name,
17 they were on the initial response.
18    Q. Okay. On the way to the fire from your --
19 or, excuse me, to the fire hall from your home,
20 could you see the fire?
21    A. It's in a creek bottom that you can't see,
22 but we could definitely see the glow of it. We knew
23 we had an active fire.
24    Q. At some point, did you decide that you
25 needed more assistance and call for mutual aid?

26

1     A. In these fires, we know right away we need
2  mutual assistance, so I was calling for mutual aid.
3  Between my house and arriving at the fire hall, I
4  was on with dispatch calling for mutual aid from
5  pretty much send us everybody you've got, along with
6  Montana. And Montana unfortunately had several
7  fires working in their districts, so they
8  couldn't -- all of Carbon County couldn't respond
9  immediately. They did send Belfry Fire our way kind
10 of late in the fire, but Belfry Fire came to assist
11 in two additional fires we had that night while we
12 were working this one.
13    Q. And so the mutual aid came from Belfry,
14 Powell, Cody? Is --
15    A. Correct. I believe we had a tender out of
16 Bridger, Montana, also because Carbon County kind of
17 works as one. So I believe there was a Bridger,
18 Montana, fire tender there also with Belfry.
19    Q. Okay. And as you are responding from the
20 fire hall the 7 miles to Line Creek, did you have
21 radio communication with dispatch or with any of the
22 mutual aid responders?
23    A. I don't recall. I am sure there was. I'm
24 sure I was connecting with dispatch and connecting
25 with our -- communicating with our other responders

27

1  to remind them that we have to transfer towers once
2  we get up against the mountain or starting the Line
3  Creek, we have to transfer towers from our Dead
4  Indian channel to our County Clark channel.
5      Q.  And so, obviously, communication while
6  you're responding to the fire and while you're doing
7  your attack and whatever you decide to do is
8  dependent upon radio communication?
9      A.  Correct.
10     Q.  And do have you to then, what you just
11 described, do you have to transfer channels then
12 once you're on the scene, or do you maintain -- does
13 the fire department, that is, Clark Fire Department,
14 maintain the same channel?
15     A.  We have to transfer channels depending on
16 where we are in our area because we'll get into
17 radio dead zones, so we have to transfer to a
18 different repeater.  When one repeater can't see an
19 area we have to make sure everybody transfers to a
20 different repeater so that we have radio
21 communication in radio dead zones.
22     Q.  And as I reviewed the records, we became
23 aware that there was a problem with one of your
24 repeaters that night; is that true?
25     A.  Correct.

28

1      Q.  Tell us what happened.
2      A.  The repeater that we needed that night to
3  reach into this Line Creek drainage, the one we call
4  the County Clark Repeater, at some point during
5  the -- during this fire, during our response, it was
6  blown down and we lost communication with our
7  dispatch in Cody.
8      Q.  And is that something that you became aware
9  of as soon as it happened?
10     A.  No.
11     Q.  How is it that you learned or recognized
12 that the repeater was down?
13     A.  Just the loss of communication, not being
14 able to reach out, figuring there was something,
15 something had to have happened.  You can just tell
16 when you cannot get out on it anymore, and you can
17 tell when you key your mic and you're not hitting it
18 any longer that it's down.  You can't jump to
19 conclusions because sometimes it's the radio in your
20 truck that just went down, so you have to make sure
21 that multiple engines are having the same problem.
22 When we figured out they were, then we tried to get
23 a -- one of our other rescues that wasn't being used
24 on the fire up to an area that we know to be able to
25 reach our other repeater and talk down in there and

29

1  try to do some radio relay to pick up that -- I
2  guess, pick up the job of that repeater in some
3  ways.  But it has to be a relay rather than just a
4  repeater.
5      Q.  So you improvised?
6      A.  Best we could.
7      Q.  Okay.  We'll talk about that in the sequence
8  of events, Nate.
9          If we can, I'm going to try to go about this
10 chronologically because I assume that that's the
11 easiest for you; is that accurate?
12     A.  For the most part, it should be, yes.
13 It's -- there's things that run together from that
14 night and blank spots in my memory, and so I'll do
15 the best I can from -- but like we discussed at the
16 fire hall, it's -- it tends to be a little bit like
17 war, fighting fire in those conditions.  So.
18     Q.  And you explained to me that there are just
19 some times that you don't remember?
20     A.  Correct.
21     Q.  And you attribute that to what?
22     A.  All of the stress of the night, between the
23 response, the evacuations that we were dealing with,
24 all of the agencies trying to -- trying to
25 coordinate all of the agencies together at the same

30

1  time as a search for Cindy Ruth, which turned into
2  location of her remains, and then dealing with
3  Jerry, who was one of my firemen, her husband, and
4  trying to help him through that situation while
5  still trying to deal with incoming fire resources.
6          And it just -- there is some times there
7  where I have hours that are missing from the night,
8  so -- in my memory.
9      Q.  Okay.  And we're just asking you to do the
10 best you can, okay?
11     A.  Yep, correct.
12     Q.  Okay.  So you're en route responding in Unit
13 81, and you have with you three others?
14     A.  Two others, my daughter, Kaydence, and Jacob
15 Inglis were in my engine initially responding.
16     Q.  And Inglis is I-N-G-L-I-S?
17     A.  Correct.
18     Q.  And did you know that you had other
19 responders coming in behind you in the other units?
20     A.  Yes, correct.
21     Q.  You, en route -- I think I've asked you
22 this, I apologize, you didn't get any size-up of
23 what the fire was in terms of its size or the
24 conditions; is that right?
25     A.  No.  No, we just -- we knew we had a fairly

63

1 location, but the fire front passed the residence
2 and immediately attacked the residence, and see if
3 they could save it. And they were successful in
4 that. They lost the shop, but saved the house.
5    Q.   And that is at 115 Louis L'Amour?
6    A.   No, that was -- 115 Louis L'Amour was the
7 residences that were at this location, trying to
8 leapfrog many vehicles out of there. The Bays, I'm
9 looking -- sorry, I'm looking at this exhibit to
10 find the Bays.
11    Q.   So Bays is on page 3, Exhibit 6. If you see
12 that list there, Bays is at 105 Louis L'Amour?
13    A.   Oh, correct, yes, 105.
14    Q.   Does that help?
15    A.   Yes. So --
16    Q.   So the structure was lost then at that
17 location?
18    A.   The shop was lost. The Powell engine was
19 able to save the house, which had caught fire, but
20 they -- the front porch had caught fire, but they
21 were able to extinguish the house and save the house
22 at 105. But that is where the fire made its -- I
23 guess, made its shift on us, unexpected shift on us
24 and got into the Line Creek bottom, which we did not
25 expect.

