# DEPOSITION OF WILLIAM JEROME RUTH

Page 1

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                     FOR THE DISTRICT OF WYOMING
 3
      WILLIAM JEROME RUTH, individually,
 4    and as Wrongful Death Representative
      of the ESTATE OF CYNTHIA SHOOK RUTH,
 5
              Plaintiff,
 6
      v.
 7
      BEARTOOTH ELECTRIC COOPERATIVE, INC.,
 8    a Montana Corporation, and ASPLUNDH
      TREE EXPERT, LLC, a Limited Liability
 9    Company formed in Pennsylvania,

10            Defendants.

11

12
                  DEPOSITION OF WILLIAM JEROME RUTH
13                          May 18, 2023
                             8:30 a.m.
14

15
      PURSUANT TO THE UNITED STATES RULES OF FEDERAL
16    PROCEDURE, this Deposition was:

17    TAKEN BY:       Henry F. Bailey, Jr., Esq.
                      Attorney for Defendant Beartooth
18                    Electric

19    REPORTED BY:    Barbara Jean Morgenweck, RPR, CCR
                      NCRA, RPR
20                    New Mexico CCR #526

21

22

23

24

25
```

**Page 29**

1  A.  Yes.
2  Q.  Were the flames near their house, or you
3  could just see them in the distance above their
4  house, or do you know?
5  A.  I could see the flames. The height of
6  the flames were over top of the roof. I
7  couldn't tell you the distance between the flame
8  and their house.
9  Q.  Okay. All right. When you got to the
10 VRBO -- well, before -- let's back up for a
11 second.
12      Anybody else with you from the Clark
13 Fire Department when you were at the Bay's?
14 A.  No.
15 Q.  Okay. Then you go to the VRBO.
16      What did you observe about the fire when
17 you were at the VRBO?
18 A.  At my -- at that time, I felt the VRBO
19 was not in imminent danger --
20 Q.  Okay.
21 A.  -- from the fire.
22 Q.  Okay.
23 A.  But at the same time, it wasn't my -- I
24 felt that they should leave because I didn't
25 know how the fire was going to react. I felt

**Page 30**

1  that they were close enough that they should
2  leave.
3  Q.  Were you concerned that the wind
4  conditions were such that the fire could move
5  fairly rapidly?
6  A.  Yes.
7  Q.  Okay. And, in fact, it did move fairly
8  rapidly that night, didn't it?
9  A.  It did.
10 Q.  Same question for when you were at Teri
11 Cothern's.
12      MR. BAILEY: Is it Cothern or Cawthorn
13 (phonetic)?
14      THE WITNESS: Cawthorn (phonetic).
15 Q.  Cothern? When you were at Teri
16 Cothern's house, what were your observations of
17 the fire at that point?
18 A.  I could see the fire clearly from her
19 house.
20 Q.  And did you know that it was moving in
21 the direction of her house?
22 A.  I felt that it was.
23 Q.  Okay. Had you been told by Nate Hoffert
24 or anyone else to go start evacuating people or
25 did you just do that on your own?

**Page 31**

1  A.  I did it on my own.
2  Q.  Okay. Where did you go after you left
3  Teri's house?
4  A.  Went back to the mailboxes.
5  Q.  Okay. Continued the coordination of
6  communications?
7  A.  Radio traffic.
8  Q.  Okay. When you went back to the
9  mailboxes after you left Teri Cothern's house,
10 were there other people from the Clark Fire
11 Department there with you that you recall?
12 A.  At some point I had a conversation with
13 Nate Hoffert.
14 Q.  Tell me about that.
15 A.  Nate was in another fire truck and he
16 had another fireman with him. I don't know who
17 that was. But we had a open-window
18 conversation, truck to truck. At some point
19 between the time that I left Teri's house and
20 when I met up with Nate, the rear window of my
21 truck was blown out, the back window that faces
22 the bed of the truck.
23 Q.  Do you know why that happened?
24 A.  Not exactly. I assumed that a rock hit
25 it, an airborne rock.

**Page 32**

1  Q.  An airborne rock. Did you ever see the
2  rock?
