# DEPOSITION OF KEVIN OWENS

                                                                        1

1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF WYOMING
2

3    WILLIAM JEROME RUTH, individually,
     and as Wrongful Death Representative
4    of the ESTATE OF CYNTHIA SHOOK RUTH,

5         Plaintiff,

6    V.

7    BEARTOOTH ELECTRIC COOPERATIVE, INC.,
     a Montana Corporation, and ASPLUNDH
8    TREE EXPERT, LLC, a Limited Liability
     Company formed in Pennsylvania,
9
          Defendants.
10

11

12              DEPOSITION OF KEVIN OWENS
                     March 15, 2023
13                     8:00 a.m.

14

15   PURSUANT TO THE UNITED STATES RULES OF FEDERAL
     PROCEDURE, this Deposition was:
16
     TAKEN BY:     Robert Pahlke, Esq.
17                 Attorney for Plaintiff

18   REPORTED BY: Barbara Jean Morgenweck, RPR, CCR
                  NCRA, RPR
19                New Mexico CCR #526

20

21

22

23

24

25

219

1  A. We have got a little latitude on that, but
2  it is primarily lowest bid unless there has been a
3  history of not acceptable work, faulty work.
4  Q. Are there any other folks, other than you
5  and...
6      MR. BAILEY: Eric.
7  BY MR. PAHLKE:
8  Q. -- Eric, who are involved in vegetation
9  management?
10 A. Not from a management responsibility.
11 Q. But if a lineman sees a tree that needs cut
12 down?
13 A. They always report that.
14 Q. The work responsibility and activities
15 personnel for conducting inspections, surveys, have
16 we already told -- you have already told me what you
17 know about that?
18 A. Yes.
19     MR. BAILEY: Yes.
20 BY MR. PAHLKE:
21 Q. Do you have any written policies or
22 guidelines or trimming materials concerning signs,
23 conditions, measurements, or symptoms of vegetation
24 that needs to be trimmed to be removed from the
25 right-of-way?

220

1  A. No.
2  Q. Have you -- what documents did you look at
3  to answer these questions I just been asking you
4  about vegetation management, if any?
5  A. I can't say that I referenced anything,
6  other than my basic knowledge. I was held a
7  position with Puget Sound Energy as manager of
8  operations in the corporate offices. Part of that
9  organization right next to me was the manager of
10 vegetation management for Puget who was a real
11 leader in the industry, and just through sitting
12 next to somebody, office to office, and knowing what
13 he was going through and what he was promoting, I
14 learned a lot just working side-by-side with one of
15 the industry's specialists.
16 Q. Let's move on to the next topic which is
17 Knowledge of any utility activities in the general
18 area of origin. Talking, again, about the tree that
19 was the source of the fire, origin of the fire in
20 the case of November 15, 2021.
21     Tell me what you know about your own or
22 Asplundh's utility activities in that area on
23 November 15th.
24 A. None.
25 Q. What about before November 15th of 2021?

221

1  A. I think Asplundh's work -- Eric and I just
2  had a conversation about this the other day trying
3  to pin down when they were active and when we
4  brought them in there. I think it was in the
5  previous August, September. This was November so I
6  think Asplundh was doing Line Creek in that August,
7  September timeframe.
8  Q. You know how many days Asplundh put in doing
9  Line Creek work?
10 A. No. It wasn't that specific. It was just
11 that was the only project that were working in
12 Wyoming so it wasn't broken out to the nth detail as
13 far as working on this lateral, working on this
14 lateral, this circuit. It was their only job was
15 Line Creek so I think we looked at their time slips
16 and that is as close as we could get.
17 Q. It didn't tell you where they were working,
18 did it?
19 A. Not specifically, no. It was working
20 Wyoming Line Creek.
21 Q. How many days were they working in the Line
22 Creek area?
23 A. I don't know the number off the top of my
24 head, but it is on the time sheet.
25 Q. Do you remember if it was more than three

