# DEPOSITION OF KEVIN OWENS

1

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF WYOMING
2

3   WILLIAM JEROME RUTH, individually,
    and as Wrongful Death Representative
4   of the ESTATE OF CYNTHIA SHOOK RUTH,

5        Plaintiff,

6   V.

7   BEARTOOTH ELECTRIC COOPERATIVE, INC.,
    a Montana Corporation, and ASPLUNDH
8   TREE EXPERT, LLC, a Limited Liability
    Company formed in Pennsylvania,

9        Defendants.

10

11

12              DEPOSITION OF KEVIN OWENS
                    March 15, 2023
13                    8:00 a.m.

14

15  PURSUANT TO THE UNITED STATES RULES OF FEDERAL
    PROCEDURE, this Deposition was:
16
    TAKEN BY:      Robert Pahlke, Esq.
17                 Attorney for Plaintiff

18  REPORTED BY:  Barbara Jean Morgenweck, RPR, CCR
                   NCRA, RPR
19                 New Mexico CCR #526

20

21

22

23

24

25

11

```
1      Beartooth regard those as customers or members?
2      A.   Members.
3      Q.   And does that make a difference in terms of
4   how the members are treated as opposed to being a
5   customer?
6      A.   In both regards it is part of the
7   cooperative business model, that it operates as a
8   cooperative.  That any cooperatives that is formed
9   on is that your members or the owners of the
10  utility.
11     Q.   And ultimately, you answer to the members?
12     A.   I answer to the board of directors.
13     Q.   Who answers to the members?
14     A.   Yes, they are elected by the members.
15     Q.   We talked about the code of conduct.  Do you
16  understand that the code of conduct requires people
17  to take responsibility for their actions and
18  inactions?
19     A.   Yes.
20     Q.   And are you prepared to do that here today?
21     A.   Absolutely.
22     Q.   And in terms of responsibility, have you
23  ever as it relates to this particular case, a case
24  involving Mrs. Ruth?
25     A.   Excuse me?
```

12

```
1          MR. PAHLKE:  Can you read it back.
2          (The last question was read by the court
3   reporter.)
4   BY MR. PAHLKE:
5      Q.   Has the Beartooth ever accepted any
6   responsibility?
7      A.   For?
8          MR. BAILEY:  Object to the form of the
9   question.
10         Go ahead.
11  BY MR. PAHLKE:
12     Q.   For what happened to Mrs. Ruth?
13     A.   No.
14     Q.   You understand that is why we are here
15  today, to talk about that?
16     A.   I understand that.
17     Q.   And are you prepared to do that?
18     A.   Yes.
19     Q.   So I'd like to talk to you about a
20  PowerPoint presentation.
21     A.   Uh-huh.  Yes.
22     Q.   And you created a PowerPoint presentation?
23     A.   Yes.
24     Q.   And you showed it to various people?
25     A.   Correct.
```

13

```
1      Q.   You showed it to Nate Hoffert, a part of it?
2      A.   Yes.
3      Q.   You showed it -- you showed part of it to
4   Jerry Ruth?
5      A.   He was in attendance, correct.
6      Q.   And then you later shared it to a group of
7   members in Clark, Wyoming, on January 17, 2022?
8      A.   That is correct.
9      Q.   Where is that PowerPoint?
10     A.   Resides on my computer and our central file.
11     Q.   Do you have any idea why that hasn't been
12  produced?
13     A.   No, I don't.
14     Q.   Is that something you have with you today?
15     A.   No, I don't.
16     Q.   Is that something you have access to today?
17     A.   I could make some calls back to the office
18  and ask somebody to get into my computer to do that.
19         MR. PAHLKE:  Can you do that today?
20         MR. BAILEY:  Sure.  What was the purpose --
21  do you want him to do that now, make the call now?
22         MR. PAHLKE:  Let's do that at a break.
23         MR. BAILEY:  Okay.
24         MR. PAHLKE:  We will try to take a break
25  every hour, more or less, on the hour.  Although, we
```