64

1    Q.   Okay. So to continue to unpackage this, up
2 to this point in time, the wind had been -- is it
3 referred to as a "straight-line wind"?
4    A.   Yes.
5    Q.   What is a "straight-line wind"?
6    A.   Just no wind shifts, unchanging. Just a
7 consistent direction, fairly consistent rate of wind
8 speed.
9    Q.   And had the wind stayed about the same since
10 you had left the fire hall or had it changed in any
11 way?
12    A.   It was pretty much the same. You know,
13 strong gusts, but pretty much a steady, very strong
14 wind with extreme gusts every couple minutes.
15    Q.   Now, you just described the wind shift.
16         To us lay people, that means the wind
17 changed direction, but to a firefighter fighting a
18 fire, engaged in the initial attack, that means
19 something else.
20         Tell us what that means.
21    A.   Well, you know, it's going to mean complete
22 change in fire behavior and direction, and we don't
23 always know what it is caused by. You have to
24 encounter it and try and figure out what has caused
25 it, but you just attack the fire. I mean, the fire

65

1 creates its own wind, so sometimes it can be a calm
2 day out, and you're fighting a big wildland fire,
3 you're dealing with the wind running in a weird
4 direction because the fire's making its own wind.
5         There's all kinds of different factors that
6 can cause a wind shift, but, for us that night, it
7 was unexpected. It was a surprise. We couldn't
8 plan for it. And that would have been the point
9 where I feel like the fire was completely out of our
10 control up. Until that point, I had a plan of
11 attack to drive it out of fuel after this happened,
12 which happened in a matter of minutes. At that
13 point, it became just evacuations.
14    Q.   What would be your best estimate of the time
15 that all of this that you just narrated occurred?
16    A.   I would hate to go on the record with a time
17 because there's -- so much runs together. I don't
18 have a -- without going back to the dispatch -- if
19 dispatch could even hear us, without going back to
20 that record, I would say, if I had to guess -- if I
21 had to guess, I would say 25 to 30 minutes after my
22 initial arrival.
23    Q.   Okay. Just so I can do the math then, so
24 did you say 15 to 20 minutes?
25    A.   I would say 25 to 30 minutes after initial

66

1 arrival.
2    Q.   So that would be roughly 11:15 or so.
3         Does that sound about right?
4    A.   Correct. But because of time running
5 together like it does in these incidents and things
6 going on, I can't say that's an accurate time. That
7 would be my guess from my recollection.
8    Q.   Understand. You mentioned something,
9 though, that there might be some information in the
10 dispatch records.
11         And what would be searched for in the
12 dispatch records? What kind of communication told
13 us about this wind shift?
14    A.   That would have been just a -- just my call
15 to the other responders, which was probably on local
16 traffic. I don't know if it would show up on the
17 dispatch reporting that -- that we had had a -- were
18 experiencing wind shift, and the fire was going into
19 the creek on us and across Louis L'Amour Lane. And
20 then Engine 83 answering me that there was no wind
21 change at their location.
22         So it's important to -- for them to answer
23 back and everybody to let everybody know on the
24 whole location what the wind is doing, if they're
25 seeing wind shift or not seeing wind shift, those

67

1 things are important to know.
2     So that's why we always answer back when
3 somebody reports something. Everybody else needs to
4 let them know what they're seeing where they are.
5   Q.  Why is it important?
6   A.  So you can continue to interpret the weather
7 pattern, interpret the wind patterns, and predict
8 what may happen next.
9   Q.  And what's your first objective in a
10 situation like this?
11   A.  Just firefighters, life safety, and
12 residents' life safety.
13   Q.  Okay. So with this wind shift, you had to
14 change your strategy in what way?
15   A.  The -- it increased the fire behavior
16 tremendously. It increased the fuel load
17 tremendously, and the fire started to run toward 20
18 or 30 residences that could be threatened at this
19 point, where we expected to corner it in this
20 pasture up against the hills behind these few
21 residences, where we would be protecting five
22 structures, five or six structures and driving the
23 fire up in the hill.
24     Now, all of a sudden, we are needing to
25 evacuate, which evacuations had already started on

68

1 the lower end, but evacuations needed to be
2 immediately carried out by all fire personnel at
3 that moment because there were people -- we knew
4 there were people that weren't even aware there was
5 a fire at this point, that the fire was going to be
6 threatening within minutes. So.
7   Q.  So we're at approximately 11:15.
8     Had any evacuations been ordered before then
9 by anybody?
10   A.  We had local traffic. I don't think
11 recorded. I had ordered evacuations, ordered excess
12 responders to start making calls. There were
13 neighbors that were making calls for us to people in
14 this drainage to wake them up and let them know. It
15 was kind of a department coordinating with
16 community, and I believe dispatch had tried to do
17 a -- now I'm on the spot, I'm going to forget what
18 it's called -- a code red.
19     We don't have a reverse 911 in our district
20 here in Wyoming, but there's a code red, that if
21 you're signed up for it, dispatch can call you in
22 that area and let you know there's an incident I
23 think a few heard from that. But there were
24 deputies out from town trying to start evacuations
25 for us. There were a lot of people trying to

69

1 coordinate -- our communications were poor because
2 we had lost our tower. We were having trouble
3 communicating with our county officials in town that
4 were in our county sheriff's office and those, so we
5 were a little bit running blind until we could bump
6 into deputies face to face and come up with a plan.
7   Q.  On scene?
8   A.  On scene.
9   Q.  Would you have an idea of when the
10 evacuations first started then?
11   A.  I don't because I know some of that, I was
12 asked early on when we were fighting the fire up on
13 the upper end. And I said, yes, we need to, you
14 know, find people, come up with manpower to start
15 some evacuations.
16     I didn't give direct orders on where it
17 started or -- so I know there were community members
18 and some members of our department trying to set
19 that up, and then deputies -- as soon as I responded
20 to the lower end to start evacuations, there was
21 already at least one deputy there evacuating, and
22 other engines were following me down to start the
23 evacuations.
24     I know that Jerry Ruth, one of my
25 firefighters, had stopped and given a few people

70

1 heads-up and asked them to evacuate, he had told me.
2 I don't know the details on that.
3     But I know there were different -- you know,
4 it wasn't a very coordinated effort, but everybody
5 was trying to get evacuations started and notify
6 everyone.
7   Q.  And every door you knocked on, did somebody
8 respond?
9   A.  No. Not for a while, but we -- you know, at
10 this time of night, you know, if there's vehicles
11 there, you pretty much know there's somebody home.
12     So we know the residences that may be empty.
13 There may not be a full-time resident there. Those
14 are still checked, but just quickly. And after we
15 were able to wake up, I think, about everybody that
16 is a full-time resident there and make them aware of
17 it and start getting them out. So -- and everybody
18 in this whole area has a lot of animals and a lot of
19 pets, and that's the big thing. And they will die
20 defending their pets, and so you have to get them
21 and their pets out, or it's -- you can hardly drag
22 them out of there.
23   Q.  So we're back-talking -- our reference point
24 is Exhibit 63, and approximately 11:15 or so. At
25 that point, how long had evacuations been going on,

71

1 would you say?
2   A.  My guess would be probably only ten minutes
3 or so.
4   Q.  Okay. How many -- roughly again, how many
5 people were assisting in -- strike that. Let me ask
6 a better question.
7       What I understand from what you've told us
8 is that firefighters were doing notification of
9 evacuations and fighting the fire ball?
10  A.  Well, the -- no, mostly our -- I would say
11 our reserve members of the department were trying
12 to -- that weren't on the front line, were trying to
13 get evacuations started and notify people via phone
14 and neighbors.
15      So we have past members of department or
16 inactive members that -- family members of
17 firefighters, those sorts of people that some
18 departments would call an "auxiliary" or something
19 like that. Those people that know what's going on
20 know that firefighters can't do it. They are tied
21 to the fire department, but -- and I can't even give
22 you the names of who was doing all that. I had just
23 heard that there were several that had taken it upon
24 themselves to call friends and neighbors, members of
25 the community, and let them know and try to --