3  A.  No.
4  Q.  Okay. But the entire back window was
5  shattered?
6  A.  Yes.
7  Q.  And gone?
8  A.  It was in little pieces.
9  Q.  Okay. Okay. That happened after you
10 were at Teri Cothern's house?
11 A.  Yes.
12 Q.  And before you spoke with Mr. Hoffert
13 that night?
14 A.  Yes.
15 Q.  Okay. Do you attribute that to the
16 wind, the blowing a rock into the glass?
17 A.  Yes.
18 Q.  Okay. Where were you when you met up
19 with Nate Hoffert?
20 A.  Right at the mailboxes.
21 Q.  Okay. All right. And he had someone
22 else with him?
23 A.  Yes.
24 Q.  Do you remember who that was?
25 A.  No.

Page 33

1  Q.   Did you know them at the time and -- or
2  did you not even know who they were at the time?
3  A.   **I did recognize them, I just don't**
4  **remember who it was.**
5  Q.   Okay. Tell me about the conversation
6  you had with Nate Hoffert.
7  A.   **So I told them the back window was blown**
8  **out. And so he told me that he would go down**
9  **and assist and get Cindy out of the fire.**
10 Q.   Okay.
11 A.   **And told me to stay where I was.**
12 Q.   Okay. But he told you that he was going
13 to go get Cindy out?
14 A.   **Yes.**
15 Q.   What did you say?
16 A.   **I said that's good. I agreed with that.**
17 Q.   Okay. Okay. At the time that you had
18 this conversation with Nate Hoffert, where he
19 said he was going to go get Cindy out, where was
20 the fire at that point?
21 A.   **It was at Hoot Owl Trail.**
22 Q.   And was moving east?
23 A.   **Yes.**
24 Q.   Okay. Prior to this conversation with
25 Nate Hoffert at the mailboxes, had he given you

Page 34

1  any recommendation or asked you if you had told
2  Cindy to get out of the house? Is there any
3  communication like that before that
4  conversation, that you recall?
5  A.   **I don't recall.**
6  Q.   Okay. Had anybody else suggested to you
7  to tell Cindy to evacuate before you had that
8  conversation with Nate Hoffert?
9  A.   **No.**
10 Q.   Okay. Do you remember anything else
11 about the conversation with Nate Hoffert at the
12 mailboxes?
13 A.   **It was short and brief.**
14 Q.   Okay. And then he left?
15 A.   **Yes.**
16 Q.   And you remained at the mailboxes?
17 A.   **Yes.**
18 Q.   You continued to coordinate?
19 A.   **Yes.**
20 Q.   Okay. I want to just pause for a
21 minute. I should have asked you this at the
22 beginning.
23      You have been through the worst kind of
24 trauma that any person can go through. You have
25 lost your companion, your sweetheart after a

Page 35

1  long and loving marriage.
2      MR. BAILEY: Do you need to take a
3  break, Mr. Ruth, because we can take one if you
4  need to?
5      THE WITNESS: No.
6  Q.   Okay. Since Cindy's death, have you
7  been under the care of any medical
8  professionals, health care professionals?
9  A.   **Yeah.**
10 Q.   Can you tell me a little bit about that?
11 A.   **The night of the fire I met with a**
12 **crisis management team that came to the fire**
13 **hall, and we talked then --**
14     THE WITNESS: Can we close that door,
15 please? Thank you.
16 A.   **And that was a lady. And she was**
17 **brought in to meet me by Larry Dodge, who's also**
18 **a member of the fire department.**
19     **And we spoke for a while, and she**
20 **exchanged her phone number and her name and told**
21 **me to give her a call if I needed to talk to her**
22 **further, and I did later the next day or two.**
23     **Then shortly after the fire, I don't**
24 **remember which day, I went and saw my personal**
25 **physician.**

Page 36

1  Q.   Okay.
2  A.   **And I told her, you know, what I had**
3  **been through, and she checked me for smoke**
4  **inhalation and other things, and she prescribed**
5  **some -- a medicine, Valium, to help me sleep.**
6  Q.   Okay. Have you taken any other