222

1  days?
2  A. I presume it was many, much more than three
3  days, yes.
4  Q. Any other knowledge you have or oral written
5  communications about the activities of your company
6  or Asplundh concerning the Line Creek area and
7  specifically what we are calling the subject tree
8  which is the one where the fire started?
9  A. I don't believe we have had anymore contact
10 with Asplundh, other than meeting on site and doing
11 existing work.
12 Q. Topic 6, evidence associated with origin and
13 cause of the Clark fire. You shared some
14 information. Do you have any other information to
15 share that you haven't already shared?
16 A. Regarding the origin?
17 Q. Yes.
18 A. No. Just that I have got a different
19 perspective as going through the process in the
20 investigation process.
21 Q. Have you shared that with us?
22 A. No, I haven't.
23 Q. Do you want to share it with us?
24 A. I believe that it is reasonable to suspect
25 that that contacting of that limb with that

231

1   hadn't been on the rest of -- the limb that broke
2   off or was fried off, had that been on there, that
3   would have been actually over the power line?
4         MR. BONA: Calls for speculation, lacks
5   foundation, misstates prior testimony.
6         THE WITNESS: I don't know.
7         MR. BONA: Asked and answered.
8         THE WITNESS: I don't think I have stated
9   anything or had any knowledge about how long that
10  limb was.
11  BY MR. PAHLKE:
12    Q.  Would you agree since we know that limb or
13  the tree was the origin of the fire that if
14  Beartooth had cut off that limb, that limb could not
15  have caused this fire?
16        MR. BONA: Calls for speculation lacks
17  foundation, misstates prior testimony, calls for
18  expert opinion.
19        THE WITNESS: I don't believe I could agree
20  with that because with the duration and the wind
21  speeds that were involved there, it was out of the
22  realm of anything that anybody had experienced. The
23  next thing that might have happened with that pole
24  would have broke off. That occurs as well.
25

232

1   BY MR. PAHLKE:
2     Q.  But the pole didn't break off?
3     A.  No, but --
4     Q.  So let's assume --
5     A.  -- I am not going to speculate.
6     Q.  We have already established through you that
7   the limb was the source of the fire?
8     A.  I think that is a reasonable conclusion.
9     Q.  Had the limb -- that limb been removed and
10  others around it if they needed to be removed, that
11  area would not have been a source of the fire; do
12  you agree?
13        MR. BONA: Calls for speculation, incomplete
14  hypothetical.
15        MR. BAILEY: Same objection, go ahead.
16        THE WITNESS: I -- just on the facts that we
17  know right now.
18  BY MR. PAHLKE:
19    Q.  Yes?
20    A.  It would not have contacted.
21    Q.  And I have never been in the position of
22  Cindy Ruth. I have never been in winds that you
23  describe as high as 140 miles-an-hour, maybe more,
24  maybe it is less than that. Maybe it is a hundred
25  miles-an-hour, in blow sand with a fire that is

233

1   rapidly advancing with flames 25 to 30 feet high.
2   Have you been in that situation?
3     A.  No, sir.
4     Q.  Have you heard or learned that other
5   witnesses who have been there were rescuing people
6   talk about how people were panicked?
7     A.  Yes.
8     Q.  And if you're panicked and you have blow
9   sand coming at you, blowing by wind, a hundred
10  miles-an-hour or more and you have a rapidly
11  advancing fire, would you reasonably expect that
12  even the most robust of us might panic?
13        MR. BAILEY: Object, argumentative,
14  speculative. Go ahead.
15        THE WITNESS: I can't speculate on what went
16  through people's heads at that time.
17  BY MR. PAHLKE:
18    Q.  I am asking about you.
19    A.  When we were discussing that, I gave you the
20  realm of a whole -- you know, you look back at it,
21  at the numerous decisions that were made. I didn't
22  focus on that decision that Cindy made. That is
23  just one of them. There was a lot of things that
24  could have changed that morning or that night.
25    Q.  Are you aware of neighbors just across the

234

1   creek who barely made it out?
2     A.  No.
3     Q.  Are you aware of other people who were
4   panicked, terrified?
5     A.  No, but based on the pictures that I have
6   seen, the videos that I have seen, I have described
7   it or categorized it as a blow torch which is a
8   pretty good representation. I doubt anybody had
9   experienced something like that.
10    Q.  The blow torch you're talking about covered
11  300, 350 acres?
12        MR. BAILEY: If you know.
13        THE WITNESS: I don't know specifically.
14  BY MR. PAHLKE:
15    Q.  You are aware that that is the approximate
16  amount of land that was burned?
17    A.  I possibly have heard something in that
18  neighborhood.
19    Q.  Are you critical of anyone else in terms of
20  what they did or didn't do in connection with this
21  case, in connection with this fire and Cindy Ruth's
22  death?
23    A.  The only thing that has been relayed to me
24  and it has only been on a couple different occasions
25  is that people had made mention that this was just a