14

```
1   have totally violated that by at least an hour for
2   the last two days.
3   BY MR. PAHLKE:
4      Q.   So let's talk about the PowerPoint.
5      A.   Sure.  Yes.
6      Q.   You personally created the PowerPoint?
7      A.   Yes.
8      Q.   You had a purpose in creating it?
9      A.   Yes, I did.
10     Q.   And your purpose was what?
11     A.   I felt a strong obligation back to the
12  members who were affected by the fire to -- out of
13  courtesy, more than anything else, that we had
14  concluded the initial part of the investigation.
15  And it was, more or less, a summary of what we knew
16  at the time.
17     Q.   For the record, do you in any way share,
18  perform, hold yourself out to be a wildlife -- or a
19  cause of origin expert for determining the cause of
20  a fire such as the one that took Mrs. Ruth's life?
21     A.   No, I don't.
22     Q.   Have you ever done so?
23     A.   No, I haven't.
24     Q.   In your meeting with Nate Hoffert and
25  Mr. Ruth, were you trying to convey any particular
```

5  (Pages 11 to 14)

15

1   message to them?
2       A.   No, it was more out of courtesy to meet with
3   them prior to the community meeting that night, so
4   they weren't blindsided by anything that was going
5   to be said or presented.
6       Q.   And in that meeting, did you and Mr. Hoffert
7   have discussions about what happened?
8       A.   Yes.
9       Q.   And in that meeting, did you share with him
10  the findings of your first engineer?
11      A.   Yes.
12      Q.   And who was the first engineer?
13      A.   Eric Black.
14      Q.   Who was the engineer -- or who was the cause
15  of origin guy -- or origin and cause guy before that
16  was hired by Beartooth?
17      A.   Nobody was ever hired by Beartooth.
18      Q.   Who hired Eric Black?
19      A.   Federated Insurance through their attorney.
20      Q.   And who's IRIS?
21      A.   I've red --
22           MR. BAILEY:  I didn't hear.
23           MR. PAHLKE:  IRIS.
24           MR. BAILEY:  IRIS.
25           MR. PAHLKE:  I-R-I-S.

16

1            MR. BAILEY:  Yeah.
2            THE WITNESS:  I have just recently here in
3   the last couple weeks seen a report from IRIS that
4   was, I believe, just in reading the investigation
5   report from State Farm, I think engaged the services
6   of a firm named IRIS.  That is the first I had heard
7   of it.
8   BY MR. PAHLKE:
9       Q.   As general manager you were not presented
10  with that report?
11      A.   Nope.
12      Q.   Have claims by the homeowners been made
13  against Beartooth?  I am talking about the
14  homeowners in the Clark area, who had damage -- fire
15  damage or lost their homes, have those claims been
16  made to Beartooth?
17      A.   No.
18      Q.   Have you had any discussion with any of
19  those homeowners?
20      A.   I have had one particular call that I
21  remember from an individual that indicated he had
22  lost some hay bales and maybe a vehicle.
23      Q.   Who?
24      A.   I can't remember who that person's name was.
25      Q.   And what did you say in response?

17

1       A.   It was an ongoing investigation at that
2   time.  It was very early in the process.
3       Q.   And has State Farm, to your knowledge, been
4   in contact with Beartooth?
5       A.   I have no knowledge of any contact with
6   Beartooth --
7       Q.   Who would --
8       A.   -- from State Farm.
9       Q.   Who would know?
10      A.   Pardon?
11      Q.   Who would know?
12      A.   Excuse me?  What was the question?
13      Q.   Who would, on behalf of Beartooth, know
14  that?
15      A.   Myself.
16      Q.   Okay.  In this PowerPoint presentation that
17  was made on January 17th, to Jerry Ruth and Nate
18  Hoffert --
19      A.   There was another individual there as well
20  from the fire department.
21      Q.   Who?
22      A.   I don't know that individual's name.
23      Q.   Was there someone else there from your
24  group?
25      A.   Yes, Eric Elton came with me that day.