72

1 they're obviously told not to go up in there. We
2 don't need more people without training in the
3 scene. So they were doing the best they could by
4 phone and calling as much as they could. I don't
5 know what all happened from that, but just fire
6 engines and deputies from the county sheriff were
7 supposed to be in the scene doing the face-to-face
8 evacuations. So.
9   Q.  We have the Park County Sheriff's Office
10 record, exhibit's 34. I don't know if -- did you
11 have a chance to look at that at some point in time?
12  A.  I don't believe I have.
13  Q.  Have you seen that document?
14  A.  I have not.
15  Q.  Okay. That's fine. Would you have an idea,
16 Nate, of how many personnel from the sheriff's
17 office responded to assist in the fire?
18  A.  I believe I only saw two, and I know of a
19 third that was at the rec center setting up a safe
20 zone, I guess, or an evacuee point to try and get
21 names of the evacuees and a place for them to stay.
22 But I believe Monte McClain was at the rec center,
23 and I believe I had two deputies that I saw. But
24 it's tough in the battle like it was. It's tough to
25 know if I only had -- if I was only dealing with one

73

1 at a time because I only talked to one, but I
2 thought I saw two separate pickups.
3   Q.  Okay. In your post-incident size-ups, the
4 meetings that we were talking about, did you or
5 somebody or a group of people arrive at a conclusion
6 of what caused the wind shift that you described?
7       MR. BAILEY: Ken, I could not hear that
8 question. Would you do that one more time.
9       MR. BARKER: Sure. I certainly will.
10 BY MR. BARKER:
11  Q.  In your post-incident size-ups, did you or
12 somebody else determine what caused the wind shift
13 that you described?
14      MR. BAILEY: Thank you.
15      MR. BONA: Calls for speculation.
16      MR. BAILEY: I'm going to join.
17      THE WITNESS: So I just --
18      MR. BONA: So you can go ahead and answer.
19 I'm just making an objection for the record.
20      THE WITNESS: Right. Right. Okay.
21      So to the best of our experience and the
22 best we could conclude, I saw two separate things
23 happen there.
24      And one I was seeing because there was a
25 ridge, higher-elevated ridge west of where the fire

74

1 was, west of this draw. There was an increased fuel
2 in that draw, but also that ridge created a wind
3 eddy that was drawing the fire back to the west
4 underneath.
5       So as it's -- the wind over top is still
6 pushing north northeast, when it hits that wind
7 break or that dead zone below that hill, it starts
8 sucking the fire back into it, which drew it down
9 towards the road and the creek.
10      And there's also a large hill there, which
11 we see in our terrain. There's a big sandstone face
12 there, which will redirect the wind. And I could
13 tell that that -- the strong winds over top were
14 being redirected down toward the creek by that hill.
15 BY MR. BARKER:
16  Q.  Are you able to see that hill in Exhibit 63
17 that you're describing, or the ridge line?
18  A.  I believe so.
19      MR. BARKER: Would you be able to just kind
20 of sketch that out with this same green -- just
21 dashes, if you would, please, on Exhibit 63.
22      Okay. So you're marking with green dashes
23 the ridge line that you're describing. And then you
24 said something in a soft voice. You said wind.
25 Those are wind direction indicators to the best of

231

1   the day after, on the 16th. Started making some of
2   my notes. And I worked on it throughout that
3   following couple of weeks off of the notes I had.
4       Q.   Okay. And the typed portion, the narrative
5   portion, when did you write that up?
6       A.   Sometime in that next two weeks after the
7   fire.
8       Q.   Let's go down to the second paragraph. You
9   said: "Winds gusting in excess of 100 mph."
10          You see that?
11      A.   Yes.
12      Q.   Was that just based on your impression, or
13  did you gather some information from some other
14  source to say that?
15      A.   That was my -- just my experience because I
16  felt it was well over that from past fires where we
17  had experienced similar things, and then we got the
18  wind recordings from that night, you know, knowing
19  that what the wind reports were that night, what we
20  experienced, I felt it was at least 100.
21      Q.   I believe you testified direct examination
22  that the wind was blowing hard enough, you had
23  trouble keeping your vehicle on the road?
24      A.   Correct.
25      Q.   What vehicle was that?

232

1       A.   A '13 Dodge Durango.
2       Q.   So when you say you were having trouble
3   keeping it on the road, describe that for us in a
4   little more detail.
5           Were you actually being blown off the road?
6       A.   Yes.
7       Q.   Okay.
8       A.   Yes. And just for a split second, and in
9   one gust, no matter how hard I turned the wheel, it
10  was taking my vehicle into a borrow ditch on dry
11  pavement.
12      Q.   Had you ever experienced anything like that
13  before?
14      A.   On these other fires we're talking about, we
15  had similar.
16      Q.   Where your vehicle was being pushed off the
17  road?
18      A.   Correct.
19      Q.   Okay. Pam Nelson testified that her 20-foot
20  horse trailer loaded with three horse was physically
21  moved by the wind.
22          Does that surprise you?
23      A.   No.
24      Q.   So when you say "in excess of 100 miles per
25  hour," do you have an idea of how much in excess?

233

1       A.   No, I don't. You, you know, you hear
2   things. You hear different people reporting, and
3   everybody likes to embellish a story, so I don't
4   have any -- and I didn't really go look. I heard
5   what some of the reports were. Some of the reports
6   we saw here, I had seen something similar to that
7   afterwards from different locations.
8           But in the Clark area, it can be one thing
9   here and a completely different thing 3 miles over
10  in a different drainage because you can have
11  extremely different wind speeds. So it's hard to
12  nail that down.
13      Q.   Okay. But in any event, your impression
14  was -- and you weren't trying to embellish when you
15  said it's in excess of 100 miles per hour?
16      A.   Correct.
17      Q.   Okay. Now, at some point that night, you
18  asked Jerry Ruth if he had told his wife to evacuate
19  yet, correct?
20      A.   Correct.
21      Q.   Was that a conversation you had with him
22  face to face or by radio or by cell phone?
23      A.   By radio.
24      Q.   Okay. And was that -- when you concluded
25  the fire was out of control, that it took place at

234

1   about that time?
2       A.   Correct.
3       Q.   And that was when it was moving from the
4   Bays' residence towards Line Creek, correct?
5       A.   Correct.
6       Q.   How far is it from that point to the Ruth
7   residence, approximately?
8       A.   I would say, approximately, 1 and a half
9   miles.
10      Q.   Okay. I saw something somewhere in the
11  records that this fire moved a mile -- went a mile
12  east in like five minutes.
13          Have you seen anything like that?
14      A.   I haven't seen anything like that. That's
15  definitely what I felt that night. And I know I
16  have mentioned to people that I thought it ran over
17  a mile in five or six minutes. And it just seemed
18  like it happened awful fast. And we were trying to
19  accomplish things in between that time, but when I
20  crossed that bridge, and when I headed down and saw
21  where the fire was, I don't know how long that took.
22  So I -- but it felt to me like five or six minutes,
23  so I would say if someone else saw that, I would say
24  that's accurate.
25      Q.   So when you told Jerry Ruth that he should