7  medications to help you with the trauma that
8  you've been through, besides Valium?
9  A.   **I was on antidepressants for a while.**
10 Q.   Okay. Do you remember what they were?
11 It's not a huge thing if you don't. I am just
12 curious.
13 A.   **I don't recall.**
14 Q.   Okay. And those were prescribed by your
15 doctor?
16 A.   **Yes.**
17 Q.   Same doctor?
18 A.   **Yes.**
19 Q.   What's her name?
20 A.   **Adelle [sic] Bowlby.**
21 Q.   B-O-L-B-Y [sic]?
22 A.   **Yes.**
23 Q.   And where is she located?
24 A.   **Billings Clinic in Cody.**
25 Q.   Okay. In addition to Dr. Bowlby and

**Page 41**

1  A.  Okay.
2  Q.  Okay. Your phone number at the time was
3  (307) 254-2922; is that correct?
4  A.  Yes.
5  Q.  And your wife's phone number was (307)
6  254-2931; is that correct?
7  A.  Yes.
8  Q.  And I'm definitely not an expert in
9  interpreting these things, but I'm going to ask
10 you a couple of questions about a couple of
11 entries on this statement to see what you
12 remember.
13       We look at the fourth line down,
14 November 15 at 11:54 p.m., it appears that you
15 placed a call to your wife.
16      Do you see that?
17 A.  Yes.
18 Q.  Do you remember that call?
19 A.  I don't remember making a call at that
20 particular time, okay?
21 Q.  Okay.
22 A.  I do remember making calls on that day
23 in that timeframe, okay?
24 Q.  Okay. Let's turn to page 000083.
25      MR. BAILEY: Keep your finger there in

**Page 42**

1  that one, but just go ahead and turn to --
2  you're going to, yeah, 83 just a few more pages.
3  Q.  And you're going to -- you're going to
4  see this is Cindy's phone, 254-2931.
5       At the bottom of this page, third from
6  the bottom, you're going to see a phone call
7  that appears she made to you at 11:53 p.m. that
8  evening. And it says two minutes, but I don't
9  know what that means. I think it means that it
10 was a phone call that lasted between one and
11 two minutes.
12      But do you remember receiving a phone
13 call from Cindy in that timeframe that evening?
14 A.  No.
15 Q.  Okay. At some point you listened to a
16 voicemail from Cindy that she left you that
17 evening, correct?
18 A.  Yes.
19 Q.  It's my understanding that there was
20 only one voicemail you received from Cindy that
21 evening; is that correct?
22 A.  To the best of my knowledge.
23 Q.  Okay. Were you -- did you have any text
24 exchanges with Cindy that evening that you
25 remember?

**Page 43**

1  A.  No.
2  Q.  Okay. Are you a texter?
3  A.  When it's appropriate.
4  Q.  Okay. I'm not a big texter, but, you
5  know, I think that's a younger generation kind
6  of thing. Is that the same with you?
7  A.  Is that a yes or no?
8  Q.  Yeah. However you want to explain it?
9  A.  I text when it's just going to be a
10 quick one-answer thing. I prefer a voice
11 contact over texting. It's more efficient and
12 you get more information that way.
13      Is that sufficient?
14 Q.  Thank you.
15 A.  Okay.
16 Q.  Was there any other means of
17 communication that you had with Cindy that
18 evening other than by cell phone?
19 A.  You're talking about after I left the
20 house?
21 Q.  After you left the house, yeah?
22 A.  No.
23 Q.  Okay. And what I meant by that, I mean,
24 was there any -- did she have a shortwave radio
25 or a handheld radio or anything like that?

**Page 44**

1  A.  No.
2  Q.  Okay. So there's a call that she placed
3  to you, and then according to your record, you
4  placed a call to her at 11:54.
5       You're not sure if that's the precise
6  time, but you do recall making a phone call to
7  her on your cell phone that evening?
8  A.  Yes.
9  Q.  When was that call made in relationship
10 to the conversation you had with Nate Hoffert at
11 the mailboxes?
12 A.  Before.
13 Q.  Okay. And what did -- tell me about
14 that conversation.