235

1  terrible, terrible tragedy, that it is hard to place
2  blame on anyone under the condition of such extreme
3  wind and fire, event like that. They just felt it
4  was a terrible, terrible tragedy to Larry and the
5  community.
6  Q.  To Larry?
7  A.  Suffering the loss of Cindy.
8  Q.  You mean Jerry?
9  A.  Jerry, yes. I am sorry.
10 Q.  Are you blaming -- I need to know, are you
11 blaming Cindy?
12 A.  No, I am not speculating on any of that. It
13 is just, as I relayed originally, it is a terrible
14 event that a lot of things happened in a very short
15 amount of time.
16 Q.  Are you critical of Cindy?
17 A.  No.
18 Q.  Are you critical of Jerry?
19 A.  No.
20 Q.  Are you critical of the fire department?
21 A.  No, I have nothing to be critical of them
22 of. It was a terrible event. It was a tragic
23 event. You wouldn't want to see anybody go through
24 or that community go through.
25 Q.  You do agree that if a tree trimming company

236

1  had done its job properly, it could have cut that
2  limb back?
3       MR. BONA:  Asked, answered, calls for
4  speculation, incomplete hypothetical, calls for
5  expert opinion.
6       MR. BAILEY:  Right. Could I get that
7  question read back?
8       (The last question was read by the court
9  reporter.)
10      THE WITNESS:  Yes, I believe that.
11 BY MR. PAHLKE:
12 Q.  The next topic I have for you is, I believe,
13 No. 7, scope of the contract you have had with
14 Asplundh?
15 A.  Yes.
16 Q.  Is there any additional information that you
17 haven't given us concerning the contract and the
18 performance of the contract you want to call to our
19 attention?
20 A.  No.
21 Q.  Other than Exhibit 65, the large poster, are
22 there any quality control standards, safety
23 standards, safety rules, safety practices that apply
24 to either, first of all, to bear...
25      MR. BAILEY:  Beartooth.

237

1  BY MR. PAHLKE:
2  Q.  That we haven't talked about?
3       MR. BONA:  Misrepresents the exhibit and the
4  purpose of the exhibit but go ahead.
5  A.  They're bound by the same safety rules as
6  our lineman are as far as proximity to live
7  conductors and safety procedures.
8  Q.  Are you talking about Asplundh?
9  A.  Yes and any tree trimmer.
10 Q.  Any utility company?
11 A.  Yes.
12 Q.  Any other standards, rules, safety rules,
13 safety practices that apply that you know of?
14 A.  They are all bound encapsulated in our
15 safety manual.
16 Q.  Can we take a look at Exhibit 3 which is the
17 contract? Do you have Exhibit 3 in front of you?
18 A.  Yes, I do.
19 Q.  Is that the right-of-way clearing contract
20 you had with Asplundh that commenced on May 26th of
21 2011 or 2011 -- let me start over. Is this the
22 contract for right-of-way clearing that Beartooth
23 had with Asplundh that is dated May 26th of 2021?
24 A.  The date I signed that was on June 30th of
25 2021, yes.

238

1  Q.  The front page says, "May 26th."
2  A.  Oh. Yes, okay. Reference there.
3  Q.  But you signed it?
4  A.  Yes.
5  Q.  And they accepted the contracts?
6  A.  They did.
7  Q.  And this states that they represent their
8  experience in tree and brush trimming removal of
9  your hazardous energize power lines?
10 A.  Yes.
11 Q.  This states furthermore that the easements
12 must be maintained to reduce accumulation of trash
13 of trees or brush that may interrupt service?
14 A.  That is correct.
15 Q.  The contract will furnish all the labor,
16 materials, equipment, tools, services necessary to
17 perform and complete the work?
18 A.  Correct.
19 Q.  In paragraph 4, to commence the work within
20 ten days following the initiation of the contract
21 unless a different date was agreed on?
22 A.  Correct.
23 Q.  And then on Page 2, it talks about tree
24 limbing. States that: Trees which originate
25 outside of the right-of-way easement, but have