18

1       Q.   And what was Eric Elton's role?
2       A.   He is the superintendent of operations and
3   engineering at Beartooth.
4       Q.   And what is his educational background?
5       A.   Former lineman.
6       Q.   High school and some college?
7       A.   High school.  I am not sure if there was any
8   college involved.
9       Q.   In that meeting on January 17th, that --
10  let's set the scene -- that was in Clark?
11      A.   At the fire hall.
12      Q.   And was it in an office or was it in a
13  conference room?
14      A.   It was more -- it's a small building, so it
15  was kind of their general meeting room.
16      Q.   Table in the middle?
17      A.   It was -- I believe it was more a horseshoe
18  shaped table layout.  And we sat at one end.
19      Q.   And you sat across from whom?
20      A.   Jerry and Nate.
21      Q.   And Eric as well?
22      A.   Off to my left behind me.  And we were kind
23  of in a row, similar to what Hank and I are right
24  now.
25      Q.   And so Jerry and Mr. Hoffert were sitting

6  (Pages 15 to 18)

19

1  across the table, much like Ken and I are sitting
2  across the --
3      A.   No. No, they were sitting on this side of
4  the table. That other individual from the fire hall
5  was sitting across the table an angle, but...
6      Q.   Was that Mark Griffith's?
7      A.   I don't know the person's name.
8      Q.   Were you introduced?
9      A.   Introduced, but I never got his name. It
10  was mumbled.
11      Q.   And you never sought clarification?
12      A.   No.
13      Q.   So I am curious about the anonymous person.
14  Do you remember telling them that an anonymous
15  person contacted Beartooth?
16      A.   Yes, I do.
17      Q.   Did that anonymous person come to you?
18      A.   He came directly in -- his first contact
19  with Beartooth was with our staking engineer, Marty
20  Tomlin, is who he spoke to first. And I was
21  delivered a message that this individual -- Marty
22  came to me and notified me that this individual
23  was -- had some information on the fire and I should
24  give him a call back.
25      Q.   And did you?

20

1      A.   I did.
2      Q.   And did you record that call?
3      A.   No, I did not.
4      Q.   And what is the person's name and phone
5  number?
6      A.   Larry Martin, and his phone number is --
7          (A phone interruption occurred. )
8          (Discussion is held off the record.)
9          (The last question was read by the court
10  reporter.)
11          THE WITNESS: I don't have that. That is in
12  one of the Interrogatories that I provided somewhere
13  along the line. So it is in the file someplace.
14  BY MR. PAHLKE:
15      Q.   Larry Martin is his name?
16      A.   Yes.
17          MR. BAILEY: I can give you that number,
18  Bob, if you -- it is in our initial disclosures
19  if --
20          MR. PAHLKE: You don't have to if it is
21  there.
22  BY MR. PAHLKE:
23      Q.   So where does Mr. Martin live?
24      A.   Down in the Clark area.
25      Q.   Do you know where?

21

1      A.   No, I don't.
2      Q.   Have you ever been to his home?
3      A.   No, I haven't.
4      Q.   Before the fire of November 15th, 2021, at
5  the Hutton property, the camp --
6      A.   Oh, the Hutton?
7      Q.   Hutton, yes. Thank you for correcting me.
8          -- had you ever been there?
9      A.   No, I haven't -- hadn't.
10      Q.   In terms of the geography that Beartooth
11  Electric serves, can you give us the number of
12  square miles that Beartooth serves?
13      A.   I don't have the -- that number off the top
14  of my head. And usually the way I refer to it, that
15  people that inquire is, we serve from Red Point,
16  Montana to Clark, Wyoming. That is over quite a
17  distance.
18      Q.   Ballpark, how far is it to -- you said
19  Red Point?
20      A.   It is probably 80 miles, 80 to -- 80,
21  90 miles. That is just a guess.
22      Q.   North of Red Lodge?
23      A.   Northwest of Red Lodge.
24      Q.   And how far are you from Clark?
25      A.   I would guess 60 miles. It is an hour

22

1  drive.
2      Q.   And that is kind of the north/south
3  dimensions, borders?
4      A.   Yeah.
5      Q.   And east/west, what are the borders?
6      A.   I believe it is Highway 308 that runs
7  through Bridger and Fromberg down the Clark's Fork
8  Valley over -- as far as an eastern boundary.
9  Western boundary, the Stillwater Mountain.
10  North-wise it runs to Rapelje, Montana. Rapelje,
11  R-A-P-E-L-J-E.
12      Q.   And Stillwater County, is that Columbus?
13      A.   That is Columbus.
14      Q.   Is there a reason at this meeting on
15  January 17th, why you told the people in attendance
16  that this person was anonymous?
17      A.   I wasn't -- I didn't feel I was at liberty
18  to reveal their name because I hadn't talked to him
19  about revealing his name. And I didn't want a
20  hundred people calling him at his home address if I
21  had a release from him or some acknowledgement that
22  he wanted his name made public.
23          It is a close-knit community, I didn't want
24  to pit neighbor against neighbor. So that was my
25  concern at the time.