235

have -- he should tell his wife to evacuate, tell me again what was actually said in that conversation. What did he say and what did you say?
A. This is just the best of my recollection from --
Q. Correct?
A. -- a couple years ago or whenever this was.
But I remember calling him and saying -- asking him -- I think I let everyone know that we need to evacuate everyone as quick as possible. It's in the creek bottom, it's running.
And then I asked him, called him directly and asked him if he had told Cindy to evacuate, and -- or if Cindy was evacuated, maybe is what I asked, if she had evacuated. And he said, no, should I, or something along those lines in broken radio communication. And I said, yes, immediately.
That's the best of my recollection to what that conversation was. And he was either asked later by me or someone else -- I don't know if he was asked -- if she had evacuated and if she was going, or if he came on the radio and said that he's having trouble getting a hold of her.
But I remember, in my mind, I did get confirmation from him that he had told her to get

236

out, to evacuate and to get out, and then he was having trouble getting a hold of her.
Q. So at some point you had confirmation from someone that he had told her to get out?
A. Correct.
Q. But the initial conversation you had with him, he hadn't yet told her that?
A. Correct.
Q. Okay. And that initial conversation took place because you knew when the fire hit Line Creek, it was going to go quickly to the east with the wind the way it was?
A. I felt there was a strong chance. It was very surprising to me that it ran that fast. We've dealt with these fires on creek bottoms in this exact creek bottom. With the same thing, we were able to keep it on the upper end, and we fought it all night long, and we were able to keep it on the upper end, where I thought we were keeping this one.
So my initial reaction was we didn't need to do evacuations down below because we hadn't at the fire in the past, and I thought we could keep it up there. We needed to start notifying people. And then when -- just with the change in fire behavior, it took us all by surprise, and you could tell that

237

it was off and running, and we needed to evacuate as quick as possible. I still would have never believed that it would have made the run it made. I would have never -- that was like when you hear people talk about -- well, in forest firefighting, wildland fire, "crown fire," where it crawls into the crowns and just takes off and just consumes timber. That's what it felt like what happened in a short amount of time. So.
Q. I'm not a fire expert, so this may be a really stupid question, but with the winds blowing at sustained speeds of 70 miles an hour, and the wind the fire itself generates that you testified about, wind gusts of occasionally in excess of 100, what's -- how fast is that fire moving? Do you have any idea how fast the fire itself is moving?
A. No. It generally -- it's tough to say, but generally those kind of wind speeds to the vegetation and spotting out ahead, it -- a lot of times, it's moving 30 to 35 miles an hour, maybe a third of the wind speed a lot of times, depending on how far -- a lot of that depends on the spotting.
So if you get a lot of spotting way out further and that fire takes off, and then, you know, it kind of -- it really runs a lot faster in those

238

situations. But there's times where vegetation will slow it. You know, it'll run out of a little bit of the right fuel, and then there's other times where it'll hit the right fuel in the right area and just take off. So it's really tough to -- but we've seen fire running at probably 30 miles an hour in that kind of wind, what I would feel is 30 miles an hour.
Q. You testified earlier on in your response to this fire, when it was, for example, at the Linebaugh area, that one of your goals, what you hoped to do was to navigate or move that fire up towards the hills.
A. Correct.
Q. Why was that? What was your thinking in moving it up?
A. Above that -- above the irrigation ditch on those hillsides, it turns into pretty sparse, thin vegetation, and the flame lengths are real short when it gets up in that stuff. It won't travel far or fast. There's times where it can't travel at all in that vegetation. So if you're able to flank it and get this fire out in the vegetation, flank it and drive it up into no vegetation, you can let it put itself out if you kind of corner it.
Q. Okay. And I believe you actually used the

Morgenweck Court Reporting, 307-250-0220

243

1  unsure of.
2  Q.  Okay. Do you know if -- do you know if
3  Jerry Ruth had the ability to communicate with Cindy
4  by radio?
5  A.  I don't.
6  Q.  Okay. We know from phone records that he
7  placed a call to her at 11:54 p.m. that night. We
8  don't know how long that phone call was, but it was
9  at least one second because it shows up on Verizon
10  as one minute if it's placed.
11      We have no other phone call before that time
12  that night. That's why I was curious if you knew if
13  there was any other means of him communicating with
14  her besides his cell phone. And you just don't know
15  the answer to that?
16  A.  No, I don't. None that I know of.
17  Q.  Okay. I think you said in direct
18  examination that your daughter was with you in your
19  fire truck that night; is that correct?
20  A.  Correct.
21  Q.  How old is your daughter?
22  A.  She's 18.
23  Q.  Okay. Was she a volunteer firefighter?
24  A.  Yes.
25  Q.  Okay. Did she stay with you the entire

244

1  evening?
2  A.  Yes.
3  Q.  Okay. Did she have any active role in
4  fighting a fire?
5  A.  Not fighting. In evacuations, she was
6  active in evacuations with us in helping carry dogs
7  and people and close doors and chase chickens.
8  Q.  Okay. The minutes from the Clark Fire
9  meetings, you said you do keep minutes, and they're
10  actually in -- they're written minutes, correct?
11  A.  Correct.
12  Q.  Do you still have the minutes from 2021?
13  A.  I would guess we do, but as I --
14      MR. PAHLKE:  Go ahead, you finish.
15      THE WITNESS:  -- as I said before, we don't
16  generally keep an official minutes of the critiques.
17  We discuss these are the calls that were critiqued,
18  but we don't go into keeping minutes of the
19  critique. So that's kind of an in-house,
20  after-action discussion.
21  BY MR. BAILEY:
22  Q.  Sure. But you do have minutes?
23  A.  Correct.
24  Q.  Okay.
25  A.  Of the meeting.

245

1      MR. PAHLKE:  Can we talk you into a break?
2      MR. BAILEY:  Could we what?
3      MR. PAHLKE:  Have a break?
4      MR. BAILEY:  Oh, absolutely.
5      (A recess was taken from 2:53 p.m. until
6  3:02 p.m.)
7      MR. BAILEY:  Nate, thank you for your
8  patience. We'll try to get through this as quickly
9  as possible.
10  BY MR. BAILEY:
11  Q.  To your recollection, did you communicate
12  with anybody on the night of the fire,
13  November 15th, or the early morning of the next day,
14  November 16, 2021, by text messages?
15  A.  I can't recall any of that.
16  Q.  If you did communicate by text message,
17  would you still have them on your phone, do you
18  know? Do you have a habit of deleting old messages?
19  A.  I try to. I try to clean things out a lot
20  of times if it doesn't matter. But I don't -- I'm
21  sure I was texting, but I don't recall any
22  conversations or anything like that.
23  Q.  Okay. Most of your communication that night
24  was by radio?
25  A.  Correct.