15 A.  It was very short and to the point. I
16 told her that I -- and I -- excuse my language
17 at this point -- I told her to get the fuck out.
18 Q.  Okay.
19 A.  And I don't use that word ever. And,
20 you know, I wanted to drive a point home to her
21 that she needed to leave immediately.
22 Q.  Okay. Was there some hesitation on her
23 part to leaving?
24 A.  No.
25 Q.  Okay.

Page 45

1  A.  **Not that I picked up on.**
2  Q.  Okay. And you hadn't had any other
3  conversation with her before that?
4  A.  **No.**
5  Q.  Okay. Other than the one at home?
6  A.  **Correct.**
7  Q.  Okay. Did you give her any instructions
8  about where to go when she left the home?
9  A.  **No.**
10 Q.  To come to the staging area or anything
11 like that, just get out?
12 A.  **Just get out.**
13 Q.  Okay. When you had that conversation
14 with her, where was the fire as far as you can
15 recall?
16 A.  **It was on Hoot Owl Trail.**
17 Q.  Okay. And Hoot Owl Trail moving east?
18 A.  **Yes.**
19 Q.  Along Line Creek?
20 A.  **Yes.**
21 Q.  Okay. Then if we -- if we look back --
22 stay on page 78, Mr. Ruth. We have a number
23 of -- there are a number of calls that you
24 placed to Cindy beginning at 11:54.
25     MR. BAILEY: If you go down two more

Page 46

1  lines, you'll see a 12:00 a.m. There's another
2  call to Cindy's phone.
3      Do you see that?
4  A.  **Yes.**
5  Q.  Okay. And then you see one at 12:02?
6  A.  **Yes.**
7  Q.  And then you go down a little ways, you
8  see one at 1:25?
9  A.  **Yes.**
10 Q.  1:33, right?
11 A.  **Yes.**
12 Q.  And then 1:43?
13 A.  **Yes.**
14 Q.  But you only spoke with her one time
15 that evening?
16 A.  **Yes.**
17 Q.  These other -- do you recall making
18 repeated phone calls to her phone?
19 A.  **Yeah, I blew it up.**
20 Q.  Okay. Trying to reach her?
21 A.  **Yes.**
22 Q.  Okay. Is it your memory that the only
23 time you spoke with Cindy that evening after you
24 left the home was the first time you tried to
25 call her?

Page 47

1  A.  **Yes.**
2  Q.  Okay. All right.
3      MR. SANDEFER: If we're at a breaking
4  point, we've been going about an hour, I might
5  take a little break.
6      MR. BAILEY: Absolutely. Absolutely.
7  Yeah.
8      (A recess was taken from 9:34 a.m. until
9  9:49 a.m.)
10     (Exhibit 112 was marked for
11 identification.)
12 BY MR. BAILEY:
13 Q.  Mr. Ruth, I'm handing you what's been
14 marked Exhibit 112. And I gave you a copy. And
15 this is not a document that you had anything to
16 do with preparing, I realize that.
17     This is the Park County Sheriff's Office
18 narrative of the Clark fire. And I just want to
19 clarify a couple of things.
20     MR. BAILEY: If you'll turn to the
21 second page of that document, Mr. Ruth, and we
22 go down to the line that begins: "On Tuesday
23 November 16, 2021, at approximately
24 0-1600 hours, he received a voicemail."
25     First of all, let me ask you this: Do

Page 48

1  you remember speaking with a deputy from the
2  Park County Sheriff's Office the day after the
3  fire?
4  A.  **On the 16th?**
5  Q.  Well, at any time after the fire, do you
6  remember speaking with a deputy from the Park
7  County sheriff's department?
8  A.  **Yes.**
9  Q.  Okay. And was his name Phil Johnson?
10 Does that sound familiar, or do you know?
11 A.  **I don't know.**
12 Q.  Okay. Do you recall where the
13 conversation took place?
14 A.  **I remember a conversation that took**
15 **place at the mailboxes.**
16 Q.  On the day after the fire?
17 A.  **On the 16th.**
18 Q.  Okay. With a sheriff's deputy?
19 A.  **Yes.**
20 Q.  Okay. Do you recall telling him on that
21 date that it was approximately 0-1600 hours that
22 you received a voice mail from your wife?
23 A.  **I don't remember that specific**
24 **conversation.**
25 Q.  Okay. Do you remember anything about