247

1   A.   Not very many.
2   Q.   But you don't know?
3   A.   No, I don't.
4   Q.   But you know it does happen a few to a
5   number of times per year?
6   A.   We have got a couple areas of our system
7   that experience high winds.
8   Q.   This is one of them?
9   A.   Yes.
10  Q.   It has done so for years?
11  A.   I would say more pronounced in recent years
12  than in the past. There is an element of climate
13  change that has taken place in that valley and the
14  Beartooths.
15  Q.   So No. 2, I asked you this before. I think
16  you already answered it, but do you in any way
17  criticize or blame Cindy Ruth for her death?
18  A.   No, not at all.
19  Q.   Do you in any way blame the Clark Fire
20  Department?
21  A.   No. I am not passing judgment on any of
22  those people.
23  Q.   Do you -- in this it says, if the Clark fire
24  was caused by a tree coming into contact with your
25  line and if a pre tree was not properly trimmed by

248

1   Asplundh, Defendant Asplundh bears sole
2   responsibility for any and all damages resulting
3   from its negligence? Do you agree with that?
4        MR. BAILEY: Object to the extent it calls
5   for a legal conclusion.
6        THE WITNESS: That is exactly out of my pay
7   grade.
8   BY MR. PAHLKE:
9   Q.   I assume that your attorney was authorized
10  to make that claim on your behalf?
11  A.   Yes. It was the same one I was going to
12  offer but sounded more official from Hank.
13  Q.   Do you know anything about the 2007 Line
14  Creek fire?
15  A.   Only by reference.
16  Q.   What have you done to learn about that?
17       MR. BAILEY: I don't want to be critical of
18  you. You're a friend, but if we're going to get to
19  Mr. Elton, do we have to go through the 2007 Line
20  Creek fire? He wasn't there then.
21       MR. PAHLKE: I know but he had a duty.
22       MR. BAILEY: I am trying to get Mr. Elton
23  done today.
24       THE WITNESS: There is nothing in our files
25  on the 2007 fire.

249

1   BY MR. PAHLKE:
2   Q.   No. 12, do you know anything about other
3   fires ignited on November 15th or 16th in 2021 in
4   the area?
5   A.   Not in the Clark area, Wyoming area. I
6   believe there was another one over in the Roscoe
7   area.
8   Q.   No. 13, is we searched for documents
9   concerning identity of witnesses, witness
10  statements. Are there any witness statement you
11  haven't shared?
12  A.   No, I haven't taken any statements.
13  Q.   Has your company taken any statements?
14  A.   No.
15  Q.   Have you provided all the reports from your
16  experts if you know?
17  A.   Yes.
18  Q.   Do you have any memos, notes, measurements,
19  diagrams, sketches, photographs that you haven't
20  produced?
21  A.   No.
22  Q.   Same question with text messages, videos,
23  phone, voice mails, phone records that was
24  considered in the investigation of the Clark fire?
25  A.   I did queries on all of that. Didn't come

250

1   up with much. I didn't think there was going to be
2   much.
3   Q.   Give me about a minute with Ken.
4        (A recess was taken from 3:48 p.m. until
5   3:58 p.m.)
6             EXAMINATION
7   BY MR. BONA:
8   Q.   Mr. Owens, we have been off the record. My
9   name is David Bona. I represent Asplundh in this
10  litigation. One of the disadvantages of going
11  second is I have to jump around a lot. I am going
12  to be moving and asking questions about a variety of
13  topics that have been covered, some of them several
14  hours ago, some of them more recently.
15       So if I get started on a question and
16  something is unclear to you, just let me know. I
17  will rephrase the question; is that fair?
18  A.   I will try to be as nimble as possible.
19  Q.   Okay. Did you or to your knowledge anyone
20  at Beartooth ever give Asplundh a copy of your
21  safety manual?
22  A.   That would be a question for Eric, and I
23  don't know. If they needed it, we would have made
24  it available to them.
25  Q.   Do you know why they would need it?