23

```
 1      Q.   Were you concerned that nobody would believe
 2   this guy's story?
 3      A.   I was just stating the facts.
 4      Q.   Were you concerned that nobody would believe
 5   this guy?
 6      A.   I wasn't concerned about that at the time.
 7      Q.   Did he -- tell me what he told you.
 8      A.   He just indicated -- when I called him back
 9   that day, I asked him the nature of the call and why
10   he was calling us and whatever, and find out the
11   nature of why he was calling.  And he -- I believe
12   he presented himself as somebody that had a past in
13   the fire industry.
14           And he was calling because he had had a
15   conversation with his daughter who lived up in the
16   Line Creek area.  So it was, more or less, his
17   daughter making a statement to him, and he felt the
18   obligation at least to call us and state her claims.
19      Q.   Any reason why she didn't state her claims
20   to you?
21      A.   That is her choice.  I have no knowledge why
22   she chose that.
23      Q.   So what exactly did Mr. Martin tell you?
24      A.   That he had spoke with his daughter and she
25   had indicated to him that she had seen people on the
```

24

```
 1   premises up there --
 2      Q.   When?
 3      A.   -- in the area of where the fire started.
 4      Q.   When?
 5      A.   I don't know that.
 6      Q.   Did you ask?
 7      A.   I -- if I would have asked, I would have
 8   remembered.  So it was just in the context of when
 9   the fire started in our conversation.
10           I believe that is what she was relaying to
11   me.  In my mind, that is what I thought she was
12   telling me, that at the time that afternoon of the
13   fire she had seen people up in that proximity.  That
14   is what she relayed to me.
15      Q.   Two things.  One, you're telling me this is
16   the afternoon of the fire?
17      A.   That is what I believed she was telling me.
18      Q.   And so --
19      A.   That was my interpretation of the
20   conversation.
21      Q.   So you're telling me, quote, she is telling
22   you?
23      A.   Uh-huh.  That is correct.
24      Q.   And so now, the daughter, she is talking to
25   you?
```

25

```
 1      A.   That is correct.  Because I asked Larry for
 2   her phone -- her name and her phone number, so I can
 3   talk to her directly.
 4      Q.   Did Larry Martin have any personal knowledge
 5   of what she claimed to have seen?  Did he claim to
 6   have seen the same thing?
 7      A.   No, he did not.
 8      Q.   Did he tell you that he did not see
 9   anything?
10      A.   He didn't represent that at all.  It was
11   all --
12      Q.   Did --
13      A.   It was all coming from a conversation he had
14   with his daughter who lived in the proximity of Line
15   Creek.
16      Q.   And so you called the daughter?
17      A.   I did.
18      Q.   What day?
19      A.   I'd have to go back and look on a calendar,
20   but it was in the week after that as far as the fire
21   was.
22      Q.   Week after what?
23      A.   The fire.  It was within that week, ten days
24   after the fire, relatively soon.
25      Q.   And you took her number down?
```

26

```
 1      A.   I took her number down and I called her.
 2      Q.   And she lives where?
 3      A.   Up at that Line Creek -- I believe she lives
 4   up in that Line Creek development or subdivision.
 5      Q.   Do you know who her neighbors are?
 6      A.   No, I don't.
 7      Q.   Do you know how far she is from the Hutton
 8   property or what is called the camp -- Be There
 9   Ranch camp?
10      A.   No, I don't.  All I was doing was taking
11   down information because I knew I would pass it on
12   to somebody some day further down the line.  She was
13   just a point of information to me at that point.
14      Q.   Did you ask her what she does?
15      A.   No.
16      Q.   Did you ask her -- I guess you -- you said
17   it was in the afternoon that she had this
18   observation, true?
19      A.   I don't remember whether she specifically
20   stated it was the afternoon, the evening or a
21   specific time of day.
22      Q.   I could be wrong, but the record will tell
23   us.  It was my understanding that she was sharing
24   observations of what happened that afternoon?
25      A.   I wouldn't pin it down to that afternoon.  I
```