246

1  Q.  Or at least you tried to communicate by
2  radio?
3  A.  Correct. Yeah, but we don't have -- in that
4  drainage, there's no cell coverage unless you're --
5  if you're up by the mailboxes, you might be able to
6  get cell phone service, but down where I was most of
7  the night, I won't have any kind of cell coverage.
8      So there would have been a period when I
9  made the runaround down 1AB and over to the Wild
10  Willy Trail to come in the other side, I may have
11  had cell communication at that time, but most of the
12  night, I wouldn't have had any.
13  Q.  When you told Jerry Ruth that he should tell
14  his wife to get out immediately or right away, did
15  you give him any instructions to go along with that?
16  For example, tell her to meet us at the staging area
17  or tell her to do, you know, go in this direction or
18  that direction or anything like that?
19  A.  No, I don't recall giving him any --
20  anything other than just tell her to get out now.
21  Q.  This other road that you talked about that
22  you went in and came up behind the Ruth residence,
23  you called that -- did you call ir a two-track road
24  or something like that?
25  A.  Yeah, it's a two-track. In spots, it's kind

Morgenweck Court Reporting, 307-250-0220

247

1  of like a goat trail, but it's a -- it's kind of a
2  rough two-track.
3     Q.  Is that a trail or a track that goes to the
4  east and north of the Ruth property?
5     A.  Yes, northeast. I would say pretty much
6  straight east, a little bit northeast, I think. It
7  deviates and goes out to -- once it gets up on the
8  flat, I think it goes out there a little bit to the
9  northeast.
10    Q.  Did that road take you all the way to the
11 Ruth residence?
12    A.  Yes.
13    Q.  Do you know of anything that would have
14 prevented Cindy Ruth from taking that route to
15 evacuate?
16    A.  I don't know of anything, other than if she
17 was unsure. That country out there washes out a lot
18 of times. There's always issues with those roads.
19 They're not -- so I was wondering if we would get in
20 there. I don't know if she maybe had -- was
21 concerned she'd get stuck going out that way in a
22 car. I don't know what other option she had, and
23 you have to go through their horse corral to get
24 back to it. And so I -- that's something I've
25 questioned since then myself, is if she was

248

1  uncomfortable with that or didn't think of that in a
2  panic. Or I don't understand, you know, why that
3  wasn't an option to her.
4     Q.  Yeah, okay.
5         I am going to have you refer to Plaintiff's
6  Exhibit 8. And these are --
7         MS. COATES: I couldn't hear what exhibit
8  that was.
9         MR. BAILEY: Plaintiff's Exhibit 8.
10        MS. COATES: Thanks.
11        MR. BAILEY: Photographs.
12 BY MR. BARKER:
13    Q.  These photographs, Nate, were taken by a
14 fire investigator named Todd Hageland, (ph), I
15 believe. And I don't know when they were taken, but
16 obviously they were taken soon after the Clark fire.
17        And I am not going to -- we're not going to
18 go through all of them. And I know you didn't take
19 them, and maybe this is the first time you've
20 actually seen them, but I do have some questions for
21 you.
22        If you'll look at -- the first photograph is
23 Bates-stamped in the lower right-hand corner IRIS
24 Photos 0001.
25        Do you see that?

249

1     A.  Yes.
2     Q.  Do you recognize the vehicle in that
3  photograph?
4     A.  Yes.
5     Q.  Is that Cindy Ruth's vehicle?
6     A.  Yes.
7     Q.  And am I oriented correctly when I say that
8  the front of the vehicle is facing us in that photo,
9  correct? Or can you tell?
10    A.  It's hard to tell. I don't recall.
11    Q.  Okay. But in the background, if you look
12 way into the background in that photo, is that the
13 Ruth residence?
14    A.  Yes.
15    Q.  What is that road? Is that part of Louis
16 L'Amour Lane or is that a private driveway?
17    A.  That's Ruth's private driveway, I believe.
18 I think their address is 1 Louis L'Amour, so I don't
19 know if that's considered part of Louis L'Amour or
20 if that's their private drive, where it comes off of
21 Louis L'Amour, but I believe that's the private
22 drive.
23    Q.  Do you know what the composition of that
24 road is? Is it gravel, is it just dirt, sand, what?
25    A.  It's mostly blow sand with areas of gravel.

250

1  There's areas where it's washed out, where it's kind
2  of rocky, where you kind of go through a wash. But
3  for the most part, it's blow sand.
4     Q.  You testified on direct that it looked to
5  you like when you first saw the vehicle there, it
6  was at a 45-degree angle, it looked to you like
7  Cindy maybe was trying to turn around and go back,
8  correct?
9     A.  Correct.
10    Q.  There's nothing in the road itself that
11 would have prevented her from keeping on going west
12 that you know of in the road itself?
13    A.  Correct.
14    Q.  Okay. Now, on the right-hand side of this
15 photograph, I think what we're looking at is terrain
16 that has been burned by the fire.
17        Am I seeing that correctly?
18    A.  Yes.
19    Q.  And that the trees down there on the
20 right-hand side of the photograph, that's where Line
21 Creek is, correct?
22    A.  Correct.
23    Q.  And I believe you testified that Cindy
24 Ruth's body was 65 feet to the south of the road; is
25 that accurate?

251

1  A. That's -- as I recall, yes, that's
2  definitely in the south or southwest direction from
3  the vehicle.
4  Q. Without getting bogged down on the exact
5  distance, it's clear when she exited the vehicle, at
6  some point, she headed in the direction of the fire;
7  isn't that true?
8  A. Correct. Or I guess I believe the fire was
9  probably west of her, and she was headed south in
10 front of the fire, but not directly toward the fire.
11 I don't think the fire was there yet. But...
12 Q. Clearly headed in the direction of Line
13 Creek?
14 A. Yes.
15 Q. And if we look on the left-hand side, the
16 upland side of the terrain, it does not -- to me, it
17 does not look like that upland side of the terrain
18 past the edge of the road has suffered any
19 significant fire damage.
20     When you were out there the next day looking
21 at things, was there any significant fire damage on
22 that side of the road?
23 A. Not that I recall for the most part. It may
24 have hopped in a couple spots, but I don't even
25 recall that for sure. It seems like it was -- the

252

1  road stopped it.
2  Q. Okay. Now, if you'll turn to the next
3  photo, to me, this looks like the rear end of the
4  vehicle with the hatch opened.
5     Do you see that?
6  A. My page 2 is dirt.
7  Q. Oh, I'm sorry. Your -- I'm sorry. Bates
8  No. 6. Bates No. 6.
9  A. Okay. Exhibit 8, page 6, yes, that looks to
10 be the rear of the vehicle.
11 Q. Now, from the Clark County sheriff's
12 department records, it appears that -- you maybe
13 testified about this and I just -- things are
14 running together in my brain now.
15    But Jerry Ruth is an assistant member -- an
16 assistant fire chief from the Cody Fire Department
17 and maybe another individual came across this
18 vehicle sometime the next morning on the 16th, and
19 it was still intact and the dogs were inside it.
20    Is that your understanding?
21 A. That was my understanding when they -- when
22 we were -- during our evacuations on the other side,
23 I made contact with them, and they had said they
24 were going in there, and I'm unsure at what time
25 that was. I would say a best guess again, but

253

1  they -- so Assistant Fire Chief Nate Filener, Cody
2  Fire, and I believe he had either -- he had another
3  fire engine with him, Jerry Ruth in the passenger
4  seat of his pickup, and then they took one of their
5  wildland engines with them. So those two vehicles
6  went in there and tried to find her and make
7  contact.
8     And what they had told me was they found the
9  dogs were okay. They got the dogs out. The car was
10 just starting to catch fire, was what they told me.
11 And they got the dogs out of there and started
12 looking for her at that time, and couldn't find her.
13 Q. Now, I know what I'm about to read to you,
14 you didn't write, okay? I know that. This is from
15 the sheriff's account of what Jerry Ruth told him.
16 And I just want to see if it's consistent with what
17 you were told.
18    (The court reporter asks for clarification.)
19 BY MR. BAILEY:
20 Q. Okay. So this is Phil Johnson of the Park
21 County Sheriff's Office recounting what Mr. Ruth
22 told him on Tuesday, November 16th, apparently.
23 Again, I know you didn't write this.
24    MR. BARKER: What exhibit are you reading
25 from?