```
                                                  Page 49
1   the conversation?
2   A.   Not that specific conversation that
3   you're talking about.
4   Q.   Okay. Let me ask you this: In his
5   narrative -- and this is the long paragraph on
6   that second page -- he's recounting, I think,
7   what you told him, and he says on that same
8   date, around 0200 hours, he was able to make it
9   back in the area of his residence with the help
10  of other fire personnel. He observed his wife's
11  vehicle in his driveway.
12       Let's just stop there. On the 16th
13  early in the morning, were you able to make it
14  back up your driveway to find your wife's
15  vehicle?
16  A.   Yes.
17  Q.   Okay. Who was with you at that time?
18  A.   A single firefighter.
19  Q.   Do you remember who it was?
20  A.   No.
21  Q.   Okay. What kind of vehicle were you in?
22  A.   We were in a fire vehicle pickup truck.
23  Q.   Pickup truck. And I assume, although I
24  may be wrong about this, that this was after you
25  had the conversation with Nate Hoffert at the
```

```
                                                  Page 50
1   mailboxes, where he said he was going to go get
2   Cindy?
3   A.   Yes.
4   Q.   Okay. Any idea how long after?
5   A.   Can I make some clarifications here?
6   Q.   Yes. Well --
7        MR. SANDEFER: If you need to say
8   something to answer his question in context, go
9   ahead, is my thought.
10       MR. BAILEY: Okay. Go ahead.
11       THE WITNESS: So restate your question,
12  please.
13  BY MR. BAILEY:
14  Q.   This time that you go to your -- with
15  this fire department employee, you go to your
16  wife's vehicle, you find your wife's vehicle.
17  A.   So let's back up just a second.
18  Q.   Sure.
19  A.   I made two trips down there.
20  Q.   Okay.
21  A.   Okay? And this is where I want to
22  clarify some things.
23  Q.   Okay.
24  A.   Okay? I made two trips. One initially
25  to -- right after I saw Nate Hoffert drive down
```

```
                                                  Page 51
1   Crossfire Trail, he did not go to where our
2   driveway was.
3        At that time, I went and made contact
4   with another fireman that I did not know, he was
5   from another fire department. And I said to
6   him, I said, I need to get down to get my wife
7   out. And he agreed to go with me.
8        He drove his truck, I was a passenger.
9   We went to Louis L'Amour Lane, which is on the
10  north side of Line Creek, meaning we had to
11  cross over the bridge on Line Creek, and we
12  turned and went east down the driveway to where
13  we found my wife's car parked, stopped in the
14  middle of the driveway.
15  Q.   Okay.
16  A.   Can I continue?
17  Q.   You can, absolutely, go ahead.
18  A.   Okay. The car was occupied by three
19  dogs. The rear hatch of the Subaru was open.
20  There was a pillow that was on fire inside of
21  the hatch. My wife was not around. But I
22  tossed pillow aside, and we took the dogs. The
23  firemen and I both took all three dogs out of
24  the car, we placed them in the fire truck.
25       At that point we went down the driveway.
```