8  (Pages 23 to 26)

27

1    can't remember specifically what she said whether it
2    was that afternoon, that weekend, earlier in the
3    evening. I don't remember the specifics behind the
4    time of day she observed this.
5        Q.   Do you know whether it was daylight or dark?
6        A.   I don't remember whether she said the
7    afternoon, early evening, the days before that.
8        Q.   Did she drive -- describe the pick-up?
9        A.   Yes, she said it was a black pick-up, and
10   she said that she looked at the taillights and
11   thought they were Chevrolet truck pick-up lights,
12   taillights.
13       Q.   So she is telling you based upon seeing the
14   taillights she thinks it's...
15       A.   A Chevy truck.
16       Q.   Tell me all that you remember from that
17   conversation?
18       A.   That is about it. It was a very short
19   conversation. I took down, you know, the notes,
20   what I recall from it. It was a short conversation,
21   and I was just gathering information at that time.
22       Q.   Tell me about your notes?
23       A.   Just scribbling on them, stick-it pad, as
24   far as her name and number, the specifics about what
25   she said that she claimed she saw somebody up in

28

1    that area.
2        Q.   You still have that note?
3        A.   No.
4        Q.   What did you do with it?
5        A.   Cleaned it off my desk.
6        Q.   You pitched it?
7        A.   Yeah.
8        Q.   Any reason why you didn't save it?
9        A.   No. Never thought to. All it was was a
10   name and phone number.
11       Q.   It was also a story.
12       A.   I didn't write down the story.
13       Q.   Did you dictate anything about the story
14   that she was telling you?
15       A.   Probably in my conversations and what I
16   provided to the attorney.
17       MR. BAILEY: Don't discuss what you and I
18   have talked about.
19       THE WITNESS: Okay.
20   BY MR. PAHLKE:
21       Q.   We are not interested in your conversations
22   with Mr. Bailey. But at any time other than
23   communication with Mr. Bailey after you got this
24   information, did you create a note for your office?
25       A.   No, I didn't.

29

1        Q.   Did you create a note for your insurance
2    company?
3        A.   No, just a name and phone number.
4        Q.   Other than your lawyers, who have you talked
5    to about this conversation with this lady?
6        A.   Just as it was relayed in that presentation
7    that day that we had a call from the community that
8    indicated that there might have been some activity
9    that was or was not related to the fire itself.
10       Q.   Did you give --
11       A.   I mean, I gave it at that presentation in
12   the community hall. I have discussed it with our
13   attorneys, and all I was doing was relaying
14   information at that time.
15       Q.   I am interested in the information relayed?
16       A.   Just what I have discussed with you here is
17   the context of it. That was all that was noted in
18   my notes that I provided.
19       Q.   What do you recall about what your
20   PowerPoint had to say about this young lady?
21       A.   Just that we had received a call about other
22   activity in the area and that is what I presented,
23   just made people aware of it, didn't make a
24   determination one way or the other; but it was just
25   another fact at the time, not knowing whether it had

30

1    any bearing or not. I wasn't making any judgment on
2    that.
3        Q.   When this meeting January 17th took place at
4    the fire hall --
5        A.   Yes.
6        Q.   Just a reminder, we want to have a good
7    record. We don't want to have the court reporter
8    mad at us. I want you to be able to say what you
9    want to say. I am appreciative if you let me finish
10   my question, and the main thing is don't talk over
11   each other.
12       And I would also say that if I ask you a
13   question you don't understand, would you just stop
14   me and ask me to repeat it or rephrase it, so you
15   and I can be on the same wavelength and have
16   accurate communications?
17       A.   Agreed.
18       Q.   Okay. And, obviously, if you need a break,
19   we will take a break unless a question is pending,
20   and then we will take a break after the question,
21   fair enough?
22       A.   Fair enough.
23       Q.   Now, with regard to the conversation or the
24   meeting on January 17th at the fire hall, Mr. Ruth
25   was there and Nate Hoffert was there and Eric was