254

1    MR. BAILEY: It's Clark Fire PCSO 1001.
2  It's a document you provided with your initial
3  disclosures.
4    (There was a brief discussion off the
5  record.)
6    MS. COATES: Exhibit 34.
7    MR. BAILEY: Oh, it's your Exhibit 34.
8  Thanks, Holly.
9  BY MR. BAILEY:
10 Q. And, Nate, if you'll turn to page 2 of that
11 document. And I stand corrected.
12    Actually, he met with Jerry apparently on
13 Saturday, November 20, 2021.
14    And he says: "I learned the following.
15 Jerry Ruth stated that when the Clark fire
16 department was paged, he responded for emergency
17 services while Cindy Ruth was still at home. On
18 Tuesday, November 16, 2021, it approximately
19 0016hrs" -- which I believe is 12:16 a.m. on the
20 16th -- "he received a voicemail from his wife
21 saying that she was take care of the animals but she
22 didn't know what to do after that. On the same
23 date, date around 0200hrs" -- or 2:00 a.m. -- "he
24 was able to make it back in the area of his
25 residence with the help of other fire personnel. He

65 (Pages 251 to 254)

255

1  observed his wife's vehicle in his driveway."
2        And we've been talking about the driveway,
3  right, Nate, in the pictures?
4     A.   Right.
5     Q.   "At the time, the vehicle was still intact.
6  The rear hatch was open the couple's dogs were
7  inside, along with a pillow that was partially on
8  fire. Jerry Ruth put the fire out and secured the
9  dogs. The firefighters took the dogs back to the
10 staging area while Jerry took a side by side and
11 continued the search."
12       Do you see that?
13    A.   Yes.
14    Q.   Is that consistent generally with what you
15 were told about what happened that morning?
16    A.   Yes. Other than -- again, the time, that
17 wasn't something we discussed. And I can't attest
18 to that, but the rest seems accurate to what I was
19 told.
20    Q.   Okay. Now, if you'll go to Bates -- in the
21 photographs, Bates 0021.
22       MR. PAHLKE:  What exhibit?
23       MR. BAILEY:  This is Exhibit 8.
24 BY MR. BAILEY:
25    Q.   Do you recognize that as the Ruth residence?

256

1     A.   Yes.
2     Q.   Do you recognize the equipment on the
3  right-hand side of the road?
4     A.   Yes.
5     Q.   Do you recognize that as equipment belonging
6  to Jerry Ruth?
7     A.   Yes.
8        (A person enters the room. )
9        (A recess was taken from 3:21 p.m. until
10 3:25 p.m.)
11 BY MR. BAILEY:
12    Q.   I believe we were looking at Bates-stamped
13 0021 in the lower right-hand corner?
14    A.   Correct. And I might -- I might be able to
15 speed some of this up because I see where you're
16 going here. And, you know, there's -- like I say,
17 there's so much happened that night that I don't
18 even remember until I'm reminded of it.
19       But I am the one that actually used the skid
20 steer to move the car out of the road once the
21 deputies had finished, and the coroner had taken
22 Cindy. And we were having to try to drive in and
23 around and over through sand berms to get in and out
24 to finish the extinguishment of everything at
25 Jerry's property.

257

1  So I made the decision to borrow his skid
2  steer and go down there and grab the car and set it
3  out of the road so we weren't getting stuck in the
4  stand all the time.
5     Q.   Well, you've kind of anticipated what I was
6  going to ask you.
7     A.   I could see that you was going there when
8  you were pointing to the skid steer. I'm like,
9  well, I better clear that up because that was me. I
10 apologize.
11    Q.   So when you got in the skid steer,
12 presumably the key was in it?
13    A.   Yeah.
14    Q.   So you didn't -- I mean, you didn't have to
15 go looking for a key. It was in the skid steer,
16 correct?
17    A.   I believe so. If it's a key start. I can't
18 even remember.
19    Q.   Yeah. Well, I've only operated one a few
20 times, and I've always had to have a key, but maybe
21 there's another kind?
22    A.   Yeah. Some of them are code and some of
23 them are key, but I can't remember which his is, so
24 it must have been a key.
25    Q.   So you used this skid steer the day after

258

1  the fire on the 16th to move Cindy's vehicle?
2     A.   I believe it was the night of the 16th. I
3  can't even recall. The days were running together,
4  but I know I -- I remember that I had waited for --
5  I believe I had waited for the deputies and
6  everyone, coroner, all of them to do their job and
7  look at the whole scene because I know the car can't
8  be moved before then.
9        But once it -- that had been done, we needed
10 to get it out of the way so we could use the road
11 because it became a problem getting the fire engines
12 in and out.
13    Q.   Okay. So was the skid steer located where
14 it is in this picture when you used it, or was it up
15 by the house, or do you recall?
16    A.   I believe I put it back where it had been
17 parked.
18    Q.   Okay. But that skid steer was capable of --
19 the skid steer was capable of going over terrain
20 that a car sometimes can't manage, correct?
21    A.   Correct.
22    Q.   And do you have any knowledge of whether
23 Cindy knew how to operate a skid steer?
24    A.   I don't.
25    Q.   Okay. To your knowledge, did the Ruth

Morgenweck Court Reporting, 307-250-0220

259

1  residence sustain any damage in the fire?
2      A.  Not in the --
3      Q.  I'm talking about the home itself?
4      A.  -- yeah. In the initial fire, there was
5  some damage on a porch to the north, I believe, and
6  I can't remember exactly what that was, but there
7  was a porch area to the north that I believe
8  sustained some damage. And then when we had gone
9  back there after we had taken Jerry to the
10 neighbor's, he had asked for some personal items in
11 his pickup, which was parked up near Cindy's car or
12 somewhere in that area, or at his residence. It was
13 there somewhere.
14      I -- he had asked for that and some personal
15 items, clothes and things out of the house, and I
16 went in with Katrina Hayworth, who's a -- she's a
17 ranger, law enforcement ranger with the forest
18 service who was there that night. She agreed to
19 give me a ride in her vehicle to get some things for
20 him and get his pickup for him.
21      We went back in there, and the logs around
22 the garage door on his house had ignited and caught
23 fire, and there was railroad ties in the planter
24 beds with pretty dry evergreens in those flower beds
25 up against the house, and those were starting to