```
                                                  Page 52
1   I was calling for my wife. I was calling her
2   name.
3   Q.   Can I interrupt you for a second?
4        When you say "we went down the
5   driveway," did you go towards your house? Is
6   that --
7   A.   East on the driveway toward the house.
8   Q.   Okay. Okay. Okay.
9        And you're with the fireman at this
10  time?
11  A.   Yes.
12  Q.   And with the dogs?
13  A.   The dogs are in his truck, secured in
14  his truck.
15  Q.   Okay.
16  A.   We didn't -- we went on foot --
17  Q.   Oh, okay.
18  A.   -- at this point because we couldn't get
19  past the car.
20  Q.   Okay, I follow you. Okay.
21  A.   The terrain was on fire to the south of
22  the driveway --
23  Q.   Okay.
24  A.   -- over to the creek.
25  Q.   Okay.
```

Page 53

1  A.  And there was a bit of fire on the north
2  side of the driveway as well.  So with the dog
3  secured in his truck, we went on foot to the
4  house.
5  Q.  Okay.  Did you walk all the way to the
6  house?
7  A.  Yes.
8  Q.  Okay.  Did you go in the house?
9  A.  Yes.
10  Q.  Okay.  Again, you're searching for your
11  wife?
12  A.  Yes.
13  Q.  Okay.  How -- any idea how long it took
14  for you to walk from the car to your house?
15  A.  I'm going to say it's roughly half a
16  mile.
17  Q.  Okay.
18  A.  So not very long.
19  Q.  Okay.  And then when you got to the
20  house, what did you do?
21  A.  Well, the house was on fire.
22  Q.  Where was the house on fire?
23  A.  The house was on fire on the northwest
24  corner.
25  Q.  By the garage?

Page 54

1  A.  No, this would have been by the -- what
2  we commonly call the front door.
3  Q.  Oh, okay, okay.  What did you do?
4  A.  I grabbed the bucket and threw water on
5  it.  There was -- we have a hot tub, and I
6  flipped the cover over and grabbed the bucket
7  with water and threw water on it --
8  Q.  Okay.
9  A.  -- and put it out.
10  Q.  Okay.  Then what did you do?
11  A.  Entered the house and the house was full
12  of smoke.  We did not locate my wife there.
13  He -- I believe the other fireman checked my
14  shop, which was still a wreck, but on fire at
15  that point.  And we reconnected and walked back
16  to the car and to his truck, and he said, we
17  need to get out of here.
18  Q.  Okay.  So you drove back the way you
19  came in?
20  A.  Yes.
21  Q.  Okay.  And the reason you went with the
22  fireman is after Nate Hoffert told you he was
23  going to get Cindy, he didn't go in the
24  direction to get Cindy?
25  A.  Correct.

Page 55

1  Q.  Did you have any conversations with him
2  about that?  I mean, did you radio him and say,
3  hey, you're going the wrong way or what are you
4  doing or anything like that?
5  A.  He made an inquiry across the radio,
6  asking if Cindy had made it out yet.  And I told
7  him no.  And this is after I saw him driving
8  down Crossfire Trail.  There's -- there was a
9  couple houses right on the corner of Crossfire
10  and Louis L'Amour Lane.
11       And so when he called up and said that
12  he hadn't -- I told him that she hadn't made it
13  out yet, then, yeah, I don't -- there was no
14  other communication between him and me.
15  Q.  How did you know she hadn't made it out
16  yet?
17  A.  Because I was right at the mailboxes
18  where she would have come out.
19  Q.  Okay.  What you meant was she hadn't
20  made it out all the way to that point where you
21  were?
22  A.  Yes.
23  Q.  Okay.  Okay.
24  A.  I hadn't seen her move or the car move
25  or anything.

Page 56

1  Q.  Could you see your house from the
2  mailboxes?
3  A.  Yes.
4  Q.  So just so I have the sequence correct,
5  and correct me if I'm wrong, you had a
6  conversation with Cindy at approximately
7  11:54 that evening if your phone records are
8  accurate, which we have no reason to doubt,
9  where you told her get the F out now, something
10  to that effect?
11  A.  Yes.
12  Q.  After that, Nate Hoffert drives up and
13  tells you he's going to go get her out?
14  A.  Yes.
15  Q.  You see him go a different direction,
16  and he calls you and asks you if Cindy got out
17  yet?
18  A.  Yes.