9  (Pages 27 to 30)

31

1   there and you were there.  Do you remember Mr. Ruth
2   setting a recording device on the table?
3      A.  I don't remember that, no.
4      Q.  Have you seen that recording?
5      A.  Just in the last week.
6      Q.  Have you read the content of the transcript?
7      A.  Yes, I have.
8      Q.  Have you listened to the meeting?
9      A.  No.
10     Q.  I want to talk to you about your jobs.  How
11  many years have you been involved in either rural
12  cooperatives or rural electric cooperatives or other
13  companies that sell electric energy to consumers?
14     A.  With the exception of King County, which was
15  three or four years, be over 40, 42 years, 43 years.
16     Q.  How many of those areas have rural aspects
17  to their consumer base?
18     A.  All of them.
19     Q.  How many of those have trees that grow up
20  around the power lines?
21     A.  All of them.
22     Q.  In all of those jobs that you have had in
23  the last 40 years, did you learn early on in the job
24  if not even before the job that trees growing in the
25  power lines or contacting the power lines can be

32

1   trouble?
2      MR. BONA:  Incomplete hypothetical;
3   overbroad.  You can answer.
4   BY MR. PAHLKE:
5      Q.  Answer, please.
6      A.  That's correct.
7      Q.  The problems that can be had are if the
8   power line is contacted or the power line, itself,
9   contacts a tree, that can cause a very specific
10  problem, true?
11     A.  Yes.
12     Q.  And that specific problem begins with
13  arcing, true?
14     A.  That is not necessarily true, no.
15     Q.  Is that one of the things that is true?
16     A.  Yes.
17     Q.  That's arcing of electricity to the tree?
18     A.  That is correct.
19     Q.  And other problems that can occur?
20     A.  Well, there is certainly the safety aspect
21  of it.  The electricity is going to ground through
22  that tree, and a lot determines as far as the
23  severity of that arc, it can be just burning laying
24  there on a limb without any arcing or anything else,
25  or it can just lay there and smoulder.  It can be --

33

1   carry a much larger arc when it contacts it.  It all
2   depends on the situation where it is at on the
3   system, the conductivity of the tree.  There is a
4   lot of variances that go into that.
5      Q.  One of the variances is the dryness of the
6   tree?
7      A.  Correct.
8      Q.  And in your experience, are trees that are
9   dry more likely to be a problem than trees that have
10  a lot of moisture?
11     MR. BONA:  Overbroad, incomplete
12  hypothetical.
13     THE WITNESS:  I couldn't make a
14  determination on that.  They're going to react
15  differently.
16  BY MR. PAHLKE:
17     Q.  Do you know why?
18     A.  The water can be a great conductor of
19  electricity.
20     Q.  And if there is persistent arcing over a
21  period of days or weeks or years, what happens to
22  that part of the tree?
23     A.  It's going to show a contact mark.
24     Q.  What is witch's brooming?
25     A.  Excuse me?

34

1      MR. BAILEY:  I didn't understand that.
2   BY MR. PAHLKE:
3      Q.  What is witch's brooming?
4      A.  I don't understand the question.
5      Q.  Do you know what witch's brooming is?
6      A.  No, I don't.
7      Q.  In terms of the training that you have been
8   provided over the course of your career to make sure
9   that the power lines are being run in a safe way,
10  has that been by books?
11     A.  It's been through standards codes, written
12  into manuals and standards based on where I was
13  working at the time.
14     Q.  Did it also involve the use of computer
15  software programs?
16     A.  It may have.  I wasn't working with anything
17  related to that.
18     Q.  At Beartooth, do you use computer software
19  programs to train employees about safety as it
20  relates to the interaction of power lines and trees?
21     A.  We participate in a widespread safety
22  program that is operated with all the Montana
23  electric cooperatives, and through those trainings,
24  I'm sure I can't remember specifically, but I would
25  suspect that would be part of that training.

10  (Pages 31 to 34)