260

1  burn.
2      And so we had hit them with extinguishers
3  and were calling for an engine to come back in and
4  help us, and I was having an issue with my radio
5  reaching out to finally get a hold of somebody, and
6  they scrambled two engines down there, and we got
7  that put out.
8      But his residence was about to catch fire
9  that second time I went back in, and we had already
10 been there and felt it was safe, and now it was
11 catching.
12      So there was at the debris pile over the
13 hill toward the creek bottom that was on fire, would
14 have been sawdust and wood debris, that it was
15 burning underneath of that, and we had to really
16 work hard to dig that out and extinguish it. That's
17 what was spreading sparks to the house at this time.
18      Once we got that done, I took his pickup and
19 the clothes and things he had asked for down to the
20 neighbor's residence, and we sat with Jerry for a
21 minute, and I talked to him and tried to comfort
22 him, and then I came back up to the fire.
23     Q.  So what you just described, was all of that
24 on the 16th?
25     A.  It would have been the morning of the 16th,

261

1  early morning hours, still dark, but, yes.
2      Q.  So just so I'm clear on the sequence of
3  events, when you went to the house in the morning of
4  the 16th, the house itself was intact. There was no
5  fire on the house, correct?
6      A.  Correct. My -- that I could see my first
7  pass through there. Now, my first pass through
8  there that morning was when I had come in from the
9  other road, and I was there for a short time. That
10 was me that called the -- that Cindy had been found.
11     (The court reporter asks for clarification.)
12     THE WITNESS: I was there just for a short
13 time at the house. When I had come in from the
14 east, up the two-track, I was there for a short time
15 at the house. I remember, and then I was called on
16 the radio that they needed me at staging. Cindy had
17 been found and I needed to be there because they
18 were about to talk to Jerry.
19     So they were requesting -- these are mutual
20 aid departments requesting that I get there quickly
21 because they're about to notify Jerry that Cindy's
22 been found.
23 BY MR. BAILEY:
24     Q.  Okay, I need to stop you there.
25     About what time is that?

262

1      A.  Zero idea. I'm sorry.
2      Q.  Okay. But you went to the house before
3  Cindy was found?
4      A.  Correct.
5      Q.  Okay.
6      A.  Or about the exact time she was being found.
7  It would have been very close to that. To that
8  point, and then I came out from there. When I was
9  requested, I came out there past Cindy's body and
10 the engine that was guarding her, and out to staging
11 to talk to Jerry.
12     Then after we talked to Jerry and neighbors
13 were taking him down to -- someone was taking him
14 down to their house, he had asked us to go back in
15 for a few items. We were trying to comfort him and
16 help him, and that's when he asked us to go back in
17 there. And then Mrs. Hayworth and I went back in,
18 and that's when we found the house starting on fire.
19 And that would have been -- no idea again.
20     Q.  Was it light yet?
21     A.  No.
22     Q.  Okay. And where did you see the house
23 starting on fire? What part of the house?
24     A.  The lower garage door, or there's two garage
25 doors facing toward Line Creek, two small garage

Morgenweck Court Reporting, 307-250-0220

267

1  Q. Do you know? Okay.
2  Let's go to Bates 85. And Bates 85, is that
3  corral you were referring to earlier that Cindy
4  would have had to have gone through to go north from
5  her residence?
6  A. No, I don't believe so. I think that's
7  the -- I think this is a round corral that was -- I
8  can't remember this location, but that the other
9  corral was -- it could be, and -- but I don't
10 believe this is it. I think it was a different
11 corral with a -- whether it be a lean-to shed there,
12 a wire gate you had to come through, not as many
13 panels, but I can't remember clearly.
14 Q. Okay. Let's go to Bates 87. There appears
15 to me there to be a two-track road between that
16 building and that corral.
17 Do you see that?
18 A. I do.
19 Q. Do you know where that goes?
20 A. I do not. Appears to be headed north. I do
21 not know where that goes or --
22 Q. If you go to Bates 88, in the lower
23 right-hand corner, there's another picture of that
24 road or two-track, whatever we want to call it.
25 But you have no idea where that goes as it

268

1  goes north?
2  A. I don't.
3  Q. Let's go to 101, Bates 101.
4  And in this picture, Nate, we've got -- it
5  looks like a white flat-bed truck down there by the
6  tractor.
7  Do you see that?
8  A. Yes.
9  Q. Is that your truck?
10 A. Yes.
11 Q. The road that's the two-track that we see on
12 the right-hand side of the picture here, is that the
13 road that leads up to the residence, or is that a
14 different road?
15 A. That one goes around above the residence, I
16 think, and back toward the corral. And then the
17 lower road down there goes past the lower end of the
18 residence and over to the where the shop used to be
19 or maybe again.
20 Q. So tell me where that -- you said which
21 residence?
22 A. The Ruth residence. So the lower road goes
23 below the house and this road on the right-hand side
24 goes above the house.
25 Q. Above it? Okay.

269

1  Does the one on the right connect to that
2  road that you came in on, the two-track that you
3  came in on?
4  A. I believe so. Yes.
5  Q. Okay.
6  A. As I recall.
7  Q. The hoses -- I mean, I think those are hoses
8  laying on the ground, do you know, were those used
9  to put out those fires at the residence or do you
10 know?
11 A. They weren't by our fire personnel. I
12 assume that, yeah, I guess I made assumptions when I
13 was there as to what they were for, but we didn't
14 use them. We used all water off of our trucks.
15 Q. Now, what I want to do is start with Bates
16 107, and we'll just go through these quickly.
17 Hopefully, you can tell me where you saw fire the
18 second time you came in that morning to the
19 residence.
20 A. Okay.
21 Q. So 107, and did you see any fire in -- at
22 that elevation?
23 A. No.
24 Q. 108?
25 A. No.

270

1  Q. 109?
2  A. No. I -- no, I do not.
3  Q. Okay. 110?
4  A. No.
5  Q. Let's go to 112. Any fire sign there?
6  A. No.
7  Q. 113?
8  A. No.
9  Q. 114?
10 A. I can't tell if I can see it in the corner,
11 but I don't believe so.
12 Q. Okay. 115?
13 A. Yes.
14 Q. And where on this picture do you see
15 evidence of fire?
16 A. The bottom right-hand corner of that garage
17 door log.
18 Q. Okay. Anyplace else on this photo?
19 A. No, I don't believe so.
20 Q. And if we go to picture 116, we see the same
21 spot on the right, the right post on that garage
22 door, correct?
23 A. Correct.
24 Q. Okay. The large arc archway you removed
25 from the road, maybe you testified to this, but I

Morgenweck Court Reporting, 307-250-0220

271

1  just -- do you recall who that belonged to?
2      A.  Give me just a second and I will.  Dawn and
3  Pamela Herschberger.
4      Q.  Okay.  Can you describe the archway, what
5  kind of material it was made from?
6      A.  I recall it to be old telephone poles or
7  something similar.
8      Q.  It's your understanding that it blew over in
9  the wind?
10     A.  Correct.
11     Q.  What did you have to do to move it?  What
12 did you have to use?
13     A.  We ended up -- we started with just a chain
14 saw, and couldn't get the -- couldn't get a chain
15 saw started, so we ended up using a log chain and
16 our fire engine just to drag it to the side.
17     Q.  Okay.  You said that Jerry Ruth's activities
18 the night of the fire were directed by others and
19 not by you; is that correct?
20     A.  Yes.
21     Q.  Other people were coordinating whatever he
22 was doing, correct?
23     A.  Right.  Correct.
24     Q.  Have you had conversations with any of those
25 other people about what they told him to do that