19  Q.  Did you say anything to him such as, I
20  thought you were going to go get her?
21  A.  No.
22  Q.  Okay.  What kind of a vehicle was he in?
23  A.  A fire vehicle.
24  Q.  I mean, is it a pickup truck?
25  A.  It's an all-wheel drive vehicle.  I -- I

Page 149

1 is it orderly or is it chaotic or what is it?
2 Can you describe it for us?
3    A.    I would start off saying it was a
4 nightmare. And that it was very chaotic. We
5 had at least three fire companies up there and
6 very poor communication between the personnel
7 that were actually out trying to work the fire.
8         And, you know, it appeared to me that
9 there was people standing around that could have
10 been doing things. There was a lack of
11 direction because there was too many
12 misconnections between people that were in
13 charge.
14    Q.    Okay.
15    A.    That's how I would describe it.
16    Q.    I'm going to turn just briefly to Nate
17 Hoffert.
18    A.    Yes.
19    Q.    Do you remember the line of questioning
20 about the conversation with Nate, whether he was
21 going to go down and get Cindy or get Cindy out?
22    A.    Yes.
23    Q.    First of all, are you upset with Nate at
24 all?
25    A.    I'd say I'd have to answer that yes and

Page 150

1 no.
2    Q.    Why?
3    A.    Well, he told me he was going to do
4 something and he did something different.
5    Q.    What did he do different?
6    A.    Well, he told me that he was going to go
7 get Cindy out.
8    Q.    Okay.
9    A.    And he didn't do that.
10    Q.    You said he -- that's what he told you
11 he was going to do.
12         What did he do instead of getting Cindy
13 out, do you know?
14    A.    He went to other neighbors and started
15 getting them out.
16    Q.    Do you know why he would go to another
17 neighbor's house rather than go to get Cindy?
18    A.    Well I believe that he thought that they
19 were in peril, and he didn't know where Cindy
20 was. And, you know, having been in that
21 situation before, you have very limited time to
22 make a decision. And he made a decision to
23 evacuate some other people, other neighbors
24 instead of getting Cindy, and that's something
25 that he's got to answer and not me.

Page 151

1    Q.    There's been some discussion about the
2 wind that night?
3    A.    Yeah.
4    Q.    The wind might have played a part in the
5 broken window on truck 83 that you were driving?
6    A.    I know it did.
7    Q.    Okay. Have there been other times where
8 you've had windows broken because of the wind
9 out there?
10    A.    Yes.
11    Q.    On other occasions?
12    A.    Yes.
13    Q.    Is it a windy place regularly?
14    A.    Yes. Or it can be.
15    Q.    Just briefly, you were asked about
16 counselors you've been to. I just wanted to
17 make sure, did you go to a grief support group
18 as well?
19    A.    Yes.
20    Q.    Can you tell us about the grief support
21 group and what that was about?
22    A.    So the grief support group I'm still
23 active with meets up in Red Lodge once a month.
24 When I started going there, it was once a week,
25 and it was just an open forum. They had a grief

Page 152

1 counselor there that kind of guided people into
2 a direction, but, basically, it was open to
3 anybody that was dealing with grief, and it
4 was -- you were allowed to come in and just talk
5 about whatever it was you were dealing with.
6    Q.    How often does that group meet?
7    A.    Right now once a month.
8    Q.    Has it varied over time how often it
9 met?
10    A.    Yeah. Initially, it started at once a
11 week on Mondays, and then because of seasonal
12 changes and people's needs, it went to once a
13 month.
14    Q.    Okay. And do you find it helpful?
15    A.    Yes, very much so.
16    Q.    Why didn't you just drive truck 83 down
17 to your house?
18    A.    Well, it was -- it would have been
19 unsafe for me to do that.
20    Q.    Why?
21    A.    Because the rear window was broken out.
22    Q.    Why can't you drive it with the rear
23 window broken out?
24    A.    Well, the smoke and the flames would
25 have been sucked right into the cab. And I