272

1  night?
2      A.  I have -- I don't even know who, you know,
3  who made what decision or any of those things.  I --
4  I believe he may have had conversations with my dad,
5  so you could ask him on that, on his response.  But
6  other than that, I don't know of anyone that had
7  conversations with him.
8      Q.  The only conversations you had with Jerry
9  that night would have been the ones related to
10 having him tell Cindy to evacuate; is that correct?
11     A.  Correct.  Prior to finding her body.
12     Q.  Right.  You mentioned in your direct
13 testimony that in addition to seeing the burned limb
14 in the cottonwood that's visible in the pictures we
15 looked at, that you saw evidence of other burned
16 limbs.
17         Did I hear that correctly?
18     A.  Only the one on the ground that, I guess, if
19 that's what you're asking.
20     Q.  I just want to verify, when you took that
21 picture of that burned limb, you didn't see any
22 other burned limbs in the cottonwood, correct?
23     A.  Correct.
24     Q.  If you had, you would have taken pictures of
25 those, too, correct?

273

1      A.  Correct.
2      Q.  Okay.  This may seem a small point, but
3  maybe it isn't.
4          There isn't any question in your mind, is
5  there, the fire, the origin of the fire, where the
6  fire actually started was about 140 feet east of the
7  cottonwood tree, correct?
8      A.  Correct.
9      Q.  As best you could measure?
10     A.  Yes.
11     Q.  I maybe shouldn't ask this question because
12 I'll be 70 in May, but what is the -- what is the --
13 what were the ages of your volunteer firefighters?
14 I know you're a young man, and I know your
15 daughter's young, but were most of the fire --
16 volunteer firefighters that night older men?
17     A.  On our department, the initial tack engines,
18 several of them were older gentlemen.  All of our
19 mutual aid departments, they're all young guys.
20     Q.  Sure.
21     A.  And I had -- we have a pretty fair mix of
22 younger to -- I'm kind of the middle of the road.
23 We have some younger firefighters and some older.
24     Q.  On the night of this fire, were most of the
25 Clark volunteers older men like your dad?

274

1      A.  I would say probably maybe half or a little
2  less than half.
3      Q.  Okay.  With respect to your goal the night
4  of the fire, once you're paged to this fire, it's
5  true, isn't it, it doesn't really matter how the
6  fire started or where it started.  Your job that
7  night was to try to keep people safe and structures
8  safe, correct?
9      A.  Correct.
10     Q.  And, apparently, that happened in every case
11 except for Cindy Ruth.  Everybody survived this fire
12 besides Cindy?
13     A.  Yes, other than pets, but Cindy was the only
14 human life lost.  Lost a lot of structures, but --
15     Q.  And from the physical evidence that we know
16 of, we know that if she had stayed in her home,
17 she'd be alive today, correct?
18         MR. BARKER:  Objection, foundation.
19 BY MR. BAILEY:
20     Q.  Well, let me rephrase it.
21         We know that if she had stayed in her home,
22 she would not have been killed that night by this
23 fire, correct?
24         MR. BARKER:  Same objection.
25 BY MR. BAILEY:

275

1 Q. Correct?
2 A. In hindsight, yes.
3 Q. We also know that if she stayed in her
4 vehicle, she'd be alive today, correct?
5 A. Also in hindsight, yes.
6 Q. We also know that if she had gone north
7 across the road uphill, she'd be alive today,
8 correct?
9 A. Probably, yes.
10 Q. We also know that if she had taken that
11 two-track road and gone north and east, she'd
12 probably be alive today?
13 MR. BARKER: Same objection.
14 BY MR. BAILEY:
15 Q. Go ahead.
16 A. Yes possibly.
17 MR. BAILEY: That's all I have, Nate. Thank
18 you.
19 THE WITNESS: You're welcome.
20 MR. BONA: I have a few questions. Do you
21 want to take a short break?
22 THE WITNESS: No, go ahead.
23 MR. BONA: Can I see Exhibit 63.
24 (There was a brief discussion off the
25 record.)

276

1 EXAMINATION
2 BY MR. BONA:
3 Q. If this would be helpful -- if this will be
4 helpful in the questions I'm going to ask or perhaps
5 this one?
6 A. Okay.
7 Q. I just need to get a little bit more clarity
8 on what happened on the 16th when you were doing
9 your investigation.
10 The way I understood your testimony, you
11 arrived in the 16th, and you parked, and you
12 indicated up by the main structures?
13 A. Yes, up here in this area (indicating).
14 Q. Okay. And you were there with -- I'm
15 sorry -- the two gentlemen, one from BLM, one from
16 the federal -- I think you said it was the federal
17 IC. So Fred Tucker, he's BLM, right?
18 A. Correct. They both -- both Sage Decker,
19 Fred Tucker, BLM. Sage was acting IC for the feds
20 on their portion of the fire, which was just to
21 assist us.
22 Q. Right. And "IC" is incident commander?
23 A. Correct, yeah.
24 Q. Did you go to the scene with Fred and Sage?
25 A. To -- that morning --

277

1 Q. Yes, on the 16th?
2 A. Correct.
3 Q. Did you coordinate by phone beforehand?
4 A. No, just on the ground. When they tied in
5 with me to ask what they could do and have me give
6 their guys an assignment, I told them I was headed
7 up there and asked them if they wanted to go along
8 to get it.
9 Q. Okay. And I think you said that you knew
10 Fred and Sage from prior incidences?
11 A. Correct.
12 Q. How -- how many fires have you been involved
13 in with Fred Tucker?
14 A. I would say four at least and multiple
15 trainings.
16 Q. And what -- when were those fires, the four
17 fires before the November 21st -- the November 2021
18 fire?
19 A. What were they?
20 Q. Yeah. When?
21 A. I have no way to be able to recall that.
22 Q. Do you recall the names?
23 A. No. They weren't -- not large incidents.
24 They would just be a number in our book.
25 Q. Okay. And for those fires that you were

278

1 involved in with Fred, did Fred do the origin cause
2 investigation?
3 A. I guess I would -- most of them there, I
4 guess I would say there wasn't really an origin and
5 cause investigation because it was very simple,
6 straightforward, and it never went to court kind of
7 thing.
8 So most of them would generally be a --
9 either it was, you know, you could tell it was a
10 lightning strike, or that's what it had to be kind
11 of -- when you're dealing with the BLM, you're
12 generally out in the boonies somewhere. So either
13 we knew the start because it was reported, or there
14 wasn't really a need for an origin and cause, that
15 they were evident. So.
16 Q. Okay. What about Sage Decker, had you been
17 on fires with him?
18 A. I think we might have been on one of the
19 same fires. I can't recall, but not a lot. I know
20 the name.
21 Q. Okay. Do you know what Fred Tucker's
22 wildland fire origin and cause investigation
23 experience is?
24 A. No.
25 Q. What about Sage Decker?

71 (Pages 275 to 278)

Morgenweck Court Reporting, 307-250-0220